## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| ISRAEL DEL TORO, KATHLEEN CLAYTON, LUKE SORENSEN, NATHANAEL SKIVER, JASON REEVES, GARRETT FLICKER, and the COLORADO STATE SHOOTING ASSOCIATION ("CSSA")<br><br>      Plaintiffs,<br><br>v.<br><br>JARED SCHUTZ POLIS, in his official capacity as Governor of the State of Colorado, PHILIP JACOB WEISER, in his official capacity as the Attorney General of the State of Colorado, and MICHAEL J. ALLEN, in his official capacity as the District Attorney for the Fourth Judicial District<br><br>      Defendants. | Civil Action No.<br><br><br><br><br>Complaint |

Plaintiffs Israel Del Toro, Kathleen Clayton, Luke Sorensen, Nathanael Skiver, Jason Reeves, Garrett Flicker, and Colorado State Shooting Association ("CSSA") submit the following complaint.

## I.    INTRODUCTION

This action challenges the constitutionality of Colorado Senate Bill 25-003 (the "Act Concerning the Prohibition of Certain Semiautomatic Firearms and Rapid-Fire Devices" or the "Act") enacted by the Legislature of the State of Colorado and signed into law by Governor Jared Polis on April 10, 2025.[1] The Act consists of 13 sections. Sections 1 through 9 either modify or amend a provision of an existing Colorado Revised Statute or create a new provision within a

---

[1] A copy of Senate Bill 25-003 is attached to this filing as "Exhibit A."

Colorado Revised Statute; Sections 10 and 11 concern appropriations, Section 12 addresses severability; and Section 13 declares that the Act is "necessary for the immediate preservation of the public peace, health, or safety …[and] for the support and maintenance of the departments of the state and state institutions."[2] With the exception of Section 2—which bans the manufacture, distribution, transfer, sale or purchase of most semiautomatic firearms—the provisions of the Act went into effect on April 10, 2025. The provisions of Section 2 of the Act go into effect on August 1, 2026.

With limited exceptions, the Act makes it unlawful for any person to manufacture, distribute, transfer, sell, or purchase a specified semiautomatic firearm unless they have first

---

[2] Sections 1 – 9 of the Act:

- Section 1 modifies Colorado Revised Statute 18-12-101 – *Peace officer affirmative defense – definitions*.

- Section 2 creates a new statute: Colorado Revised Statute 18-12-116 - *Enforcement of large-capacity magazine ban by regulating the manufacture, distribution, transfer, sale, and purchase of specified semiautomatic firearms - penalties - definitions.*

- Section 3 creates a new statute: Colorado Revised Statute 33-9-115 - *Firearms training and safety course record system - rules - legislative declaration - definitions.*

- Section 4 amends and modifies Colorado Revised Statute 18-12-108 - *Possession of weapons by previous offenders.*

- Section 5 amends Colorado Revised Statute 24-33.5-424 - *National instant criminal background check system - state point of contact - fee - grounds for denial of firearm transfer - appeal - rule-making - unlawful acts - instant criminal background check cash fund - creation.*

- Section 6 amends and modifies Colorado revised Statute 18-12-401.5 - *Permit required - issuing agency - cash fund - inspections - penalty - report - rules - repeal.*

- Section 7 creates a new statute: Colorado Revised Statute 24-35-122 - *Specified semiautomatic firearms guidance.*

- Section 8 amends Colorado Revised Statute 18-12-302 - *Large-capacity magazines prohibited - penalties - exceptions.*

- Section 9 amends Colorado Revised Statute 18-12-102 - *Possessing a dangerous or illegal weapon - affirmative defense - definition.*

acquired a "Firearms Safety Course Eligibility Card," and have completed at least one of three forms of firearms safety courses. After completing these safety courses, applicants are then required to pass an instructor-administered exam with a passing score of at least ninety percent. As part of this permit-to-purchase process, the Act also mandates an additional background check to be completed by a third-party vendor, as well as the payment of "processing" and "card" fees.

In addition to the provisions dealing with the acquisition of specified semiautomatic firearms, the Act also prohibits the sale and purchase of all rapid-fire conversion devices, and makes it unlawful for any person to transfer, purchase, sell or possess large-capacity magazines.[3]

Because the Act attempts to govern and regulate arms-bearing conduct, the text of the Second Amendment is implicated, and there is no relevantly similar historical analogue from the time of the Founding that can be used to justify the Act's provisions. Consequently, the Act is violative of the Second Amendment to the United States Constitution, as made applicable to the states by the Fourteenth Amendment.

## II.     PARTIES

1.     Plaintiff Israel Del Toro is an adult resident of Colorado. While serving in the United States Air Force in Afghanistan in 2005, Mr. Del Toro was severely wounded when a Humvee that he was traveling in was struck by an improvised explosive device. Although he was on fire from head to toe after the blast, Mr. Del Toro was able to escape the burning wreckage before collapsing. He suffered burns over 80% of his body, lost one hand and most of the fingers of his other hand, and was given only a 15% chance of survival. He endured five years of numerous surgeries, skin grafts, and brutal physical therapy, and the military ultimately classified him as "100% disabled."  Despite

---

[3] Pursuant to Colorado Revised Statute § 18-12-302(2)(a), a person may possess a large-capacity magazine if they have owned it since July 1, 2013, and have maintained continuous possession of it since that time.

this classification, and unwilling to accept the limitations others tried to impose on him, in 2010 Mr. Del Toro convinced the Department of Defense to do something they had never done before— allow a fully disabled veteran to re-enlist. Mr. Del Toro served nine more years before retiring from the Air Force in 2019 as a Senior Master Sergeant.

