IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:25-cv-02725-WJM-MDB

ISRAEL DEL TORO;
KATHLEEN CLAYTON;
LUKE SORENSEN;
NATHANAEL SKIVER;
JASON REEVES;
GARRETT FLICKER;
and the COLORADO STATE SHOOTING ASSOCIATION,

      Plaintiffs,

v.

JARED SCHUTZ POLIS, in his official capacity as Governor of the State of Colorado;
PHILIP JACOB WEISER, in his official capacity as the Attorney General of the State of
 Colorado; and
MICHAEL J. ALLEN, in his official capacity as the District Attorney for the Fourth Judicial
 District,

      Defendants.

---

## STATE DEFENDANTS' MOTION TO DISMISS
## UNDER F.R.C.P. 12(b)(1) AND 12(b)(6)

---

Colorado has suffered several horrific mass shootings, and firearm-related injury remains a leading cause of death for Coloradans ages 1 to 44. *See, e.g.*, 2023 Colo. Sess. Laws, Ch. 125, § 1(1)(a). To improve public safety, reduce firearm injury and death, and enhance gun safety education, the Colorado General Assembly enacted Senate Bill 25-003 ("S.B. 25-03" or "Act")[1] in 2025.

---

[1] "Act Concerning the Prohibition of Certain Semiautomatic Firearms and Rapid-Fire Devices," S.B. 25-003, 75th Gen. Assemb., 1st Reg. Sess. (Colo. 2025), https://tinyurl.com/SB2503; *see also* ECF No. 1-1, Compl. Ex. A. All citations herein are to the Colorado Revised Statues, "C.R.S.", (2025), unless otherwise indicated.

Under Section 2 of the Act, most Colorado residents will need to obtain a license before purchasing specified semiautomatic firearms after August 1, 2026. The Act's licensing requirement is a presumptively constitutional "shall-issue" licensing law, which withstands Second Amendment scrutiny under the Supreme Court's precedent in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1, 38 n.9 (2022). And the Act is more moderate than laws passed by at least 10 other states that ban the purchase and possession of semiautomatic firearms like the AR-15 and AK-47[2]; such bans have been repeatedly upheld, including by "every Circuit to address the question." *Nat'l Ass'n for Gun Rts. v. Lamont*, 153 F.4th 213, 246 n.40 (2d Cir. 2025).[3] The Act also classifies "rapid-fire devices" as dangerous weapons and makes possession of rapid-fire devices a felony as of April 10, 2025. *See* S.B. 25-03 § 1, *codified at* C.R.S. § 18-12-101(1)(u.3), & § 9, *codified at* C.R.S. § 18-12-102(3).

Plaintiffs' challenge to S.B. 25-03 is largely premature. Because the Act's licensing requirement does not take effect until August 2026, many of the parameters of this program have yet to be finalized, including the amount of any applicable fees and the specifics of the required firearm safety training. Plaintiffs cannot satisfy Article III's standing or ripeness requirements

---

[2] Cal. Penal Code § 30510; Cal. Penal Code § 30515; Conn. Gen. Stat. § 53-202a; 11 Del. Code Ann. §§ 1465, 1466; Haw. Rev. Stat. § 134-1; Md. Code Ann., Crim. Law § 4-301; Mass. Gen. Laws ch. 140, § 121; N.J. Stat. Ann. § 2C:39-5; N.Y. Penal Law § 265.00; R.I. Gen. Laws §§ 11-47.2-1, 11-47.2-2; Rev. Code Wash. §§ 9.41.390, 9.41.010(2).

[3] *See NAGR*, 153 F.4th at 246 & n.40 (assault weapons and LCMs); *Capen v. Campbell*, 134 F.4th 660, 675–77 (1st Cir. 2025) (assault weapons and LCMs); *Bianchi v. Brown*, 111 F.4th 438, 441–42 (4th Cir. 2024), *cert. denied sub nom. Snope v. Brown*, 145 S. Ct. 1534 (2025) (assault weapons); *Bevis v. City of Naperville*, 85 F.4th 1175, 1197, 1203 (7th Cir. 2023) (assault weapons and LCMs), *cert. denied sub nom. Harrel v. Raoul*, 144 S. Ct. 2491 (2024); *see also Del. State Sportsmen's Ass'n v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 210 (3d Cir. 2024) (Roth, J., concurring) (assault weapons and LCMs), *cert. denied sub nom. Gray v. Jennings*, 145 S. Ct. 1049 (2025).

for purposes of their pre-enforcement challenge to S.B. 25-03 Section 2. Likewise, the Complaint's allegations of injury in fact fail to demonstrate all Plaintiffs' standing for purposes of their challenges to the Act's regulation of large-capacity magazines and rapid fire-devices. Plaintiffs' claim for damages should be rejected based on sovereign immunity, qualified immunity, and for failure to state a claim. Finally, Plaintiffs' challenge to the Act's regulation of rapid-fire devices should be dismissed because firearm accessories are not "arms" protected by the Second Amendment.

Accordingly, Defendants Jared Polis, in his official capacity as Governor of the State of Colorado and Philip J. Weiser, in his official capacity as the Attorney General of the State of Colorado, (together, "State Defendants") move to dismiss the Complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).[4]

**_WJM Revised Practice Standard III.D Conferral Statement_**: Counsel for the State Defendants conferred with counsel for Plaintiffs and for Defendant Allen by videoconference on November