2.      Due to his physical restrictions, Mr. Del Toro relies on common firearm accessories like force-reset triggers to enable him to operate a firearm.[4] However, under the provisions of the Act, forced reset triggers, and all other "rapid-fire devices," have now been classified as "dangerous weapons," possession of which is a class 5 felony.[5] Similarly, due to the difficulty that he experiences trying to hold a more traditional-style handgun with only one partially intact hand, Mr. Del Toro has come to rely on the more versatile AR platform semiautomatic pistol with stabilizing brace.[6] However, under the provisions of the Act, AR-platform pistols will become illegal to manufacture, sell, or purchase in Colorado starting August 1, 2026. Accordingly, when Mr. Del Toro wishes to acquire one of these firearms in the future, he will have to submit to the complicated, burdensome, and costly permit-to-purchase scheme established by the Act. The Act provides no accommodations or exceptions to the onerous safety courses and exams for disabled persons. Nor does it take into consideration those individuals who need items like rapid fire devices and pistol stabilizing braces in order to effectively use firearms for self-defense. Mr. Del Toro has the right to defend himself in the way that is most practical given his physical disability, but the Act

---

[4] A force reset trigger is a firearm trigger mechanism that mechanically resets the trigger after a round is fired, eliminating the need for the user to manually release and re-engage the trigger for each shot.

[5] The Act amended Colorado Revised Statute 18-12-102 ("Possessing a dangerous or illegal weapon") to include "rapid-fire devices" under the definition of dangerous weapons.

[6] An AR platform pistol is a semiautomatic handgun built on the AR-15 platform, but classified as a pistol due to the fact that it has a barrel shorter than 16 inches and lacks a rifle-style buttstock. Instead of a stock, it features a short buffer tube and often includes a stabilizing brace, which attaches to the user's arm to provide stability.

effectively forecloses exercise of such right for Mr. Del Toro. For these reasons, Mr. Del Toro's Second Amendment protected right to keep and bear arms has been and will continue to be infringed by the provisions of the Act.

**Figure 1 – Photograph showing extent of injuries to Mr. Del Toro's hands**



3.      Plaintiff Kathleen Clayton is an adult resident of Colorado whose Second Amendment protected rights will also be infringed when the Act goes into full effect in August of 2026. After enduring years of domestic abuse, Ms. Clayton rebuilt her life—healing (physically and mentally) and making a promise to herself that never again would she feel defenseless. As part of that rebuilding, Ms. Clayton started purchasing firearms and acquired a concealed carry permit. Although Ms. Clayton has purchased numerous and varied firearms over the years, her firearm of choice has and will continue to be a Springfield Armory Hellcat semi-automatic pistol. The Hellcat is a micro-compact pistol, making it small and thin for easy concealment, which allows Ms.

Clayton to feel protected no matter where she is, how she is dressed, or what threats she might face. Semi-automatic handguns like the Hellcat provide Ms. Clayton with easier and faster reloading with detachable magazines, reduced recoil which aids in staying on target, and superior ergonomics for better handling and user comfort. In short, such features allow Ms. Clayton to effectively exercise her right of self-defense if that becomes necessary. Ms. Clayton intends to periodically purchase other Hellcats in Colorado in the future, including after August 1, 2026. Carrying a semi-automatic handgun like the Hellcat gives Ms. Clayton the confidence and security that she fought so hard to reclaim after years of domestic violence. Yet under the provisions of the Act, Ms. Clayton will be forced to wait months and battle through layers of red tape just to exercise her constitutionally protected right to keep and bear a firearm for self-defense.

4.    Plaintiff Luke Sorensen is an adult resident of Colorado whose Second Amendment protected rights will also be infringed when the Act goes into full effect in August of 2026. At present, Mr. Sorensen is 19 years old. Because Colorado Revised Statute § 18-12-112 prohibits anyone who is under twenty-one years of age from purchasing a firearm, Mr. Sorensen will not have an opportunity to purchase one of the specified semi-automatic firearms included in the Act until after the semi-automatic firearms provisions go into full effect on August 1, 2026. He fully intends to purchase a firearm after that date, and throughout his life. But by the time that he is twenty-one years of age, the Act's new permit-to-purchase system will be in full force, saddling Mr. Sorensen with delays, additional fees, and a slew of burdensome courses and testing requirements that must be accomplished before he will even have the opportunity to exercise his Second Amendment protected right to acquire and subsequently keep and bear a semiautomatic firearm.

5.      Plaintiff Nathanael Skiver is an adult resident of Colorado whose current role as a firearms instructor requires him to frequently acquire semi-automatic firearms. That requirement will continue even after the provisions of the Act become fully effective in August of 2026. As a firearms instructor, Mr. Skiver is not only familiar with semi-automatic firearms, but extremely well-trained and proficient in their function and use. It is Mr. Skiver's job to train others on how to properly and effectively use semi-automatic firearms. And yet, even with all of his expertise and experience, the Act does not exempt Mr. Skiver from its permit-to-purchase training requirements. He will still have to spend the time and money to be instructed (likely by people less proficient than he is). Moreover, because one of the central purposes of the Act is to delay and restrict the manufacture and sale of semi-automatic firearms, the Act will likely cause the semi-automatic firearm purchase rate to decline in Colorado over the coming years. These declining rates will inevitably reduce the job opportunities and income Mr. Skiver makes as a firearms instructor. For these reasons, once the Act goes into full effect, Mr. Skiver will not only sustain a constitutional injury but a financial one.