---

[4] The Governor and the Attorney General enjoy Eleventh Amendment sovereign immunity from suit where they are sued in an official capacity "'to enjoin the enforcement of an act alleged to be unconstitutional,'" _Peterson v. Martinez_, 707 F.3d 1197, 1205 (10th Cir. 2013) (quoting _Ex parte Young_, 209 U.S. 123, 157 (1908)), but do not "'have a particular duty to 'enforce' the statute in question and a demonstrated willingness to exercise that duty,'" _id._ (quoting _Prairie Band Potawatomi Nation v. Wagnon_, 476 F.3d 818, 828 (10th Cir. 2007)); _see also Hendrickson v. AFSCME Council 18_, 992 F.3d 950, 965–68 (10th Cir. 2021) (same; collecting cases). The Complaint does not allege that the Governor has any criminal prosecutorial power, or that the Governor or Attorney General have demonstrated a willingness to prosecute Plaintiffs. But for the purpose of defending S.B. 25-03 against Plaintiffs' Second Amendment challenge here, which seeks declaratory and injunctive relief, in part, the Governor and Attorney General agree to waive their sovereign immunity and consent to be sued in this Court in only this case, in only their official capacity, and only for prospective relief. _See MCI Telecomms. Corp. v. Pub. Serv. Comm'n of Utah_, 216 F.3d 929, 935 (10th Cir. 2000) ("[A] state may waive its sovereign immunity by consenting to suit in federal court."). They do not waive any immunities with respect to Plaintiffs' damages claims.

3

25, 2025, from 11am to 12pm. Counsel discussed in detail the Rule 12(b)(1) and 12(b)(6) bases

for dismissal set forth below. Plaintiffs' counsel did not agree that the deficiencies merit

dismissal or require correction by amendment and oppose the relief sought herein.

## FACTUAL BACKGROUND

Colorado's S.B. 25-03 does the following:

*Regulation of semiautomatic firearms (S.B. 25-03 Sections 1-2)*. S.B. 25-03 defines a

new statutory category of guns, "semiautomatic firearms." *See* S.B. 25-03 § 1, *codified at* C.R.S.

§ 18-12-101(1)(u.7). Semiautomatic firearms automatically chamber a new round of ammunition

after each shot but require a distinct pull of the trigger to fire each round. *See* C.R.S. §§ 18-12-

101(1)(u.7).[5] This new category builds on Colorado's long-time, constitutional, prohibition of

machine guns.[6] C.R.S. § 18-12-102; *see also, e.g.*, *United States v. Morgan*, 150 F.4th 1339,

1341–42 (10th Cir. 2025) (upholding Congress' 1986 federal machine gun ban). Where a

machine gun permits a user to fire rounds continuously by holding the trigger, a semiautomatic

firearm allows a user to fire as quickly as they can repeatedly pull the trigger.

Under S.B. 25-03, semiautomatic firearms are regulated, not banned. *See* S.B. 25-03 § 2,

*codified at* C.R.S. § 18-12-116. In relevant part, a license will be required to purchase, sell, or

---

[5] The full definition of "semiautomatic firearm" is
> a firearm that is not a machine gun and that, upon initiating the firing sequence,
> fires the first chambered cartridge and uses a portion of the energy of the firing
> cartridge to extract the expended cartridge case, chamber the next round, and
> prepare the firing mechanism to fire again, and requires a separate pull, release,
> push, or initiation of the trigger to fire each cartridge.

C.R.S. § 18-12-101(1)(u.7).

[6] A machine gun is any weapon "that shoots automatically more than one shot, without manual
reloading, by a single function of the trigger." C.R.S. § 18-12-101(1)(s).

transfer "specified semiautomatic firearms." *See* C.R.S. §§ 18-12-116(2) & (3)(e). The licensure

requirement does not go into effect until August 1, 2026. C.R.S. § 18-12-116(2). Currently,

individuals may purchase, sell, or transfer semiautomatic firearms without a license. Under S.B.

25-03, after August 1, 2026, the unlicensed manufacture, distribution, transfer, sale, or purchase

of a specified semiautomatic firearm will be prohibited and constitute a class 2 misdemeanor.

C.R.S. § 18-12-116(4)(b). Subsequent offenses will be class 6 felonies. *Id*. The law does not

regulate the possession of semiautomatic firearms. *Cf.* § 18-12-116(2) (not prohibiting

possession of semiautomatic firearms).

S.B. 25-03 applies to specific semiautomatic rifles, shotguns, and handguns that use

ammunition larger than .22 caliber and can accept a detachable magazine with greater than 15

rounds of ammunition, including semiautomatic AR- and AK-style pistols.[7] C.R.S. § 18-12-

116(1)(d)(II). The Act exempts recoil-operated handguns, including most popular handguns like

Glocks. *Id*. The Act does not cover firearms manually operated by bolt, pump, lever, or slide

action, or firearms with permanently fixed magazines holding 15 or fewer rounds. *Id*.

***Semiautomatic Firearm Licensure (S.B. 25-03 Sections 2-7)*.** In Colorado, once S.B. 25-

03 takes effect, a person may purchase a semiautomatic firearm by complying with the licensing

requirements. First, a person must obtain a firearms safety course eligibility card. To obtain this

card, a person must submit an application to a sheriff including a copy of government-issued

photo identification, the results of a background check completed by third-party vendor,

---

[7] The Act permits the sale or transfer of covered semiautomatic firearms in certain contexts,
including to law enforcement, prisons, the military, federally licensed firearms dealers, people in
other states, and gunsmithing instructors, etc. C.R.S. §§ 18-12-116(2) & (3). Plaintiffs do not
appear to fall into these categories. *See* Compl. ¶¶ 1-8.

attestations they are not a convicted felon prohibited from owning a gun and will follow the law, and a fee to cover processing and recording of the eligibility card. C.R.S. §§ 18-12-116(5)(a)(II) & (5)(b).

Unless a sheriff cannot identify the applicant or the applicant cannot lawfully possess a gun, the sheriff *shall issue* an eligibility card. C.R.S. § 18-12-116(5)(b)(VI). A sheriff may deny an eligibility card only if the sheriff has a reasonable belief that documented past behavior makes it likely the applicant will present a danger to themselves or others. C.R.S. § 18-12-116(5)(b)(VI)(C). An eligibility card is good for five years and may be revoked by the sheriff only if a person becomes legally prohibited from owning a gun or the sheriff believes it is likely the card holder will be a danger to themselves or others. C.R.S. §§ 18-12-116(5)(b)(I) & (VI)(D). If a sheriff denies or revokes a person's eligibility card, that person may seek judicial review. C.R.S. § 18-12-116(5)(b)(X)(A).