6.      Plaintiff Jason Reeves is a veteran and a former law enforcement officer in the United States Air Force who currently possess a Top-Secret security clearance. And yet, he too is not exempted from the Act's permit-to-purchase requirements. Mr. Reeves currently possesses multiple semi-automatic firearms and intends to acquire similar "specified semiautomatic firearms" after the provisions of the Act are fully implemented. In addition, Mr. Reeves owns several rapid-fire devices, including a forced reset trigger, "super safety" trigger systems, and binary triggers; devices which the Act now classifies as "dangerous weapons," possession of which is a class 5 felony. In multiple ways—now and in the future—the provisions of the Act infringe upon Mr. Reeves Second Amendment protected right to keep and bear arms.

7.     Plaintiff Garrett Flicker is a board member of CSSA who has a history of purchasing semi-automatic firearms in Colorado. He is also a gay, Lebanese, Jewish man who has grown increasingly concerned by the alarming rise in hate crimes directed at the communities he is a part of. Mr. Flicker feels the need to continue to arm himself for protection against those who wish him harm due to his sexual orientation, ethnic background, or religious faith. Consequently, Mr. Flicker plans to purchase additional semi-automatic firearms after the provisions of the Act are fully implemented.  But like the other individual plaintiffs, Mr. Flicker will be prevented from doing so unless he follows a series of burdensome and costly bureaucratically imposed steps, including: paying a third party vendor to perform a background check separate from the background check required at the time a firearm is purchased; enrolling in and successfully completing an Extended Firearms Safety Course or some combination of similar courses; and passing with a minimum score of 90% an exam establishing firearm proficiency.[7] Incumbent in each of these steps for Mr. Flicker and the other individual plaintiffs will be additional—currently unspecified—fees and costs. Therefore, the provisions of the Act infringe upon Mr. Flicker's Second Amendment right to keep and bear arms.

8.     Plaintiff CSSA is the official state association of the National Rifle Association (NRA). It is CSSA's mission "to advance, preserve, and exercise the natural right of gun ownership by all Coloradans."[8] CSSA has thousands of members across the State of Colorado. CSSA brings this action on behalf of its members, including Israel Del Toro, Kathleen Clayton, Luke Sorensen,

---

[7] Note that the minimum score required to pass the Colorado POST (Peace Officer Standards and Training) written certification examination is 70%. This means that the Act imposes higher standards on the civilian population than Colorado requires for its law enforcement officer candidates. *See* Colorado Department of Law Criminal Justice Section, POST Manual, Rule 15 – Certification Examination Basic, Provisional, Renewal and Rule 1 – Definitions, subsection "(rr)." https://post.colorado.gov/sites/post/files/documents/January%202023_Manual_RULES.pdf

[8] CSSA website: https://www.cssa.org/content.aspx?page_id=0&club_id=243984

Nathanael Skiver, Jason Reeves, and Garrett Flicker, who have and will be adversely and directly harmed by Defendants' enforcement of the Act challenged herein.

9.    Defendant Jared Polis is the Governor of Colorado, and this action is brought against him in his official capacity. The Colorado Constitution states that the "supreme executive power of the state shall be vested in the governor, who shall take care that the laws be faithfully executed." Colo. Const. Art. IV, § 2. Colorado has long recognized the practice of naming the governor, in his official role as the state's Chief Executive, as the proper Defendant in cases where a party seeks to enjoin state enforcement of statute, regulation, ordinance, or policy. *See Developmental Pathways v. Ritter*, 178 P.3d 524, 529 (Colo. 2008). The Governor, in his official capacity, possesses sufficient authority to enforce (and control the enforcement of) the Act. *Cooke v. Hickenlooper*, 2013 WL 6384218, at *8 (D. Colo. Nov. 27, 2013), *aff'd in part sub nom. Colorado Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537 (10th Cir. 2016).

10.    Defendant Phil Weiser is the Attorney General of the State of Colorado. This action is brought against him in his official capacity, to the extent that relief against the Act must include the Attorney General as a party to this matter. As Attorney General of the State of Colorado, Defendant Weiser is the state's Chief Legal Officer whose duty is to ensure that the laws of the State are uniformly and adequately enforced.

11.    Defendant Michael J. Allen is the District Attorney for the State of Colorado's 4th Judicial Circuit. This action is brought against him in his official capacity. As the elected District Attorney for the 4th Judicial Circuit, he is tasked with prosecuting individuals who commit crimes against the State of Colorado—including violations of the Act—in the counties making up the 4th Judicial Circuit. All of the individual Plaintiffs in this case live in the 4th Judicial Circuit. The District Attorney's future enforcement of the Act across the 4th Judicial Circuit places Plaintiffs under

imminent threat of arrest and prosecution should they violate one or more of the Act's provisions. The District Attorney maintains an office in El Paso County at 105 E. Vermijo Avenue in Colorado Springs, Colorado.