Second, after a person obtains a firearm safety course eligibility card, they must complete certain training and have three alternative paths to do so. They may: (1) complete an extended firearms safety course within five years of purchase, § 18-12-116(3)(e)(I)(B); (2) complete an extended firearms safety course more than five years before purchase and complete a basic firearms safety course within five years before purchase, § 18-12-116(3)(e)(I)(C); or (c) complete a Division of Parks and Wildlife ("Division") hunter education course and within five years before purchase complete a basic firearms safety course, § 18-12-116(3)(e)(I)(A). The basic and extended safety courses must be taught by an instructor verified by a sheriff. § 18-12-116(5)(a)(I). A basic firearms safety course is a minimum of four hours, while an extended course is at least 12 hours over two days of in-person instruction. C.R.S. §§ 18-12-116(5)(a)(III);

33-9-115(4)(b). Both courses include instruction on safe handling of semiautomatic firearms and ammunition magazines, safe storage, child safety, firearm deaths due to mental illness, and extreme risk protection orders. §§ 18-12-116(5)(a)(IV); 33-9-115(4)(b). To complete a course, an individual must pass an exam. § 18-12-116(5)(a)(V).

   ***Enhanced penalty for possession of LCMs (S.B. 25-03 Section 8)***. S.B. 25-03 amends Colorado's existing large capacity magazine ban ("LCM Ban"), by enhancing the criminal penalty for selling, transferring, or possessing a large capacity magazine[8] ("LCM") to a class 1 misdemeanor. *See* S.B. 25-03 § 8 (amending § 18-12-302).

   ***Classification of "rapid-fire devices" as dangerous weapons (S.B. 25-03 Section 9)***. Colorado has long prohibited possession of certain "dangerous weapons," including machine guns and "machine gun conversion devices."[9] C.R.S. § 18-12-102 (2023). S.B. 25-03 amends the definition of "dangerous weapons" by replacing "machine gun conversion devices" with a new prohibited category, "rapid-fire devices." *See* S.B. 25-03 § 9, *codified at* C.R.S. § 18-12-102. "Rapid-fire devices" is defined as "any device, part, kit, tool, accessory, or combination of parts that has the effect of increasing the rate of fire of a semiautomatic firearm above the standard rate of fire for the semiautomatic firearm that is not otherwise equipped with that device, part, or combination of parts." *Id*. § 1, *codified at* C.R.S. § 18-12-101(1)(u.3). Knowingly possessing a dangerous weapon, including a rapid-fire device, is a class 5 felony. C.R.S. § 18-12-102(3).

---

[8] A large capacity magazine is defined by existing law as magazines capable of accepting more than 15 rounds of ammunition. C.R.S § 18-12-301(2).

[9] A machine gun conversion device is defined as "any part designed or intended, or combination of parts designed or intended, for use in converting a firearm into a machine gun." C.R.S. § 18-12-101(1)(g.2) (2023).

## LEGAL STANDARD

### I.    Rules 12(b)(1) and 12(b)(6).

Dismissal under Rule 12(b)(1) is appropriate for lack of Article III standing or ripeness.

*Baker v. USD 229 Blue Valley*, 979 F.3d 866, 871 (10th Cir. 2020) (standing); *New Mexicans for*

*Bill Richardson v. Gonzales*, 64 F.3d 1495, 1499 (10th Cir. 1995) (ripeness). Plaintiffs bear the

burden of establishing the court's subject matter jurisdiction under both doctrines. *See id.*; *Baker*,

979 F.3d at 871.

A complaint must be dismissed under Rule 12(b)(6) when a plaintiff's allegations fail to

set forth a set of facts that, if true, would entitle him to relief. *See Ash Creek Mining Co. v.*

*Lujan*, 969 F.2d 868, 870 (10th Cir. 1992); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678–79

(2009) (holding that a claim must be facially plausible to survive a motion to dismiss).

### II.    The *Bruen-Rahimi* framework for Second Amendment challenges.

The Second Amendment guarantees "the individual right to possess and carry weapons in

case of confrontation." *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008). But it is "'not a

right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever

purpose.'" *United States v. Rahimi*, 602 U.S. 680, 691 (2024) (quoting *Heller*, 554 U.S. at 626).

*Bruen* and *Rahimi* establish a two-step analysis for Second Amendment claims. *See Bruen*, 597

U.S. 1; *Rahimi*, 602 U.S. 680. First, Plaintiffs must show that their challenge falls within the

Second Amendment's "explicit text, 'as informed by history.'" *Rocky Mountain Gun Owners v.*

*Polis*, 121 F.4th 96, 113 (10th Cir. 2024) ("*RMGO*") (quoting *Bruen*, 597 U.S. at 19). A

regulation falls within the ambit of the Second Amendment only if the regulation "infringes" the

Second Amendment right to keep and bear arms. *Md. Shall Issue, Inc. v. Moore*, 116 F.4th 211, 220 (4th Cir. 2024), *cert. denied*, 145 S. Ct. 1049 (2025).

Under *Bruen*, because "shall-issue" licensing laws "*do not necessarily prevent* law-abiding, responsible citizens from exercising their Second Amendment right[s]," such laws are presumptively constitutional. 597 U.S. at 38 n.9 (emphasis added, internal quotation marks and citation omitted). Where the licensing scheme employs "narrow, objective, and definite standards" and offers authorities no discretion in issuing a license to persons who meet those objective standards, "shall-issue" laws do not prevent law-abiding individuals from exercising their Second Amendment rights. *See id*. Thus, shall-issue licensing laws generally do not "infringe" the right to keep and bear arms, unless Plaintiffs can show that the regulation has been put to "abusive ends." *Md. Shall Issue*, 116 F.4th at 221.