12.     Defendants are enforcing or will enforce the unconstitutional provisions of the Act against Plaintiffs under color of state law, within the meaning of 42 U.S.C. § 1983.

## III.     JURISDICTION AND VENUE

13.     The Court has original jurisdiction of this civil action under 28 U.S.C. § 1331, because the action arises under the Constitution and laws of the United States. The Court also has jurisdiction under 28 U.S.C. § 1343(a)(3) and 42 U.S.C. § 1983 since this action seeks to redress the deprivation, under color of the laws, ordinances, regulations, customs and usages of the State, of rights, privileges or immunities secured by the United States Constitution.

14.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202, respectively, and their claim for attorneys' fees is authorized by 42 U.S.C. § 1988.

15.     Venue in this judicial district is proper under 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

## IV.     LEGAL BACKGROUND

16.     The Second Amendment to the United States Constitution guarantees that "the right of the people to keep and bear arms shall not be infringed." U.S. Const. amend. II; *see also District of Columbia v. Heller*, 554 U.S. 570 (2008); *McDonald v. City of Chicago*, 561 U.S. 742 (2010); and *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022).

17.     In *Heller*, the United States Supreme Court firmly rejected the erroneous notion that the Second Amendment protects only the communal right of a state to maintain an organized militia. 554 U.S. at 580-81. Instead, the Supreme Court affirmed that the Second Amendment protects an

*individual's* natural right to keep and bear arms for self-defense and the defense of others. *Id.* at 592.

18.    In *McDonald*, the Court held that the right to keep and bear arms recognized in the Second Amendment is made applicable to the states by the Fourteenth Amendment. 561 U.S. at 777.

19.    And then in *Bruen*, the Supreme Court put an end to the practice that many lower courts had used when considering the constitutionality of firearms-related regulations—an "interest-balancing test" that elevated the policy preferences of the government over the intent of the Founders. Instead, the Court established a new standard for courts to use: "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct" and "[t]he government must … justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24. The Court went on to explain that "[o]nly if a firearm regulation is consistent with this nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* at 17 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961)).

20.    The Court's decisions in *Heller*, *McDonald*, and *Bruen* clearly establish the principle that if a member of "the people" wishes to "keep" or "bear" an "arm," then the ability to do so "shall not be infringed," and a regulation which restricts that conduct in *any way* is unconstitutional absent historical analogues that demonstrate that the Founders never considered such conduct to be protected in the first place.

21.    Although *Bruen* stands as the operative case law regarding the proper Second Amendment analysis, *Heller* is instructive regarding which arms are covered. The firearms covered by the Second Amendment are "those 'in common use at the time'." *Heller* at 627 (quoting *United States*

*v. Miller*, 307 U.S. 174 (1939)). According to the D.C. Circuit Court of Appeals, "We think it clear enough in the record that semi-automatic rifles and magazines holding more than ten rounds are indeed in 'common use[.]'" *Heller v. District of Columbia ("Heller II")*, 670 F.3d 1244, 1261 (D.C. Cir. 2011).

22.    The individual Plaintiffs in this case desire to obtain and keep possession of "common use" arms for lawful purposes—including self-defense. The Act infringes on the individual Plaintiffs' ability to do so by prohibiting the acquisition and possession of particular firearms and firearm-related equipment, and by imposing a pre-purchase permitting scheme that consists of a complicated and multilayered application process, lengthy wait times, extensive course requirements, and numerous and costly fees.

23.    Plaintiff CSSA represents the interests of all of its members who have been or will be irreparably harmed by the Act's provisions. Included in this membership group are individual Plaintiffs Del Toro, Clayton, Sorensen, Skiver, Reeves and Flicker. Defendants' current and future enforcement of the provisions of the Act harms Plaintiff CSSA's members by denying their exercise of the constitutionally protected right to keep and bear arms.

24.    Because the Act infringes upon the right of law-abiding Coloradans to manufacture, distribute, transfer, sell, purchase or possess arms and firearm-related equipment that is in common use today—conduct that "the Constitution presumptively protects," the plain text of the Second Amendment is implicated. *Bruen*, 597 U.S. at 24 (emphasis added). Plaintiffs have met their burden under *Bruen*, and the Act is presumptively unconstitutional.

25.    Since the Second Amendment presumptively protects Plaintiffs' conduct, the State must justify the provisions of the Act by demonstrating that they are consistent with the Nation's historical tradition of firearm regulation. But, it is impossible for the State to meet this burden,

because there is no historical tradition of firearms being regulated in this manner, either at the time of our Founding and the ratification of the Second Amendment, or during the Reconstruction era and the ratification of the Fourteenth Amendment.

26.    In summary, the plain text of the Second Amendment covers Plaintiffs' conduct. Therefore, the Act is presumptively unconstitutional. The State is unable to rebut this presumption because the Act is not consistent with this Nation's historical tradition of firearm regulation. Therefore, the Act is unconstitutional.