If Plaintiffs cannot meet their burden at step one, their claims fail. *RMGO*, 121 F.4th at 113−14; *accord Bruen*, 597 U.S. at 18 ("regulated activity is categorically unprotected" if it regulates activity outside the Second Amendment's scope as originally understood). If Plaintiffs satisfy their step one burden, the burden shifts to the government to establish its law "is 'consistent with the *principles* that underpin our' Nation's historical tradition of firearm regulation." *RMGO*, 121 F.4th at 113 (quoting *Rahimi*, 602 U.S. at 692) (emphasis in original).

## ARGUMENT

### I.    Plaintiffs' claims should be dismissed under Rule 12(b)(1).

#### A.    Plaintiffs fail to demonstrate Article III standing for all claims.

Standing "is evaluated as of the time a case is filed." *Rio Grande Found. v. Oliver*, 57 F.4th 1147, 1161 (10th Cir. 2023). To establish standing, a plaintiff must allege "that (1) he or

she has suffered an injury in fact; (2) there is a causal connection between the injury and the conduct complained of; and (3) it is likely that the injury will be redressed by a favorable decision." *Ward v. Utah*, 321 F.3d 1263, 1266 (10th Cir. 2003) (quotation omitted). An injury must be "concrete and particularized" as well as "actual or imminent, not conjectural or hypothetical" to satisfy Article III. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (internal quotations and citations omitted).

"Each plaintiff must have standing to seek each form of relief in each claim." *Bronson v. Swensen*, 500 F.3d 1099, 1106 (10th Cir. 2007). "Where, as here, a case is at the pleading stage, the plaintiff must 'clearly . . . allege facts demonstrating each element" of standing. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citation omitted). Because Plaintiffs seek declaratory and injunctive relief concerning S.B. 25-03's separate provisions regulating semiautomatic firearms (Section 2), large-capacity magazines (Section 8), and rapid-fire devices (Section 9), each individual plaintiff must satisfy Article III's requirements for purposes of each challenge. *See* Compl. ¶ 69 (seeking declaratory judgment that S.B. 25-03's provisions regulating "specified semiautomatic firearms, large-capacity magazines, and rapid-fire devices"). The State Defendants address Plaintiffs' standing to challenge Sections 2, 8, and 9 in turn.

***S.B. 25-03 Section 2 (semiautomatic firearm regulations).*** Because standing is determined "as of the commencement of suit," *Lujan*, 504 U.S. at 570 n.5, and, as discussed above, S.B. 25-03 Section 2 does not take effect until August 1, 2026, Plaintiffs cannot not plausibly allege a current, actual injury in connection with those provisions. Instead, to demonstrate standing for their pre-enforcement challenge, Plaintiffs must allege "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a

statute, and there exists a credible threat of prosecution thereunder." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (citation omitted). "'Some day' intentions" do not support a finding of "imminent injury" for standing purposes. *Lujan*, 504 U.S. at 564. Plaintiffs must describe "concrete plans" to undertake the proscribed conduct. *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009).

The individual Plaintiffs' allegations fall far short of establishing "concrete plans" to violate S.B. 25-03 Section 2. At best, each alleges a vague desire to acquire a semiautomatic firearm potentially subject to the Act's licensing regulations at some unspecified time in the future. Del Toro claims that "when [he] wishes to acquire one of these firearms in the future, he will have to submit to [S.B. 25-03 Section 2's] scheme." Compl. ¶ 2. Clayton states she "intends to periodically purchase [firearms subject to Section 2] in the future, including after August 1, 2026." *Id.* ¶ 3. Sorenson states he "fully intends to purchase a firearm after [August 1, 2026], and throughout his life." *Id.* ¶ 4. Skiver merely suggests his current role as a firearms instructor "requires him to frequently acquire semi-automatic firearms." *Id.* ¶ 5.[10] Reeves alleges he "intends to acquire [firearms subject to Section 2]" after its provisions "are fully implemented." *Id.* ¶ 6. And Flicker states he "plans to purchase additional semi-automatic firearms after the provisions of [S.B. 25-03] are fully implemented." *Id.* ¶ 7.

---

[10] Skiver also alleges he will suffer a "financial injury" as a result of S.B. 25-03 Section 2 because he will need to "spend the time and money" to comply with the licensing requirements and because "the Act will likely cause the semi-automatic firearm purchase rate to decline in Colorado" thereby reducing "job opportunities and income Mr. Skiver makes as a firearms instructor." Compl. ¶ 5. Such openly hypothetical injuries—concerning speculative harm about the costs and financial consequences of a regulatory regime that does not yet exist—do not carry Skiver's burden to demonstrate standing. *Tandy v. City of Wichita,* 380 F.3d 1277, 1283−84 (10th Cir. 2004) ("A claimed injury that is contingent upon speculation or conjecture is beyond the bounds of a federal court's jurisdiction.").

No individual plaintiff describes a time frame for their future purchase more specific than "after August 1, 2026." Nor does any Plaintiff make any allegations concerning their intent to comply with S.B. 25-03 Section 2's licensing requirements beyond the fact that they believe that compliance with those requirements, once adopted by the Division of Parks and Wildlife, will be "burdensome." *See, e.g., id.* ¶ 2 (Del Toro alleging compliance with the yet-to-be-adopted scheme will be "complicated" and "burdensome"). This failure deprives them of standing. *See Lujan*, 504 U.S. at 564 ("[S]ome day intentions—without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the actual or imminent injury[.]") (quotation marks and emphasis omitted). Relatedly, the Tenth Circuit recently held that a plaintiff's statement that he "wishes to carry firearms in . . . playgrounds" at "some unspecified point in the future" was insufficient to demonstrate standing. *Springer v. Lujan Grisham*, No. 23-2192, 2025 WL 2793787, at *5 (10th Cir. Oct. 1, 2025). Plaintiffs cannot plausibly allege they will be burdened by a regulatory regime that has not yet been adopted, or by a statutory provision that will not take effect for over eight months.