## V.    <u>FACTUAL ALLEGATIONS</u>

**A.    The Challenged Provisions of the Act Cannot Withstand Scrutiny Under *Bruen***

27.    This action challenges, facially and as applied, the constitutionality of the Act's following provisions which amend, modify or add the following Colorado Revised Statutes (collectively, the "Statutes"):

   a.    **Colorado Revised Statutes § 18-12-101**: The Act repeals the term "machine gun conversion device from section (1)(g.2) of this existing statute and adds and defines "rapid-fire device" (1)(g.7) and "semiautomatic firearm" (1)(g.8).

   b.    **Colorado Revised Statutes § 18-12-116**: The Act creates this new statute which, with limited exceptions, criminalizes the manufacture, distribution, transfer, sale or purchase of a specified semi-automatic firearm unless an individual wishing to

obtain one of these firearms fully satisfies a permit-to-purchase scheme in advance of the acquisition.[9] *See* § 18-12-116(3)(e) and (5)(a)-(b).

1)    In order to acquire a specified semi-automatic firearm, an individual must first satisfy one of the following three mandatory "firearms safety" training course options:

    a)    Complete both a Colorado Parks and Wildlife Certified Hunter Education Course *and* a Basic Firearms Safety Course within five years of the desired firearm acquisition;[10] or

    b)    Complete an Extended Firearms Safety Course within five years of the desired firearm acquisition;[11] or

---

[9] The provisions of § 18-12-116(2) do not apply to: (1) the manufacture, transfer, sale, receipt or purchase of a specified semiautomatic firearm by either a law enforcement agency, a peace officer (if authorized to carry a semiautomatic firearm in their official capacity), staff at a detention facility, an armored vehicle business, or an instructor of an accredited gunsmithing course in a state authorized institute of higher education; (2) the manufacture, transfer, sale, receipt or purchase of a specified semiautomatic firearm by members of the Armed Forces of the United States or of the Colorado National Guard in the performance of their official duties; (3) the transfer or receipt of a specified semiautomatic firearm to either a federally licensed firearms dealer for temporary storage or permanent disposal, a gunsmith for the purposes of maintenance, repair, or modification, or a student of an accredited gunsmithing course in a state-authorized institution of higher education for the purposes of educational instruction. *See* § 18-12-116(3)(a)-(d). The exceptions to the provisions of § 18-12-116(2) outlined in § 18-12-116(3)(e) are addressed in detail in the body of this Complaint.

[10] The Basic Firearms Safety Course must provide a minimum of four hours of instruction and be taught in-person with no part of the class conducted via the internet. *See* § 18-12-116(5)(a)(I)-(III). The Certified Hunter Education Course requires a minimum of 10 hours of instruction. *See* Colorado parks and Wildlife website: https://cpw.state.co.us/hunting/education-outreach.

[11] The Extended Firearms Safety Course must provide a minimum of twelve hours of instruction spread out over at least two different days, and be taught in-person with no part of the class conducted via the internet. *See* § 18-12-116(5)(a)(I)-(III).

c)    Complete an Extended Firearms Safety Course more than five years prior to acquisition *and* a Basic Firearms Safety Course within five years of acquisition. *See* § 18-12-116(3)(e)(1)(A)-(C)

2)    To graduate from either the Basic or Extended Firearms Safety Course, the individual must take and achieve a minimum passing score of 90% on a final exam that "tests a student's knowledge of the subjects taught in the course." *See* 18-12-116(5)(a)(V). In addition, they must "demonstrate the ability to safely handle firearms and a mastery of gun safety." *Id.*

**Figure 2 – Training Course Requirements**



3) However, before an individual is allowed to enroll in one or more of these courses, they must first acquire a "Firearms Safety Course Eligibility Card" from their local Sheriff's Office.[12]

   a) The Sheriff will issue a Firearms Safety Course Eligibility Card only after an individual completes the following steps:

   - The individual requesting the Firearms Safety Course Eligibility Card must submit an application to their local Sheriff with their full name and date of birth, further attesting that they are not prohibited from possessing a firearm, and will not violate state firearms laws or unlawfully transfer the specified semiautomatic firearm to another person. *See* § 18-12-116(5)(b)(II).

   - In addition to this application, the individual must submit to the Sheriff a government-issued photo ID, as well as the results of a background check completed by a third-party vendor and paid for by the applicant. *See* § 18-12-116(5)(b)(III)(B).

   b) In addition to the cost for the background check, the applicant must also submit a "Firearms Safety Course Eligibility Card" fee to the Sheriff. Under the provisions of the Act, each Sheriff is allowed to

---

[12] A Firearms Safety Course Eligibility Card is valid for five years after the date of issuance. *See* § 18-12-116(5)(b)(I).

set the fee at an amount which covers both the Sheriff's "processing fee" and the Firearms Training and Safety Course "record fee."

c)     A Sheriff has the discretion to deny an application for a Firearms Safety Eligibility Card if the applicant is determined to be a prohibited person or the Sheriff has a "reasonable belief that documented previous behavior by the applicant makes it likely [they] will present a danger to themselves or others." *See* 18-12-116(5)(b)(VI)(B).