CSSA lacks standing to sue on behalf of its members for the same reasons. *Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 181 (2000) (explaining an association may have "standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit"). CSSA may not bring suit on its members' behalf if those members lack standing. *See Summers*, 555 U.S. at 499 (explaining associational plaintiffs must "identify members who have suffered the requisite harm"). Nor does CSSA make any effort to

establish that S.B. 25-03 has "perceptibly impaired" its ability to carry out its mission. *E.g.*, *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 369, 379 (1982) (associational plaintiff may establish standing where defendant frustrated its services "with a consequent drain on resources").

Finally, Sorenson lacks standing to challenge S.B. 25-03 Section 2 for an additional reason: he cannot demonstrate redressability. As Plaintiffs concede, Sorenson is 19 years old and barred from acquiring a firearm of any kind by Colorado's Minimum Age Law, C.R.S. § 18-12-112. Plaintiffs do not challenge the Minimum Age Law in this case, and therefore—whatever decision this Court might reach on S.B. 25-03 Section 2's constitutionality—the court still cannot afford Sorenson meaningful relief. *See We the Patriots, Inc. v. Lujan Grisham*, 119 F.4th 1253, 1259 (10th Cir. 2024) (holding plaintiffs lack standing when the court is unable to provide "meaningful relief due to . . . unchallenged . . . restrictions"); *Bishop v. Smith*, 760 F.3d 1070, 1078 (10th Cir. 2014) ("[P]laintiffs fail to establish redressability only when an unchallenged legal obstacle is enforceable separately and distinctly from the challenged provision."). Because Sorenson is prevented from purchasing a firearm by a separate legal impediment, the Minimum Age Law, he lacks standing to challenge S.B. 25-03 Section 2.

Because all individual Plaintiffs lack standing to challenge S.B. 25-03 Section 2, their claim to relief concerning those provisions must be dismissed.

***S.B. 25-03 Section 8 (large-capacity magazines).*** Although the Complaint purports to challenge S.B. 25-03 Section 8's regulation of LCMs, Compl. ¶¶ 27(f), 28, 62, 69, none of the Plaintiffs state that they acquired an LCM after July 1, 2013, nor do they express a present desire to sell, transfer, or possess an LCM. Compl. ¶¶ 1-8; *see* C.R.S. § 18-12-302(2)(a)(I), (II)

(explaining a person may possess an LCM if he or she owns it on July 1, 2013, and maintains continuous possession of the LCM). In short, there are no allegations that any Plaintiff has suffered an "injury in fact" due to the LCM Ban and/or the Act's amendments to the same. *See Bronson*, 500 F.3d at 1106 (each plaintiff must have standing to seek each form of relief). Because Plaintiffs fail to plead an injury, they lack standing to challenge Section 8, and any claim that those provisions violate the Second Amendment should be dismissed.

      ***S.B. 25-03 Section 9 (rapid-fire devices).*** Plaintiffs Del Toro, Clayton, Sorenson, Skiver, and Flicker make no allegations concerning their desire or intent to possess a rapid-fire device in violation of C.R.S. § 18-12-102, now or in the future.[11] Without alleging any "intention to engage in a course of conduct arguably affected with a constitutional interest" but proscribed by S.B. 25-03 Section 9, these plaintiffs cannot carry their burden to demonstrate injury in fact, *see Driehaus*, 573 U.S. at 159 (citation and quotation omitted), and their claim to relief concerning those statutory provisions must be dismissed, *see Bronson*, 500 F.3d at 1106.

      Finally, Reeves alleges he currently possesses "rapid-fire devices, including a forced reset trigger," in violation of S.B. 25-03 Section 9. Compl. ¶ 6. Defendants do not challenge Reeves' standing for purposes of those provisions. For the reasons set forth *infra* § II.A, however, Reeves (and all Plaintiffs) have failed to state a claim concerning the Act's regulation of rapid-fire devices.

---

[11] Del Toro claims he relies on "common firearm accessories like force-reset triggers to enable him to operate a firearm." Compl. ¶ 2. As discussed above, vague allegations—like Del Toro's claimed reliance on accessories "like" the rapid-fire devices regulated by statute—do not satisfy Article III's standing requirements. *See Summers*, 555 U.S. at 496 (requiring "concrete plans" to undertake actions subject to challenged regulations).

**B. Plaintiffs' challenge to S.B. 25-03 Section 2 is not ripe.**

Plaintiffs' challenge to the shall-issue licensing law, set forth in S.B. 25-03 Section 2,

codified at C.R.S. § 18-12-116, is unripe. The doctrine of ripeness draws "both from Article III

limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction."

*Farrell-Cooper Mining Co. v. U.S. Dep't of the Interior*, 728 F.3d 1229, 1234 (10th Cir. 2013)

(quoting *Reno v. Cath. Soc. Servs., Inc*., 509 U.S. 43, 57 n.18 (1993)). Ripeness prevents courts

from "entangling themselves in abstract disagreements" and interfering with government

decision making until "an administrative decision has been formalized and its effects felt in a

concrete way by the challenging parties." *Id*. (quotations omitted). In assessing whether a claim

is ripe, federal courts evaluate "the fitness of the issues for judicial decision" and "the hardship

to the parties of withholding court consideration." *Id*. (quotations omitted). Courts may consider

"whether judicial intervention would inappropriately interfere with further administrative action"

and "whether the courts would benefit from further factual development of the issues presented."