## Figure 3 – Process for Securing Firearms Safety Course Eligibility Card



c.    **Colorado Revised Statutes § 33-9-115(1)-(7)**: The Act adds this new statute which designates the Division of Parks and Wildlife as the governmental entity responsible for developing and operating the system of records upon which the permit-to-purchase scheme established in Colorado Revised Statute § 18-12-116 relies. It further provides that the records system must allow Sheriffs, instructors and federal firearm licensees the ability to reference the records for verifying that those individuals seeking to acquire a specified semiautomatic firearm are in full compliance with the permit-to-purchase requirements.

d.    **Colorado Revised Statute §§ 18-12-108 (7)(jjj), 24-33.5-424(3)(b.3)(XIII)**, and **18-12-401.5(8)(a)(IV)(F)**: The Act amends each of these existing statutes and adds the "unlawful manufacture, distribution, transfer, sale, or purchase of a specified semiautomatic firearm, as described in § 18-12-116 to various criminal statutes that already prohibit particular action with respect to firearms, or act as a penalty for criminal behavior.

e.    **Colorado Revised Statutes § 24-35-122**: The Act adds this new statute which directs the Division within the Colorado Department of Revenue responsible for issuing firearm dealer permits with the task of "provid[ing] guidance and clarification to assist in the implementation of section 18-12-116[;]" specifically, with determining which models of firearms should be classified as "specified semiautomatic firearms." To help with this process, the Colorado Department of Revenue may—but is not required to—seek the assistance of firearms experts "about the specific models of firearms to which section 18-12-116(2) applies."

    f.    **Colorado Revised Statutes § 18-12-302**: The Act amends this existing statute to make possession, transfer or sale of a large-capacity magazine a Class 1 misdemeanor. However, a person may continue to possess a large-capacity magazine as long as they acquired it on or before July 1, 2013, and have maintained continuous possession of it since that time.

    g.    **Colorado Revised Statutes § 18-12-102**: The Act amends this existing statute by removing "machine gun conversion device" from the list of "dangerous weapons" and adding the term "rapid-fire device," possession of which is a class 5 felony. Rapid-fire devices include such items as bump stocks, forced reset triggers, super safeties, set triggers, and binary triggers.

28.    The provisions of the Act—collectively—criminalize the manufacture, distribution, transfer, sale, or purchase of specified semiautomatic firearms _unless_ those seeking to acquire them comply fully with the intentionally burdensome, time-consuming, and costly permit-to-purchase scheme. Moreover, the Act adds a class 1 misdemeanor criminal penalty under § 18-12-302 for possession of "large-capacity magazines" obtained after July 1, 2013, and makes possession of "rapid-fire devices" a class 5 felony offense under § 18-12-102. In short, what the Act does not make a crime to possess, it makes almost impossible to acquire.

29.    The "specified semiautomatic firearms" subject to the Act are currently in common use throughout the nation, and include most, if not all, of the most popular semi-automatic rifles and pistols currently sold in Colorado.

30.    The State attempts to defend these restrictions with the conclusory statement "that this act is necessary for the immediate preservation of the public peace, health, or safety or for appropriations for the support and maintenance of the departments of the state and state

institutions." *See* Section 12 of the Act. But this unsupported attempt at justification for limiting the rights of law-abiding citizens to keep and bear arms carries no weight. The Supreme Court has already disposed of this sort of means-end, public interest balancing inquiries exercised by pre-*Bruen* courts because "[t]he Second Amendment 'is the very product of an interest balancing by the people' and it 'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense." *Bruen*, 597 U.S. 1 at 26 (citing *Heller*, 544 U.S. 570 at 635). In other words, interest balancing by courts is not appropriate in the Second Amendment context because the people's interests are inherently protected by the Constitution. This critical point was recently affirmed in the Tenth Circuit's holding in *Ortega v. Grisham*, -- F.4th --, 2025 WL 2394646 (10th Cir. Aug. 19, 2025). In ordering a preliminary injunction of New Mexico's "cooling-off" waiting period law, the Tenth Circuit found that "the Supreme Court and the Constitution reject the notion that a right should be restricted simply because the government believes its interests, on balance, are more important than the individual's." *Id.* at *5.

31.    Through its many provisions, the Act clearly infringes upon arms-bearing conduct covered by the plain text of the Second Amendment. Because of that, the Defendants must justify the provisions of the Act—as reflected in the statues listed above—by demonstrating that they are consistent with the Nation's historical tradition of firearm regulation. The Defendants will not be able to meet that burden, because there are no such analogous laws from the time of the Founding or even the Reconstruction era.

**B.    The Exceptions to the Permit-to-Purchase Scheme are Arbitrary and Ambiguous and Undermine the Stated Justification for the Act.**

32.    The State has attempted to justify the Act by saying such measures are necessary for "public safety," and yet the Act exempts scores of firearms from its provisions, all but one of which if not exempted by name would have fallen under the newly adopted definition of "specified

semiautomatic firearm." *See* § 18-12-116(1)(d)(I).[13] Moreover, the excepted firearms are not in common use, and some are even capable of firing bullets more lethal than those types of rounds used in the AR15 or AK47.

33.    According to the testimony Representative Jarvis Caldwell offered on the House floor prior to the passage of the Act, the excepted firearms include a "list of forty [firearms] that are supposedly the most popular rifles." *See* Testimony of Rep. Caldwell, CO House 2025 Legislative Day 076, 10:54:00. But, although Representative Calwell owns "a lot of firearms," he could not identify "a single one" on the excepted list which he currently possesses. *Id.* That is likely due to the fact that the list of excepted firearms is filled with models that were common over forty years ago, but not today. In fact, a majority of these firearms have been out of production for decades.[14]

34.    Moreover, some of the rifles listed were originally designed, and actually fielded, for military use in the mid-Twentieth Century. Others are firearms that are chambered in calibers that are extremely uncommon in the United States today.