*Sierra Club v. U.S. Dep't of Energy*, 287 F.3d 1256, 1262–63 (10th Cir. 2002). Section 2 of the

Act establishes a presumptively constitutional "shall-issue" licensing scheme. As *Bruen*

observed, "shall-issue regimes, which often require applicants to undergo a background check or

pass a firearms safety course, are designed to ensure only that those bearing arms in the

jurisdiction are, in fact, 'law-abiding, responsible citizens.'" 597 U.S. at 38 n.9; *see also Md.*

*Shall Issue*, 116 F.4th at 229 ("governments may continue to enforce 'shall-issue' firearms

licensing regulations that impose non-abusive, objective requirements like background checks

and firearm safety training"); *Giambalvo v. Suffolk Cnty.*, 155 F.4th 163, 181-82 (2d. Cir. 2025)

(affirming denial of preliminary injunction because 18-hour firearm training requirement was presumptively lawful and not facially unconstitutional).

Because the Act is presumptively constitutional, the only way Plaintiffs can meet their burden at *Bruen*'s first prong is to show that the Act is "put toward abusive ends" because it involves "lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry." 597 U.S. at 38 n.9. While Plaintiffs allege that in the future, they will face "complicated," "burdensome," and "costly" obstacles to purchase semiautomatic firearms, Compl. ¶ 2 (concerning Del Toro),[12] the degree of any complication is far from certain.

The fundamental and insurmountable problem with Plaintiffs' allegations is that the Act's licensure requirement is not yet in effect. Details of the firearm safety courses have yet to be set by the Division (a non-party), fees have not been determined by the Division or the State's sheriffs (also non-parties), and any waiting periods Plaintiffs might face are unknown. Indeed, Plaintiffs admit that the associated costs and fees are "unknown" and "unspecified." *Id*. ¶ 7; *id*. at p. 15, Fig. 2 & p. 17, Fig. 3. Plaintiffs concede "delays" are unknown, describing them as "likely, if not inevitable." *Id*. ¶ 40. But the Court cannot determine what those wait times will be (if any) because the Act's licensing requirement is not yet in effect. It is far from certain that Plaintiffs will face extraordinary obstacles. Indeed, in the signing statement for S.B. 25-03, the Governor

---

[12] *See also id.* ¶ 3 (Clayton will "battle through layers of red tape"); *id.* ¶ 4 (after he turns 21, Sorensen will face "delays, additional fees, and a slew of burdensome courses and testing requirements"); *id.* ¶ 5 (Skiver will be required "to spend the time and money to be instructed"); *id.* ¶ 7 (Flicker will need to "follow[] a series of burdensome and costly bureaucratically imposed steps"); *id.* ¶ 28 (generally alleging the Act implements an "intentionally burdensome, time-consuming, and costly permit-to-purchase scheme"); *see also id.* ¶ 42 (alleging "lengthy wait times" and "exorbitant fees" and quoting *Bruen*, 597 U.S. [at 38] n.9).

stated that the Division would "administer this program efficiently and affordably" such that

"all" would "have access to" the Act's required training.[13] The Governor further directed the "the

Department of Natural Resources to work with [the Division] to implement this in a way that

keeps the cost for training as low as possible." *Id*. Any burdens associated with Section 2 are

contingent on future events, some of which are in the hands of third parties, and all of which are

far from determined, let alone certain.

Without specific information about the impact of the Act, judicial consideration of

Plaintiffs' as-applied and facial challenges would be premature. *United States v. Cabral*, 926

F.3d 687, 694 (10th Cir. 2019) (where factual scenarios "may not occur as anticipated, or indeed

may not occur at all," depending on a third party's future actions, a claim is "not yet fit for

judicial review") (citation omitted); *Hardre v. Markey*, No. 20-cv-03594-PAB-KMT, 2021 WL

1541714, at *7 (D. Colo. Apr. 19, 2021) (constitutional challenge to new law was unripe where

agency had not issued implementing policies or eligibility criteria and application of law to

plaintiff was uncertain and contingent on future events); *see also Nat'l Ass'n for Gun Rts., Inc. v.

City of San Jose*, 618 F. Supp. 3d 901, 913 (N.D. Cal. 2022) (finding Second Amendment

challenge to an annual mandatory fee on gun owners was unripe where the fee had not yet been

set). Here, no fees have been established—indeed, the Governor has indicated such fees should

be affordable—and any challenge to a nebulous fee is contingent on a future setting of the fee.

Additionally, Plaintiff Sorensen's claims are unripe because at just 19 years old, he is too

young to purchase firearms, and the Act's provisions do not apply to him. *See* C.R.S. § 18-12-

---

[13] *Governor's Signing Statement for Senate Bill 25-003*, Office of the Governor of Colorado
(Apr. 10, 2025), https://tinyurl.com/SB2503statement.

112. At this stage, Sorensen's claims are unripe for this Court's review and should be dismissed. *See, e.g.*, *Nat'l Ass'l for Gun Rts. v. Polis*, No. 24-cv-00001-GPG-STV, 2024 WL 3085865, at *7–8 (D. Colo. May 2, 2024) (holding plaintiffs' challenge to state law requiring serialization of firearm parts kits was "unripe as serialization currently is required under federal law").

Plaintiffs' challenge to S.B. 25-03 Section 2 is not fit for judicial consideration because the burdens associated with the Act's licensure requirements are unknown and uncertain. *See Farrell-Cooper*, 728 F.3d at 1234 (discussing importance of further factual development in determining ripeness); *see also Texas v. United States,* 523 U.S. 296, 300 (1998) (a claim is not ripe if it rests on contingent future events that may not occur as anticipated or at all.). And Plaintiffs would not suffer hardship if judicial consideration were withheld because the law is not in effect. *See Farrell-Cooper*, 728 F.3d at 1234. This claim should be dismissed as unripe.

**C.  Plaintiffs' money damages claims are barred by sovereign and qualified immunity.**

Plaintiffs contend they are entitled to damages under Section 1983 against the State Defendants for "violations of the Constitution by state officials acting under color of state law." *See* Compl. ¶¶ 64–68. Because the Eleventh Amendment bars damages in official-capacity suits, and because the State Defendants have qualified immunity in their individual capacities, Plaintiffs' damages claim must be dismissed.