35.    Almost all of the excepted firearms that are listed are collector's items and would already be exempted under 27 CFR § 478.11 as a curio or relic per § 18-12-116(1)(d)(II)(G).

36.    But it is the inclusion of the firearms that are not collector's items that are telling of the Act's arbitrary scope and undermine the government's "public safety" justification. For example, the inclusion of the Springfield M1A Standard Issue Rifle variant on the excepted list is particularly baffling since it is not only a piston-driven, gas operated semiautomatic rifle, but also because it fires full-sized .308 caliber bullets. A .308 caliber bullet is much more lethal than the

---

[13] The only excepted rifle that would not have fallen under the definition would be the Ruger model 44 because it has a tubular magazine, which is not detachable.

[14] Of the listed semiautomatic firearms, only eight are still in production. Ironically however, most of these "excepted" semiautomatic firearms have the ability to readily accept larger detachable magazines, which seems to undermine one of the central provisions of the Act.

types of rounds used in the AR15 or AK47. *See* Testimony of Rep. Caldwell CO House 2025 Legislative Day 076, 10:53:00. If the Springfield M1A Standard Issue Rifle had not been specifically excluded, it most certainly would have fallen under the Act's restrictions for specified semiautomatic firearms.

37.    Similarly, the inclusion of the Ruger Mini-14 and Ruger Mini-30 on the exempted list further shows the arbitrariness of the Act's restrictions considering that both of those firearms are also piston-driven, gas operated semiautomatic rifles that use the same ammunition as their AR15 and AK47 counterparts.

38.    A law that requires law-abiding citizens to spend months navigating through a burdensome and costly bureaucratic obstacle course before they can obtain some of the most common and popular firearms in America, and yet still allows more lethal firearms to be exempted from the rule, is by its very nature arbitrary and capricious and will inevitably confuse law-abiding citizens when trying to determine which semiautomatic firearm to purchase. Moreover, the exemption of 39 semiautomatic firearms only further undermines the State's "public safety" justification for the Act's provisions.

### C.    The Permit-to-Purchase Scheme Infringes Upon the Second Amendment Protected Right of Law-abiding Citizens to Keep and Bear Arms

39.    As previously detailed, for those who wish to purchase a specified semiautomatic firearm, the Act requires them to delay that purchase for weeks or months in order to complete a series of complicated, burdensome, and costly permit-to-purchase requirements. There are "firearms safety" training courses that must be taken and completed, followed by exams in which the test taker must achieve a 90% (an A-) in order to pass. But before enrollment in these courses can even occur, the individual must fill out an application, pay a fee, submit to a separate background check conducted

by a third-party vendor, pay another fee, and then throw themselves at the mercy of their local Sheriff—which results in the payment of yet another fee!

40.     Not only is the Act's permit-to-purchase scheme costly, it is also time-consuming with delays likely, if not inevitable, at every stage. According to Representative Caldwell, there is already such an extensive backlog in Colorado of people attempting to apply for and receive their Hunter's Safety Training card that the minimum wait currently averages 120 days. *See* Testimony of Rep. Caldwell CO House 2025 Legislative Day 076, 10:51:00.

41.     The Act's cumbersome and expensive pre-purchase training and certification requirements are also designed to effectively stall, if not stop entirely, those trying to exercise their Second Amendment protected rights. This has already been demonstrated with respect to the training and certification requirements recently implemented by Colorado's new statutory process for obtaining a concealed carry permit. *See* HB24-1174. For example, residents in Teller County face a three-year wait in order for a prospective concealed carry permit recipient to get the requisite training, because there are only two approved firearms instructors for the entire county. *See* Testimony of Rep. Bradley CO House 2025 Legislative Day 076, 11:22:15.

42.     It is one thing to wait three years to conceal carry a firearm <u>you already possess</u>, it is quite another to wait the same time to purchase a semiautomatic handgun that you would simply like to keep in your home for self-defense. And these wait times will only worsen throughout Colorado once the Act, with all of its safety course and training requirements, is fully implemented in August of 2026. "Permitting scheme[s] can be put toward abusive ends … where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens, their [Second Amendment] right to public carry." *Bruen*, 597 U.S. 1 n.9.

**D.      The Criminalization of "Rapid-fire Devices" Contravenes Federal Firearms Law and Violates the Second Amendment**

43.     The Act reclassifies "rapid-fire devices" as dangerous weapons and makes possession of them a class 5 felony.

44.     Several of the Plaintiffs in this case lawfully obtained and currently possess one or more rapid-fire devices and face criminal prosecution if they continue to possess such items.

45.     Rapid-fire devices like bump stocks, forced reset triggers, binary triggers, and other trigger replacement mechanisms (not including fully automatic sears or other mechanisms that actually give a firearm fully automatic capabilities) are not federally regulated.

46.     The Act's reclassification of these items is a clear attempt to criminalize arms-bearing conduct in violation of the Second Amendment.

**FIRST CLAIM FOR RELIEF**
**Right to Keep and Bear Arms**
**U.S. Const., amends. II and XIV**

**Declaratory Relief**

47.     Paragraphs 1-46 are re-alleged and incorporated by reference.

48.     The Act implicates the text of the Second Amendment because it restricts arms-bearing conduct, including the acquisition and possession of semiautomatic firearms, magazines, and rapid-fire devices.