"The ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court." *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001). A suit "against state officials acting their official capacities . . . is no different than a suit against the State itself." *Muscogee (Creek) Nation v. Okla. Tax Comm'n*, 611 F.3d 1222, 1227 (10th Cir. 2010) (quotation marks omitted). Therefore, the Eleventh

Amendment bars any request for damages against the State Defendants in their official capacities. *Tarrant Reg'l Water Dist. v. Sevenoaks*, 545 F.3d 906, 911 (10th Cir. 2008) ("[W]hen the requested relief is akin to a retrospective damages award . . . the Eleventh Amendment prohibits the federal suit.").

Plaintiffs' claims for damages against the State Defendants in their personal capacities are similarly barred by qualified immunity. Qualified immunity "is an entitlement not to stand trial or face the other burdens of litigation." *Ahmad v. Furlong*, 435 F.3d 1196, 1198 (10th Cir. 2006) (citation omitted). "The privilege is an immunity from suit rather than a mere defense to liability." *Id.* (citation omitted). To defeat a claim of qualified immunity, a plaintiff must demonstrate both that (1) the facts alleged establish the violation of a constitutional right, and (2) the right at issue was "clearly established" at the time of the defendant's alleged misconduct. *White v. Pauly*, 580 U.S. 73, 79–80 (2017); *see also Thomas v. Durastanti*, 607 F.3d 655, 662 (10th Cir. 2010). A plaintiff's failure to establish either prong means the protections of qualified immunity apply. *Andersen v. DelCore*, 79 F.4th 1153, 1163 (10th Cir. 2023). The court may review either prong first and need only find one of the prongs missing to hold that qualified immunity bars a plaintiff's claims. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) ("We recently reaffirmed that lower courts have discretion to decide which of the two prongs of qualified-immunity analysis to tackle first.").

Plaintiffs fail to establish both prongs. First, Plaintiffs fail to state a plausible claim that the Governor or Attorney General violated any clearly established right because the Complaint does not contain any well-pled facts alleging that the Governor or Attorney General personally participated in depriving any Plaintiff of any constitutional right. *See infra* § II.B. Qualified

immunity therefore bars Plaintiffs' individual capacity claims against the Governor and Attorney General for any type of damages. *See Montoya v. Vigil*, 898 F.3d 1056, 1064 (10th Cir. 2018) ("It is true that if the plaintiff failed to state a claim under Rule 12(b)(6), the government would also be entitled to qualified immunity.").

The fact that the alleged constitutional deprivations do not involve "split-second decision making," Compl. ¶ 67(a), is of no matter. Split-second decision-making is a factor in finding a constitutional violation in police reasonable-use-of-force cases, which is inapplicable here. *See, e.g.*, *United States v. Mosley*, 743 F.3d 1317, 1329 (10th Cir. 2014) ("The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.") (quotation omitted).

On the second prong, Plaintiffs fail to show that there is any clearly established right at issue. To the contrary, there is no right to possess dangerous or unusual weapons. *RMGO*, 121 F.4th at 117 (citing *Heller*, 554 U.S. at 627); *cf. Ocean State Tactical, LLC v. Rhode Island*, 95 F.4th 38, 46 (1st Cir. 2024) (recognizing the tradition of regulating dangerous aspects of weapons "once their popularity in the hands of murderers became apparent"), *cert. denied*, 145 S. Ct. 2771 (2025); *Capen v. Campbell*, 134 F.4th 660, 671 (1st Cir. 2025) (recognizing a tradition of "protect[ing] the public from the danger caused by weapons that create a particular public safety threat"); *Bianchi v. Brown*, 111 F.4th 438, 464–72 (4th Cir. 2024) (describing "a strong tradition of regulating those weapons that were invented for offensive purposes and were ultimately proven to pose exceptional dangers to innocent civilians" and that are "excessively dangerous"), *cert. denied sub nom. Snope v. Brown*, 145 S. Ct. 1534 (2025) ; *Bevis v. City of*

20

*Naperville*, 85 F.4th 1175, 1199 (7th Cir. 2023) (describing "the long-standing tradition of regulating the especially dangerous weapons of the time"), *cert. denied sub nom. Harrel v. Raoul*, 144 S. Ct. 2491 (2024); *Duncan v. Bonta*, 133 F.4th 852, 874 (9th Cir. 2025) (identifying tradition of "laws to protect innocent persons from especially dangerous uses of weapons once those perils have become clear"); *Hanson v. District of Columbia*, 120 F.4th 223, 237–38 (D.C. Cir. 2024) (recognizing the tradition of regulating "weapons that are particularly capable of unprecedented lethality"), *cert. denied,* 145 S. Ct. 2778 (2025). Sovereign and qualified immunity bar Plaintiffs' damages claims against the State Defendants.

## II.    The Complaint should be dismissed under Rule 12(b)(6).

### A.    Plaintiffs fail to plausibly allege C.R.S. § 18-12-102's classification of "rapid-fire devices" violates the Second Amendment as such items are accessories, not arms.

S.B. 25-03 amends C.R.S § 18-12-102, which criminalizes "possessing a dangerous or illegal weapon" to include "rapid-fire devices" under the definition of dangerous weapons. The Act defines a "rapid-fire device" as "any device, part, kit, tool, accessory, or combination of parts that has the effect of increasing the rate of fire of a semiautomatic firearm above the standard rate of fire for the semiautomatic firearm that is not otherwise equipped with that device, part, or combination of parts." C.R.S. § 18-12-101(1)(u.3). Plaintiffs allege "rapid-fire devices" "include such items as bump stocks, forced reset triggers, super safeties, set triggers, and binary triggers." Compl. ¶ 27(g).