49.     The Act burdens the right of residents of the State of Colorado, including Plaintiffs, to exercise their right to keep and bear arms, a right that is explicitly protected by the Second Amendment.

50.     There are significant criminal sanctions for the manufacture, distribution, transfer, sale or purchase of most semiautomatic firearms, the possession of magazines that hold more than fifteen rounds of ammunition, and the possession of rapid-fire devices.

51.    These restrictions infringe Plaintiffs' rights guaranteed by the Second Amendment, which is applicable to Colorado through the Fourteenth Amendment.

52.    The Act's permit-to-purchase requirements for specified semiautomatic firearms arbitrarily delay and burden the right of law-abiding citizens to obtain and possess arms even if they have previously been determined to be law-abiding, and even if they desire to obtain and possess arms for the purpose of self-defense in the home, where Second Amendment protections are at their zenith.

53.    The State cannot meet its burden because it cannot demonstrate that the provisions of the Act are consistent with this Nation's historical tradition of firearm regulation.

54.    Plaintiffs are part of "the people" whom the Second Amendment was designed to protect.

55.    Plaintiffs satisfy the pre-requisites for entering declaratory relief.

56.    Declaratory relief—including relief that extends to the Individual Plaintiffs and Plaintiff CSSA's present and future members—is necessary to provide complete relief to Plaintiffs.

## SECOND CLAIM FOR RELIEF
### Right to Keep and Bear Arms
### U.S. Const., amends. II and XIV
### Injunctive Relief

57.    Paragraphs 1-56 are realleged and incorporated by reference.

58.    Plaintiffs' Second Amendment protected rights have been violated because they are either completely prohibited from acquiring and possessing semiautomatic firearms, magazines, and rapid-fire devices or are prevented from doing so without first completing the Act's burdensome, time-consuming and costly permit-to-purchase requirements.

59.    The Act therefore is presumptively unconstitutional.

60.    The Defendants cannot rebut such presumption because the provisions of the Act have no relevantly similar historical analogue from the time of the Founding for the purposes of the Second

Amendment analysis under *Bruen* because similar laws delaying, prohibiting and criminalizing the acquisition and possession of certain firearms and firearm related items that were "in common use" at the time simply did not exist during the Founding era.

61.    There is no adequate remedy at law for the violation of Plaintiffs' Second Amendment-protected rights because the deprivation of their Second Amendment-protected rights to keep and bear arms will continue as long as the provisions of the Act are in place and enforceable by the State.

62.    Plaintiffs have suffered and will continue to suffer irreparable harm because each time Plaintiffs seek to purchase a specified semiautomatic firearm they will either be prevented from doing so or, in the alternative, will be required to complete the Act's burdensome, time-consuming, and costly permit-to-purchase requirements before being allowed to purchase or take possession of their firearm. Plaintiffs will also suffer harm—including possible criminal sanctions—if they possess a large-capacity magazine or a rapid-fire device.

63.    Injunctive relief—including relief that extends to the Individual Plaintiffs and Plaintiff CSSA's present and future members—is necessary to provide complete relief to Plaintiffs.

## THIRD CLAIM FOR RELIEF
### Right to Keep and Bear Arms
### U.S. Const., amends. II and XIV

### Damages

64.    Paragraphs 1-63 are realleged and incorporated by reference.

65.    Defendants are sued in their individual as well as official capacities.

66.    Plaintiffs may obtain damages under 42 U.S.C. § 1983 for violations of the Constitution by state officials acting under color of state law.

67.    Plaintiffs' claims for damages are not precluded by any Qualified Immunity defense, for two reasons:

    a.    The constitutional deprivations alleged do not include split-second decision making by relevant government actors; and

    b.    Clearly established law—inter alia, *Heller*, *McDonald*, and *Bruen*—applies in this case.

68.    Plaintiffs are entitled to damages under 42 U.S.C. § 1983.

## PRAYER FOR RELIEF

Plaintiffs pray that the Court:

69.    Enter a declaratory judgment pursuant to 28 U.S.C. § 2201 that the provisions of the Act violate the Second Amendment both on their face and as applied to law-abiding citizens purchasing and possessing the specified semiautomatic firearms, large-capacity magazines, and rapid-fire devices;

70.    Enter permanent injunctive relief enjoining Governor Jared Polis, Attorney General Phil Weiser, and District Attorney Michael Allen, and all of their officers, agents, and employees, from enforcing the provisions of the Act;

71.    Award remedies to the Individual Plaintiffs and Plaintiff CSSA's present and future members available under 43 U.S.C. § 1983, and all reasonable attorney fees, costs, and expenses of suit pursuant to 42 U.S.C. § 1988 and Fed. R. Civ. P. 54;

72.    Enter an award of actual and nominal damages;

73.    Order such other and further relief as the Court may deem just, proper, and necessary under the circumstances.

## JURY DEMAND

Plaintiffs demand a jury as to all issues triable to a jury.

DATED: September 2, 2025                    Respectfully submitted,

                                           /s/ Michael D. McCoy
                                           Michael D. McCoy
                                           William E. Trachman
                                           **Mountain States Legal Foundation**
                                           2596 South Lewis Way
                                           Lakewood, Colorado 80227
                                           Phone: (303) 292-2021
                                           Email: mmccoy@mslegal.org

                                           *Attorneys for Plaintiffs*