Plaintiffs allege, cursorily, that rapid-fire devices are "common." But even if they were common (which Defendants do not concede), Plaintiffs must also allege that they are arms covered by the Second Amendment. Under *Heller* and *Bruen*, "the Second Amendment extends, prima facie, to all instruments that constitute *bearable arms*." *Bruen*, 597 U.S. at 28 (quoting

21

*Heller*, 554 U.S. at 582 (emphasis added). An instrument need not have existed at the time of the founding to fall within the amendment's ambit, but it must fit the founding-era definition of an "Arm[ ]." *Heller*, 554 U.S. at 581 (citing dictionaries from the eighteenth and nineteenth centuries). Then and now, this means the Second Amendment covers "[w]eapons of offence, or armour of defence," or "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018) (quoting *Heller*, 554 U.S. at 581). A "firearm accessory" is "not a weapon in itself (nor is it "armour of defence")." *Id*. Accordingly, firearm accessories "can't be a 'bearable arm' protected by the Second Amendment." *Id*.

Rapid-fire devices are firearm accessories, not arms. Plaintiffs do not allege rapid fire devices are arms—nor could they. The Supreme Court very recently held that a bump stock—included in the Act's definition of "rapid fire devices"—is "an *accessory* for a semiautomatic rifle," not a machine gun. *Garland v. Cargill*, 602 U.S. 406, 410 (2024) (emphasis added). And Tenth Circuit precedent is clear that firearm accessories fall outside the Second Amendment's reach. *Cox*, 906 F.3d at 1186 (Because silencers are firearm accessories, "not 'bearable arms,' they fall outside the Second Amendment's guarantee."). Because Plaintiffs fail to plausibly allege that "rapid fire devices" are "arms" within the plain text of the Second Amendment, their challenge to C.R.S. § 18-12-102 must be dismissed.

**B. Plaintiffs fail to state a claim for money damages.**

Generally, monetary damages are available under Section 1983 to compensate, retrospectively, for past constitutional torts. *Memphis Comm. Sch. Dist. v. Stachura,* 477 U.S.

299, 307 (1986). Accordingly, no "proof of an actual injury" means "no compensatory damages." *Id*. at 308.

Here, Plaintiffs do not articulate any actual past injuries; nor could they, as the licensing scheme has not gone into effect. The complaint instead lays out a theory of anticipated future injury.[14] *Cf. Tandy*, 380 F.3d 1283–84 ("To seek prospective relief, the plaintiff must" show a "threat of being injured in the future," while a "plaintiff seeking retrospective relief" must show "she suffered a past injury[.]"). Because Plaintiffs do not allege an actual or past injury, they necessarily fail to state a claim for damages. *See, e.g.*, *Samaritan Ministries Int'l v. Kane*, 760 F. Supp. 3d 1267, 1279 (D.N.M. 2024) (holding same), *aff'd,* No. 24-2187, 2025 WL 2876772 (10th Cir. Oct. 9, 2025).

Another way to consider the same issue is that Plaintiffs fail to state a claim to damages because they do not allege the State Defendants' personal involvement, in their personal capacity, in any deprivation of constitutional rights. The Tenth Circuit consistently has held that "[i]ndividual liability under § 1983 must be based on personal involvement in the alleged constitutional violation." *Gallagher v. Shelton*, 587 F.3d 1063, 1069 (10th Cir. 2009) (quoting *Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997)). There must be "an affirmative link . . . between the constitutional deprivation and either the supervisor's personal participation, his exercise of control or direction, or his failure to supervise." *Id.* (quotation omitted). "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each

---

[14] The one exception to this may be the allegations of Plaintiff Reeves that his Second Amendment rights has been violated by the new "rapid-fire devices" definition, which already took effect, and which prevents him from possessing forced reset triggers. *See* Compl. ¶ 6. Even still, that allegation fails to state a claim for the reasons articulated in the subsequent paragraphs above—he fails to allege personal involvement by the State Defendants.

Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676.

Plaintiffs do not plausibly allege the State Defendants were personally involved in any claimed deprivation—in large part because Plaintiffs do not allege *any* past or current deprivations. Even Plaintiff Reeves, who alleges his rights have already been violated via the "rapid-fire devices" definition, fails to allege any personal enforcement or connection of any kind between the State Defendants and that alleged constitutional deprivation.

Otherwise, the only claims specific to the State Defendants are that (1) the Governor, "in his official capacity, possesses sufficient authority to enforce (and control the enforcement of) the Act," Compl. ¶ 9; and (2) the Attorney General "is the state's Chief Legal Officer whose duty is to ensure that the laws of the State are uniformly and adequately enforced," *id.*, ¶ 10. But this Court need not "accept as true a legal conclusion couched as a factual allegation." *Peterson v. Martinez*, 707 F.3d 1197, 1206 (10th Cir. 2013) (citation omitted). The Complaint's complete lack of specific factual allegations concerning the Governor's or Attorney General's personal involvement in any alleged past constitutional violation renders Plaintiffs' personal-capacity damages claim implausible. *See Porter v. McCurdy*, No. 23-CV-058-RAW-GLJ, 2025 WL 817604, at *5 (E.D. Okla. Mar. 13, 2025) ("In the context of § 1983 cases, it is 'particularly important . . . that the complaint make clear exactly *who* is alleged to have done *what* to *whom*, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state.'" (quoting *Robbins v. Oklahoma*, 519 F.3d 1242, 1249–50 (10th Cir. 2008) (emphasis in original)). Therefore, Plaintiffs' damages claim against State Defendants should be dismissed under Rule 12(b)(6).

24

## CONCLUSION

As set forth above, the Complaint should be dismissed under Rules 12(b)(1) and 12(b)(6).

Respectfully submitted this 1st day of December, 2025.

PHILIP J. WEISER
Attorney General

s/ Kyle M. Holter
***Emily Burke Buckley***
Senior Assistant Attorney General
***Kyle M. Holter***
***Lane Towery***
Assistant Attorneys General
Public Officials Unit | State Services Section
Colorado Department of Law
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
Telephone: 720.508.6000
emily.buckley@coag.gov; kyle.holter@coag.gov;
    lane.towery@coag.gov

*Attorneys for Defendants Jared Schutz Polis and
Philip Jacob Weiser, in their official capacities*