**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:25-cv-02725-WJM-MDB

ISRAEL DEL TORO, LUKE SORENSEN, NATHANAEL SKIVER, JASON
REEVES, GARRETT FLICKER, and the COLORADO STATE SHOOTING
ASSOCIATION,

      *Plaintiffs*,

v.

JARED SCHUTZ POLIS, in his official capacity as Governor of the State of
Colorado; PHILIP JACOB WEISER, in his official capacity as Attorney General of
the State of Colorado; MICHAEL J. ALLEN, in his official capacity as the District
Attorney for the Fourth Judicial District; and LAURA CLELLAN, in her official
capacity as the Acting Director of the Colorado Division of Parks and Wildlife,

      *Defendants*.

---

**Motion for Preliminary Injunction**

---

**Table of Contents**

**Introduction** ................................................................................................................ 1

**Constitutional & Statutory Background** ............................................................. 2

   I.    Second Amendment Doctrine ............................................................................ 2

   II.   Colorado Senate Bill 2025-003's Permit-to-Purchase Scheme ......................... 3

**Factual Background** ................................................................................................. 7

**Legal Standard** ....................................................................................................... 10

**Argument** ................................................................................................................. 11

   I.    Plaintiffs Are Likely to Succeed on the Merits ................................................ 11

        A.   SB25-003's permit-to-purchase scheme is facially unconstitutional ...... 11

            1.    The Second Amendment's text protects the right to acquire
                 the covered firearms, and the state cannot ground its permit-to-
                 purchase scheme in historical firearm regulation ........................... 11

            2.    *Bruen* footnote 9 confirms SB25-003's constitutional infirmities .. 14

        B.   The unavailability of the permitting scheme functions as a
           prohibition as applied to certain law-abiding purchasers ....................... 19

            1.    Implementation failures and confusion make the scheme a
                 de facto ban and unconstitutional waiting period for law-abiding
                 purchasers in underserved counties................................................. 19

            2.    The scheme is unconstitutional as applied to disabled and non-
                 English speaker purchasers ............................................................ 21

   II.   Plaintiffs Will Suffer Irreparable Harm Absent Preliminary Relief .............. 22

   III.  The Balance of Equities and Public Interest Favor Injunctive Relief ............ 23

   IV.  Injunctive Relief Should Extend to CSSA's Current and Future Members
        Because CSSA Has Associational Standing....................................................... 23

**Conclusion** .............................................................................................................. 25

## Introduction

The Second Amendment protects the right to keep and bear arms; it necessarily also protects the right to acquire them. *Ortega v. Grisham*, 148 F.4th 1134, 1143 (10th Cir. 2025). Colorado's new permit-to-purchase scheme for "specified semiautomatic firearms," Colo. Rev. Stat. § 18-12-116, does not merely regulate law-abiding citizens' right to purchase these firearms—it all but eliminates it through a maze of duplicative background checks, state-level bureaucracy, local-government-level bureaucracy, undefined administrative discretion, mandatory multi-day training and testing, and fees compounded into the hundreds of dollars.

The numbers tell the story. A law-abiding Coloradan seeking to exercise his constitutional right must pass a written exam scored more strictly than the one Colorado requires of its own police officers and must spend more money jumping through the state's hoops than many entry-level rifles cost. Many counties have no available trainer at all, which matters because the law requires in-person training. Others leave applicants guessing which vendors to use, whether they must appear in person, where they must go, or how long the process will take. And so on. As one firearms dealer put it, after the state's scheme went into effect on August 1, 2026, 9 out of 10 customers declined to exercise their right to purchase a covered firearm because of the scheme's onerous requirements. If 9 out of 10 citizens abandoned their right to vote or peacefully protest because of state-imposed barriers, the constitutional problem would be obvious. It's no less obvious here.

The state's scheme cannot be reconciled with the Supreme Court's requirement that the government justify restrictions on conduct covered by the Second Amendment by proving they are consistent with this Nation's historical tradition of firearm regulation. *New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*

1

597 U.S. 1, 24 (2022). Further, the Court warned against schemes like Colorado's: one put toward "abusive ends" to deny the fundamental right. *Id.* at 38 n.9. Because Plaintiffs are likely to succeed on the merits, they are suffering irreparable constitutional injury with every day the state's unlawful scheme remains in effect, and neither the equities nor the public interest favor enforcing a law the state itself has not finished building, Plaintiffs respectfully ask this Court to restore the status quo and enjoin enforcement of SB25-003's permit-to-purchase provisions.[1]

## Constitutional & Statutory Background

### I.    Second Amendment Doctrine

The text of the Second Amendment provides: "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. This "right to keep and bear arms is among the 'fundamental rights necessary to our system of ordered liberty.'" *United States v. Rahimi*, 602 U.S. 680, 690 (2024) (quoting *McDonald v. Chicago*, 561 U.S. 742, 778 (2010)).

The Supreme Court's standard for applying the Second Amendment requires courts to first ask whether "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 597 U.S. at 17. If the answer is yes, the conduct is "presumptively protect[ed]," and, to overcome the presumption, "the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* "Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 49, n.10 (1961)).

---

[1] Plaintiffs' counsel conferred with Defendants' counsel by videoconference on August 5, 2026, *see* D.C.COLO.LCivR 7.1(a); the parties did not resolve their disagreement regarding the preliminary relief requested in this motion.

Since *Bruen*, the Tenth Circuit has applied its framework in multiple cases, including in *Ortega*, 148 F.4th 1134. Relevant to *Bruen*'s step one, the court observed, "Common sense dictates that the right to bear arms requires a right to acquire arms, just as the right to free press necessarily includes the right to acquire a printing press, or the right to freely practice religion necessarily rests on a right to acquire a sacred text." *Id.* at 1143. "When 'a text authorizes a certain act, it implicitly authorizes whatever is a necessary predicate of that act.'" *Id.* (quoting Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 96, 192–94 (2012)). The court held that "***acquiring, purchasing, and possessing*** firearms is a necessary predicate to keeping and bearing" arms and is protected by the Second Amendment. *Id.* (emphasis added).

At *Bruen*'s step two, the Tenth Circuit explained that, if the problem that the government is trying to solve is a "general societal problem" that has persisted since the 18th century, the government can meet its burden by showing that earlier generations addressed the issue in a similar manner as the modern government is attempting to do. *Id.* at 1149 (quoting *Bruen*, 597 U.S. at 26–27). "Modern restrictions must be 'relevantly similar' to historical practices in both the 'why' and 'how' they regulate firearms." *Id.* The "central considerations" are "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Bruen*, 597 U.S. at 29. While the state need not identify a "'dead ringer,' [it] must at least present [the court] with a 'ringer.'" *Ortega*, 148 F.4th at 1149 (quoting *Rahimi*, 602 U.S. at 692).

## II.     Colorado Senate Bill 2025-003's Permit-to-Purchase Scheme

In 2025, the Colorado General Assembly enacted Senate Bill 25-003 (SB25-003). S.B. 25-003, 75th Gen. Assemb., 1st Reg. Sess. (Colo. 2025). SB25-003

3

introduced multiple constitutionally suspect provisions that Plaintiffs challenge in this case. This motion for preliminary relief is limited to one of them: Colorado's new permit-to-purchase scheme for certain semiautomatic firearms.

Section 2 of SB25-003 added Colo. Rev. Stat. § 18-12-116, prohibiting the "manufacture, distribution, transfer, sale, and purchase" of a broad class of firearms the statute calls "specified semiautomatic firearms." Section 3 added section 33-9-115, which directs the Colorado Division of Parks & Wildlife (CPW) to construct and operate a statewide records system. The law's prohibition provides: "On or after August 1, 2026, it is unlawful for any person to knowingly manufacture, distribute, transfer, sell, or purchase a specified semiautomatic firearm" subject to narrow exceptions. § 18-12-116(2). Only one exception is available to the public to overcome the prohibition: a training exception in subsection 18-12-116(3)(e)(I).

### *How the permit-to-purchase scheme is supposed to work*

Under subsection 18-12-116(3)(e)(I), a law-abiding citizen may lawfully receive or purchase a specified semiautomatic firearm on or after August 1, 2026, only after completing one of three training options:

- a hunter education course *plus* a four-hour firearms course—both of which must be completed within five years of the purchase, § 18-12-116(3)(e)(I)(A);
- an extended firearms course completed within five years before the purchase, § 18-12-116(3)(e)(I)(B); or
- an extended firearms course completed more than five years before the purchase *plus* a four-hour firearms course completed within five years of the purchase, § 18-12-116(3)(e)(I)(C).

No person may enroll in a course unless he holds an "eligibility card," *infra*, which the instructor must verify through a state database. § 18-12-116(5)(a)(II).

The full permit-to-purchase scheme requires numerous steps, and many of those steps depend on a confusing and incomplete administrative infrastructure.

4

### *Process for obtaining an eligibility card*

**Step 1.** <u>Request a background check from a third-party vendor</u>. The applicant must seek out and obtain a background check from a third-party vendor capable of completing a name-based background check of national and state public criminal history and judicial databases. § 18-12-116(5)(b)(III)(B). The statute names no vendor, directs no agency to approve or publish a list of vendors, and supplies no standard against which a vendor's work is measured.

**Step 2.** <u>Vendor attestation</u>. Obtain the background check and the third-party vendor's attestation that it performed a lawful check. *See id.*

**Step 3.** <u>Apply to the county sheriff</u>. The applicant must submit an application on a form created by CPW to the county sheriff. § 18-12-116(5)(b)(II). In his application, the applicant must attest he has no convictions disqualifying him from purchasing or possessing firearms, he will not violate state firearms law, he will follow state law when he transfers his firearm, and he will not allow a potentially dangerous person to access the firearm. *Id.*

The applicant must also submit government-issued photographic identification, the results of his background check, and the third-party vendor's attestation (again, on an unspecified form). § 18-12-116(5)(b)(III). Finally, the applicant must pay a firearms course eligibility fee. § 18-12-116(5)(b)(V).

**Step 4.** <u>Sheriff review</u>. The county sheriff reviews the application, § 18-12-116(5)(b)(VI)(A), and "shall deny" it if the applicant cannot lawfully possess a firearm or if the sheriff cannot positively identify the applicant, § 18-12-116(5)(b)(VI)(C). The sheriff also "may deny" the application if he believes the applicant will present a danger to himself or others. *Id.* The statute supplies no criteria, no standards, and no decision deadline governing this discretionary

judgment. If the sheriff approves the application, he issues an eligibility card to the applicant. § 18-12-116(5)(b)(I). The card is valid for five years, but it may be revoked should the sheriff discover one of the above conditions. *Id.*

### *The database*

**Step 5.** <u>Sheriff reports issuing the eligibility card</u>. The sheriff reports the issued card in a statewide records system. § 18-12-116(5)(b)(VII). That system is a single statewide database built and operated by CPW. § 33-9-115(2). It must permit access to sheriffs to enter cardholder information, instructors to access cardholder information and enter course completions, and federally licensed dealers to identify whether a purchaser completed the statutory training. § 33-9-115(3).

### *Training courses*

**Step 6.** <u>The instructor verifies the card</u>. Before an applicant may participate in either the four-hour or extended firearms course, the instructor must verify that the applicant holds a valid card. § 18-12-116(5)(a)(II).

**Step 7.** <u>Complete statutory training</u>. A basic course requires at least four hours of instruction, and the extended course requires at least twelve. § 18-12-116(5)(a)(III). The extended course training must occur over at least two days, *id.*, and the training may not be conducted online, § 18-12-116(5)(a)(I).

**Step 8.** <u>Ace the test</u>. After the applicant participates in the firearms course, the applicant must score 90% on a written exam. § 18-12-116(5)(a)(V).

**Step 9.** <u>Report the completion</u>. The instructor reports the applicant's course completion in the database. § 18-12-116(5)(a)(VI).

### *Purchase and delivery*

**Step 10.** <u>Purchase</u>. After step 9, the applicant is permitted to purchase a specified semiautomatic firearm. When the applicant goes to a federally licensed

dealer to make the purchase, the dealer must access the database to confirm that the applicant completed the statutory training. § 33-9-115(3)(d). If he did, the dealer may complete the purchase subject to yet another background check at step 11.

**Step 11.** <u>Dealer background check and three-day wait</u>. Before the applicant may receive the firearm, the dealer completes yet another background check, which initiates a statutory waiting period. The applicant will not be able to accept delivery until either three days after the dealer's background check or the seller receives approval from the Colorado Bureau of Investigation after the Bureau completes its own check. § 18-12-115(1); *see also* § 18-12-101(1)(e).

**Step 12.** <u>Delivery</u>. § 18-12-115(1).

### Factual Background

SB25-003 was signed into law on April 10, 2025, and sections 2 and 3's permit-to-purchase scheme did not go into effect until August 1, 2026. The general assembly delayed its operative date—roughly 16 months—for CPW to build the administrative infrastructure the scheme requires.

CPW had that entire window to construct a functioning system coordinating between participants: 64 county sheriffs, hundreds of third-party vendors such as trainers and background-check companies, law-abiding purchasers, and firearms dealers. Despite this, CPW did not release the training curriculum that certified instructors are required to teach—a pinch point to the scheme—until the second half of July 2026, two weeks before the August 1 effective date. (Fenlason Decl. ¶ 15; Lockburner Decl. ¶ 21.) Unsurprisingly, instructors, sheriffs, and applicants were left to prepare for a mandatory, score-gated training course without knowing its content until days before the law required compliance. (Fenlason Decl. ¶¶ 14–17; Lockburner Decl. ¶¶ 21–23.)

To make matters worse, the general assembly outsourced the front end of the scheme—intake, background screening, and card issuance based on discretionary standards—to Colorado's 64 county sheriffs, ***without*** statutory funding, staffing support, or operational guidance. (Mikesell Decl. ¶¶ 9–16, 23–24; Smith Decl. ¶¶ 5, 10–12; Fenlason Decl. ¶ 22.) The predictable result is a patchwork: some sheriffs are piecing programs together, others refuse to, while others are looking to the state for answers. (Fenlason Decl. ¶¶ 23–36; Mikesell Decl. ¶¶ 28–29; Smith Decl. ¶¶ 13, 18.) Even applicants in counties with participating sheriffs face basic uncertainty about the process, including which third-party vendors may be used for the required background check, who makes the request, whether results are transmitted to the applicant or held by the sheriff's office, and whether the applicant must appear in person to apply, submit to screening, and receive the card. (Fenlason Decl. ¶ 34; Flanell Decl. ¶¶ 11–13; Mikesell Decl. ¶¶ 17–21.) That in-person requirement is significant for many Coloradans: it requires travel, sometimes over significant distances in rural counties, and scheduling to simply begin the process. (Fenlason Decl. ¶¶ 10–13; Hohnholz Decl. ¶¶ 10–11.)

Even where a sheriff is participating, neither statute nor CPW specifies what a background check must contain or how it must be conducted, leaving sheriffs' offices to guess. (Mikesell Decl. ¶¶ 17–21; Smith Decl. ¶¶ 14–16; Fenlason Decl. ¶ 34.) The Act also leaves to each sheriff unguided discretion in determining whether to deny an application because an applicant "present[s] a danger to themselves or others"—a standard with obvious constitutional weight and no statutory or regulatory content to cabin it, applied inconsistently from county to county, applicant to applicant. (Mikesell Decl. ¶¶ 23–24; Smith Decl. ¶¶ 17–20.)

8

The training side of the scheme is no better. CPW maintains a list of approved trainers, but that list does not reflect reality. Many counties have no listed trainer at all. (Fenlason Decl. ¶¶ 9-12.) Of the trainers listed, some are not offering the course, some were included in error, some have not been able to begin offering training because CPW did not deliver the curriculum in time, some have no available course dates for the foreseeable future, and none appear to offer accommodations for applicants with disabilities. (Fenlason Decl. ¶¶ 14–21; Lockburner Decl. ¶¶ 21–24, 35-36; Shaffer Decl. ¶¶ 24, 30–33.)

For the applicants who do locate an available training course, the cumulative cost of compliance is severe. For example, one declarant reported costs of approximately $30 for an initial background check, $52 for a CPW database fee, $132.10 for the Denver sheriff's processing and records fee, and $375 for the required training course—a total that can exceed $589 before an applicant has purchased a firearm in the first instance. (Elliott Decl. ¶¶ 8–11, 15.) That sum exceeds the retail price of an entry-level AR-15 (Elliott Decl. ¶ 14; Brownlee Decl. ¶ 4), meaning the state's permitting process can cost more than the firearm itself.

Cost is only part of the burden. The mandatory course requires 12 hours of in-person instruction over two days, forcing many applicants to take time off work. (Fenlason Decl. ¶¶ 12–13; Hohnholz Decl. ¶ 21.) Applicants in rural counties with no local trainer must also travel—in some cases considerable distances—to attend the training, compounding the time and expense already required simply to sit for the course. (Fenlason Decl. ¶¶ 9–13; Hohnholz Decl. ¶¶ 9–10, 20.)

And applicants who clear every prior obstacle—cost, availability, travel, and time away from work—must then pass a written examination with a 90% score to receive their eligibility card. (Flanell Decl. ¶ 19; Lockburner Decl. ¶ 32; Shaffer

9

Decl. ¶¶ 25, 28–29.) That threshold exceeds the score Colorado requires of its own police officers: the minimum passing score on the Colorado POST written certification examination is 70%.[2] That means SB25-003 imposes a higher testing standard on ordinary, law-abiding civilians seeking to exercise a fundamental right protected by the Second Amendment than the state imposes on candidates to achieve state law enforcement certification.

Even an applicant who successfully navigates the gauntlet of background checks, sheriff processing, training availability, cost, logistics, and acing the examination is not yet done. Upon receiving the state's permission to purchase, a purchaser is subject to a second, independent background check at the point of sale, followed by a mandatory three-day waiting period before the trebly vetted, law-abiding citizen may take possession of the firearm. (Flanell Decl. ¶ 22; Lockburner Decl. ¶ 42.) Firearms dealers report that law-abiding customers have stopped buying specified semiautomatic firearms because of the onerous scheme (Flanell Decl. ¶¶ 6–7; Lockburner Decl. ¶¶ 11–15, 45–47)—precisely the state's aim.

### Legal Standard

"District courts have discretion over whether to grant preliminary injunctions." *Free the Nipple-Fort Collins v. City of Fort Collins, Colo.*, 916 F.3d 792, 796 (10th Cir. 2019). A plaintiff seeking a preliminary injunction must show: "(1) a likelihood of success on the merits; (2) that they will suffer irreparable harm; (3) that the balance of equities tips in their favor; and (4) that the injunction is in the public interest." *Petrella v. Brownback*, 787 F.3d 1242, 1257 (10th Cir. 2015).

---

[2] *See* Colorado Dep't of Law Crim. Just. Section, POST Manual, Rule 15–Certification Examination Basic, Provisional, Renewal and Rule 1–Definitions, subsection "(rr)," https://bit.ly/3SlltaU.

10

Plaintiffs seek a preliminary injunction to preserve the status quo—when law-abiding Coloradans were able to purchase semiautomatic firearms without navigating the constitutionally burdensome and incomplete permit-to-purchase scheme imposed by SB25-003. Because this motion seeks to maintain the pre-SB25-003 scheme when no state permit was required, the requested injunction does "not compel [the state] to do something it was not already doing during the last uncontested period preceding the injunction." *See Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1155 (10th Cir. 2001).

**Argument**

**I.     Plaintiffs Are Likely to Succeed on the Merits**

    **A.     SB25-003's permit-to-purchase scheme is facially unconstitutional**

        1.     The Second Amendment's text protects the right to acquire the covered firearms, and the state cannot ground its permit-to-purchase scheme in historical firearm regulation

This case is about the right to acquire a broad class of semiautomatic firearms in Colorado. Under *Bruen*, courts first consider whether "the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 24. The burden then shifts to the government to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Id.*

The Tenth Circuit has answered whether the conduct of acquiring a firearm is covered by the plain text of the Second Amendment. In *Ortega*, the circuit held that "the right to bear arms requires a right to acquire arms," 148 F.4th at 1143, and that "cooling-off periods infringe on the Second Amendment by preventing the lawful acquisition of firearms." *Id.* at 1139. This is binding. It is also consistent with

11

longstanding Supreme Court precedent applying the Bill of Rights: constitutional rights necessarily include those rights attendant to exercising them. *See, e.g.*, *Minneapolis Star and Trib. Co. v. Minn. Com'r of Rev.*, 460 U.S. 575 (1983) (taxing use of ink and paper directed at newspapers violated First Amendment).

Indeed, the right to acquire firearms is widely recognized even by courts with an overly narrow view of the Second Amendment. *See, e.g.*, *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) ("the core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms"). SB25-003 thus plainly regulates conduct, the acquisition of firearms, "presumptively protect[ed]" by the Second Amendment.[3]

Once it is established that the Constitution "presumptively" protects the conduct, "the government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 597 U.S. at 24. Colorado cannot carry this burden. Permit-to-purchase schemes are a twentieth-century invention, and only a handful of states have ever adopted them. As the Tenth Circuit noted in its recent binding decision, there is no analogous historical tradition to support even a seven-day cooling off period, *Ortega*, 148 F.4th

---

[3] Further, the state's permitting scheme concerns "'Arms,' *i.e.*, any weapon customarily used for offensive or defensive purposes." *Wolford v. Lopez*, 146 S. Ct. 2032, 2043 (2026). There can be little doubt that Colorado's sweeping definition of "specified semiautomatic firearms," covering over 800 models including the most popular rifle in America (AR-15s), regulates "Arms" under the Second Amendment. *See Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280, 297 (2025) (unanimously recognizing the AR-15 is "the most popular rifle" in America); *see also Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. N.J.*, --- F.4th ----, 2026 WL 2075513, at *15 (3d Cir. July 17, 2026) ("Because semi-automatic rifles are firearms, they are 'Arms' within the meaning of the Second Amendment.").

12

at 1139, 1150–55, so a reticulated permitting scheme that will take many more weeks to comply with pre-purchase cannot have any supporting historical tradition.

Colorado may attempt to carry its burden by pointing to the handful of twentieth century waiting-period laws. That doesn't work. The first waiting period law was in 1923, and it was only for **_one day_**, in California, and only to provide time to complete a background check. *See* David Kopel, Written Testimony on HB23-1219 (Mar. 6, 2023), https://bit.ly/3RYL758. That's far too late under *Bruen.* 597 U.S. at 66, n.28 ("As with their late-19th-century evidence, the 20th-century evidence presented by respondents and their amici does not provide insight into the meaning of the Second Amendment [.]"); *see also Ortega*, 148 F.4th at 1150.

In fact, there is no true historical analogue for Colorado's unprecedented combination of restrictions and sequential steps involving numerous private actors and multiple governmental agencies, to say nothing of the ill-defined discretionary review and punitive 90% testing requirement (above and beyond that required for law enforcement weapons training). No expert can identify such a historical analogue because none exists. Colorado's restrictions, when considered from the perspective of a law-abiding citizen attempting to acquire a common firearm, are cumulative, resulting in unreasonable and excessive delay, huge burdens from the time and money required, and without history or tradition supporting such a complex and burdensome pre-acquisition permitting process.

Colorado's permit-to-purchase scheme operates as a de facto ban for many, or as a weeks-long waiting period, at best, for those who do pay the time and fees and jump through all the unnecessary hoops. The end result is the same for Second Amendment purposes: Colorado's newly invented scheme "severely burdens" the ability of Coloradans to acquire these arms, and the "regime hobbles what the

13

Second Amendment protects," just as Hawaii's ill-fated and similarly novel law restricting the right to carry on public property did. *Wolford*, 146 S. Ct. at 2041. Colorado's law must meet the same fate.

        2.     *Bruen* footnote 9 confirms SB25-003's constitutional infirmities

The state previously argued that the new permit-to-purchase scheme "is a presumptively constitutional 'shall-issue' licensing law" under *Bruen* footnote 9. (*See* Defs.' Mot. to Dismiss First Am. Compl. 1, Doc. 51.) To the state, it can bypass *Bruen*'s holding altogether—its two-step framework and burden shifting—by applying "shall-issue" labeling. (*Id.* at 16–17 (citing *Bruen*, 597 U.S. at 38, n.9).) But *Bruen* footnote 9 "is not … 'a different analysis' separate from or in addition to the history-and-tradition framework the Court instructed [courts] to employ in *Bruen*." *Maryland Shall Issue, Inc. v. Moore*, 116 F.4th 211, 232 (4th Cir. 2024) (Rushing, J., concurring); *id.* ("[I]t would be bizarre for the Court to double down on the interpretive standard from *Heller*, which 'centered on constitutional text and history,' and then, in a footnote, introduce an entirely distinct standard for only a small subset of regulations." (citation omitted)).

Further, footnote 9 is inapplicable on its face for two reasons. *First*, in the footnote, the Court distinguished New York's may-issue ***concealed-carry*** scheme from the 43 states' shall-issue carry schemes. The Court made clear throughout the footnote its concern was with the right "to public carry," not the antecedent right to acquire a firearm. *See Bruen*, 597 U.S. at 38, n.9. The right to carry an already-acquired firearm in public spaces is different from the right to acquire a firearm in the first instance. The Tenth Circuit confirmed in *Ortega* that "[o]ne cannot keep or bear arms if one cannot acquire them." 148 F.4th at 1143, n.3. Acquisition is core (indeed, a logical predicate) to the right to "keep and bear arms" rather than

14

ancillary to the exercise of that right. Thus, conditioning acquisition on government permission implicates a more fundamental aspect of the Second Amendment that footnote 9 does not address. Here, extending the footnote beyond its context would constitute impermissible judicial expansion of dicta.

*Second*, Colorado's scheme is not the type of "shall-issue" regime that footnote 9 contemplates. The Court in *Bruen* contrasted permissible shall-issue carry schemes, which "contain only 'narrow, objective, and definite standards' guiding licensing officials," *Bruen*, 597 U.S. at 38, n.9 (quoting *Shuttlesworth v. Birmingham*, 394 U.S. 147, 151 (1969)), with may-issue carry schemes that require "the 'appraisal of facts, the exercise of judgment, and the formation of an opinion,'" *id.* (quoting *Cantwell v. Connecticut*, 310 U.S. 296, 305 (1940)). SB25-003 has multiple "may" issue features. It grants sheriffs discretion to deny eligibility cards (***the*** prefatory step under the new scheme) based on the sheriff's "reasonable belief" that the applicant "present[s] a danger to themselves or others" even if the applicant passes the background check. *See* Colo. Rev. Stat. § 18-12-116(5)(b)(VI)(C). It also requires citizens to pass a test with a 90% score, § 18-12-116(5)(a)(V), which cannot be squared with a "shall-issue" scheme. This discretion and uncertainty foreclose any comparison to the shall-issue carry schemes the Supreme Court discussed in footnote 9.

But more importantly, the Court underscored that "because any permitting scheme can be put toward abusive ends," the Second Amendment does not countenance "regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry." *Bruen*, 597 U.S. at 38, n.9. In doing so, the Court drew on First Amendment prior-restraint doctrine. *Id.* (quoting *Shuttlesworth*, 394 U.S. at 150–51 ("a law subjecting

15

the exercise of First Amendment freedoms to the prior restraint of a license, without narrow, objective, and definite standards to guide the licensing authority, is unconstitutional")). In the narrow context where the First Amendment may tolerate advance permitting, any such scheme "must meet certain constitutional requirements." *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 130 (1992); *see also FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 228 (1990). Those constitutional minimums include: avoiding "delegate[ing] overly broad licensing discretion to a government official," *Forsyth Cnty.*, 505 U.S. at 130; time frames that are "specified" in advance, avoidance of undue delays, and the availability of prompt judicial review, *FW/PBS, Inc.*, 493 U.S. at 228; and that the practical logistical burdens on acquisition and possession based on the permit-to-purchase scheme—which are akin to logistical limitations on the "time, place, and manner" of speech—"must be narrowly tailored to serve a significant governmental interest" and ultimately "must leave open" the full exercise of Second Amendment rights. [4]

SB25-003 runs afoul of these constitutional minimums.

1. No overall time limit. Indeed, delay is baked into the scheme at every step. There is no statutory deadline for the sheriff to review eligibility-card applications—or any guarantee the sheriff will review the application. (Mikesell Decl. ¶¶ 28–29.) Even after the sheriff issues an eligibility card, the applicant must navigate layers of training by private parties. There are no statutory guarantees that training will be provided, when it will be offered, or where it will be held. (Fenlason Decl. ¶¶ 14–17; Lockburner Decl. ¶¶ 21–25; Smith Decl. ¶¶ 21–25.) The state's scheme is akin to conditioning speech at an upcoming protest on traveling

---

[4] To be clear, because *Bruen* resolves the threshold Second Amendment question through text and history, not interest-balancing, First Amendment doctrine does not substitute for that inquiry.

16

hours to attend a two-day training on how to peacefully protest. That would be constitutionally absurd under the First Amendment; the same is true under the Second Amendment. Further, the declarants' experience establishes that running the gauntlet of the permitting process will take weeks and months, not days (Brownlee Decl. ¶¶ 28–29; Burgess Decl. ¶¶ 19–27, 36; Cummings Decl. ¶ 38; Manson Decl. ¶¶ 10–16), which is itself constitutionally infirm under *Ortega*.

2. Lack of objective criteria. As discussed, the "reasonable belief" standard for eligibility-card denials introduces subjective judgment rather than "narrow, objective, and definite standards." *See Bruen*, 597 U.S. at 38 n.9. And there is also reason to question whether sheriffs will exercise their discretion or participate in the permit-to-purchase scheme. (Mikesell Decl. ¶¶ 23–29.) A permitting process, even one based on objective criteria, that is unavailable is not constitutionally adequate. *See FW/PBS*, 493 U.S. at 228 ("the licensor must make the decision whether to issue the license within a specified and reasonable time period").

3. Absence of prompt judicial review. While the Act mentions "judicial review" for denials, Colo. Rev. Stat. § 18-12-116(5)(b)(X), it effectively conditions that review on winning. Not only must an applicant who is denied an eligibility card initiate an independent court action (a process that will take months and can be cost prohibitive), but if the applicant loses, he could be on the hook for ***the government's*** fees. § 18-12-116(5)(b)(X)(C). The deterrent effect will be palpable. Indeed, while subsection 18-12-116(5)(b)(X) closely tracks the provision approved in *City of Littleton, Colo. v. Z.J. Gifts D-4, L.L.C.*, 541 U.S. 774, 777 (2004), it grafts on a new governmental shield: a "prevailing party" provision. *Cf. Christiansburg Garment Co. v. Equal Emp. Opportunity Comm'n*, 434 U.S. 412, 422 (1978) (noting "[t]o take the further step of assessing attorney's fees against plaintiffs simply

17

because they do not finally prevail would substantially add to the risks inhering in most litigation and would undercut the efforts" to protect statutory rights).

4. Exorbitant cumulative costs. The scheme imposes layers of fees: a third-party background check fee, a "Firearms Safety Course Eligibility Card" fee, a sheriff's processing and records fee, and unspecified course enrollment fees. All told, these fees could exceed $600—maybe more. (Elliott Decl. ¶¶ 8–11, 15.) Yet, a basic, entry-level AR-15 costs less than $500. (*Id.* ¶ 14.) These cumulative charges are exactly the "exorbitant fees" that *Bruen* warned would "deny ordinary citizens" their rights. And it's in part why the Court has struck fees imposed "for the enjoyment of a right granted by the federal constitution." *Murdock v. Pennsylvania*, 319 U.S. 105, 113 (1943) (striking down door-to-door religious-solicitation license fee under the First Amendment). Colorado has taxed law-abiding citizens with costly fees that prohibit the exercise of a fundamental right.

5. The scheme does not "leave open" alternatives to the full exercise of Second Amendment rights. Under *Forsyth County*, a permitting system must ultimately "leave open" the exercise of the right being regulated. 505 U.S. at 130. Here, the scheme imposes a universal chokepoint: every path to acquisition of a covered firearm runs through the state's permitting scheme such that for an applicant priced or delayed out of the process, there is no "alternative channel" to lawfully acquire the firearm. There is no option to go to another store or wait another day. This is particularly true in counties where the SB25-003 infrastructure is non-operational, e.g., no participating sheriff, no trainers, and backlogs (Mikesell Decl. ¶¶ 26, 28–29; Fenlason Decl. ¶¶ 9, 14–17, 23–36). *See McCullen v. Coakley*, 573 U.S. 464 (2014) (noting while sidewalk counselors could still be "seen and heard" outside

18

the buffer zone at abortion clinic that "misses the point" because their communication (quiet, close, personal conversation) had been eliminated).

In the end, Colorado's scheme layers "prophylaxis-upon-prophylaxis," *cf. McCutcheon v. FEC*, 572 U.S. 185, 221 (2014), piling background check upon background check, training requirement upon training requirement, fee upon fee, and delay upon delay with no limits and no practical mechanism to force the system to function for law-abiding purchasers. This is the definition of a licensing scheme "put toward abusive ends." *Bruen*, 597 U.S. at 38 n.9.

### B.    The unavailability of the permitting scheme functions as a prohibition as applied to certain law-abiding purchasers

1.    Implementation failures and confusion make the scheme a de facto ban and unconstitutional waiting period for law-abiding purchasers in underserved counties

SB25-003 has been in effect since August 1. Plaintiffs know of no Coloradan who successfully completed the process. Not only that, but applicants who reside in counties where the sheriff will not process eligibility-card applications, no trainer is available, or both, face not only a constitutional burden but a total bar. Teller, Montezuma, and Bent Counties have each declined to participate, while Montrose's and Otero's commissioners have formally opposed the Act and their sheriffs cannot be reached. (Mikesell Decl. ¶¶ 26, 28–29; Fenlason Decl. ¶¶ 28–31; Hohnholz Decl. ¶¶ 7–10.) CSSA's outreach to all 64 sheriffs' offices identified a functioning application process in fewer than 20 counties, with at least 23 unreachable or uninformed, and 21 (or 33%) other counties with no approved trainer offering both trainings. (Fenlason Decl. ¶¶ 9, 22–24.) Nor can these applicants simply apply elsewhere: some sheriffs' offices, including Mineral County, refuse applications from non-county residents altogether, and others impose higher fees on out-of-county

19

applicants and related cross-county travel burdens that are exacerbated in rural areas. (Fenlason Decl. ¶ 27; Hohnholz Decl. ¶¶ 8–11; Brownlee Decl. ¶¶ 22–27.)

This unique harm also greatly exceeds *Bruen*'s own footnote-9 examples. Footnote 9 flags "lengthy wait times" and "exorbitant fees" as abusive administration. *Bruen*, 597 U.S. at 38 n.9. Law-abiding purchasers in underserved counties face not only long waits but unbounded ones, and not high fees but no functioning process to pay one at all. (Brownlee Decl. ¶¶ 22, 28–29.) If delay and cost can render a shall-issue license-to-carry scheme abusive, no operating intake mechanism necessarily qualifies. The same logic independently establishes an unconstitutional waiting period under *Ortega*: if a fixed seven-day statewide wait is unconstitutional, an indefinite non-processing period is worse still.

Nor can the state dismiss the mayhem by pleading "local choice," because it chose the Hobson's choice. Sheriffs warned before enactment that they lacked the staff and funding to administer the permit process. (Mikesell Decl. ¶¶ 6–12.) And when they sought state funding to comply, CPW deflected the financial burden to applicants. (*Id.* ¶¶ 13–15 (explaining he would have to charge approximately $400 per applicant to offset the cost).) The state thus left counties little choice.

Where a process nominally exists, unbridled discretion and pervasive misinformation leave it unavailable in substance. Sheriffs state that there is "no objective standard or other criteria" for exercising their discretion to deny an application based on perceived danger to self or others. (*Id.* ¶¶ 23–24; Smith Decl. ¶¶ 17–20.) CSSA's outreach found the same arbitrariness in background-check guidance and documented affirmatively incorrect instructions, including Rio Grande County telling applicants to obtain the eligibility card before ever contacting the

20

sheriff. (Fenlason Decl. ¶¶ 32–34.) For applicants navigating this standardless and contradictory guidance, the process is illusory even where it exists on paper.

Thus, although the permitting scheme is abusive as to all law-abiding purchasers, it is particularly unconstitutional as applied to residents of counties lacking a functioning process.

2.    The scheme is unconstitutional as applied to disabled and non-English speaker purchasers

Every applicant, without exception, must complete an in-person course of four to 12 hours, "demonstrate the ability to safely handle firearms and a mastery of gun safety," and pass a written examination scored at 90% or higher. § 18-12-116(5)(a). The Act provides no accommodation or alternative format for applicants who cannot meet these conditions because of disability or language barriers. A condition that a class of applicants cannot physically or cognitively satisfy is not a regulation of their right to acquire a firearm—it is a prohibition.

Plaintiff Del Toro illustrates this most acutely. He was severely wounded in a 2005 IED attack in Afghanistan, suffering burns over 80% of his body and losing one hand and most of the fingers on the other. (First Am. Compl. ¶¶ 1–2, Doc. 33.) As alleged, "[t]he Act provides no accommodations or exceptions to the onerous courses and exams for disabled persons." (*Id.* ¶ 2.) Thus, the Act "effectively forecloses [the] exercise of [his] right" to defend himself "in the way that is most practical given his physical disability"—by use of an AR-15 platform. (*Id.*)

Likewise, Charles Sloan and Joshua Moothart, both profoundly Deaf and native ASL signers, face the same wall by a different route. Neither can access spoken in-person instruction without a qualified ASL interpreter, and both explain the multi-hour course requires two interpreters working in shifts at $80–$120 per

21

hour each, potentially exceeding a thousand dollars. (Sloan Decl. ¶¶ 11–18; Moothart Decl. ¶¶ 10–15.) Both also fear failing the written examination because English is not their first language, and the Act provides no ASL-accessible testing format. (Sloan Decl. ¶¶ 19–21; Moothart Decl. ¶¶ 16–19.) Vivian Laugesen, whose first language is Spanish, faces similar barriers. (Laugesen Decl. ¶¶ 6–21.) And John Newbill's dyslexia produces the same result through a cognitive barrier: he requires audio formatting, extended time, or a reader to meaningfully engage with the course and examination, accommodations SB25-003 does not offer even though Colorado accommodates the equivalent burden for voting. (Newbill Decl. ¶¶ 15–19, 23–24.) That the state accommodates one constitutional right while refusing to accommodate another underscores the problem.

Each of these purchasers is "willing and able to safely own and use firearms." (Sloan Decl. ¶ 24; Moothart Decl. ¶ 21; Laugesen Decl. ¶¶ 4, 18; Newbill Decl. ¶ 26.) What stands between them and that right is not a lack of qualification, but rather the state taking away a right through an unworkable permitting scheme. As applied, SB25-003 does not regulate the right to acquire a firearm—it eliminates it.

## II.   Plaintiffs Will Suffer Irreparable Harm Absent Preliminary Relief

"What makes an injury 'irreparable' is the inadequacy of … a monetary remedy after a full trial." *Free the Nipple-Fort Collins*, 916 F.3d at 806. "When a plaintiff is asserting an injury in the form of a violated constitutional right, we presume that the injury will be irreparable if it exists." *Ortega*, at 1142.

Plaintiffs have established that they will prevail on the merits of their constitutional claim. Recently, the Ninth Circuit confirmed that in cases involving a Second Amendment claim, a likelihood of success on the merits usually establishes irreparable harm. *Baird v. Bonta*, 81 F.4th 1036, 1048 (9th Cir. 2023). Such a

likelihood "strongly tips the balance of equities and public interest in favor of granting" an injunction. *Id.*; *see also Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011) (also applying principle in Second Amendment context); *Free the Nipple-Fort Collins*, 916 F.3d at 805 (10th Cir. 2019) ("Most courts consider the infringement of a constitutional right enough and require no further showing of irreparable injury."). Here, because Plaintiffs have demonstrated a likelihood of succeeding on the merits, they have also shown irreparable harm.

### III.    The Balance of Equities and Public Interest Favor Injunctive Relief

These factors merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). A plaintiff's likelihood of success on the merits of a Second Amendment claim tips the merged third and fourth factors in their favor, because "public interest concerns are implicated when a constitutional right has been violated, [and] all citizens have a stake in upholding the Constitution." *Baird*, 81 F.4th at 1042 (quoting *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005)). In *Chamber of Com. of U.S. v. Edmondson*, the Tenth Circuit said courts must be mindful that even if a state is pursuing a legitimate goal (there, deterring illegal immigration), it has no interest in doing so by unlawful means. 594 F.3d 742, 771 (10th Cir. 2010). Simply, "the public interest will perforce be served by enjoining the enforcement of the invalid provisions of state law." *Id.*; *see also Utah Licensed Bev. Ass'n v. Leavitt*, 256 F.3d 1061, 1076 (10th Cir. 2001) (public interest favors enjoining unconstitutional statutes).

### IV.    Injunctive Relief Should Extend to CSSA's Current and Future Members Because CSSA Has Associational Standing

An association, such as CSSA, has "standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own

23

right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 181 (2000). CSSA meets each prong.

*First*, CSSA's members would have standing to sue. CSSA's members—including Brownlee, Burgess, and Cummings—are subject to the state's new permit-to-purchase scheme (*see, e.g.*, Brownlee Decl. ¶¶ 3–5; Burgess Decl. ¶¶ 4–5; Cummings Decl. ¶¶ 3, 5–7); have begun applying for specified semiautomatic firearms that could be used for the defense of themselves and their families (Brownlee Decl. ¶¶ 4, 6–17; Burgess Decl. ¶¶ 5, 9–19; Cummings Decl. ¶¶ 5, 8–19); and, to date, despite diligent efforts to complete SB25-003's permit-to-purchase process, have been unable to acquire the desired firearms because of the state's unconstitutional infringement on Second Amendment rights (Brownlee Decl. ¶¶ 28–29; Burgess Decl. ¶ 36; Cummings Decl. ¶ 38). That is a concrete, particularized injury; it is fairly traceable to the state's permit-to-purchase scheme; and a favorable ruling would redress it. *See Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1126 (10th Cir. 2013).

*Second*, protecting the fundamental right and interests at issue in this case **is** CSSA's purpose; its mission is "[t]o advance, preserve, and exercise the natural right of gun ownership by Coloradans." *See* Mission Statement, Colo. State Shooting Ass'n, https://bit.ly/4pYSd6a. CSSA advances its mission by advocating for the protection of its members' ability to exercise their constitutional right to purchase firearms by filing and participating in litigation like this case.

*Third*, neither plaintiffs' Second and Fourteenth Amendment claims nor their requested relief require participation by individual members. Because CSSA seeks

24

injunctive relief on behalf of its members, "it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured." *Warth v. Seldin*, 422 U.S. 490, 515 (1975).

Further, federal courts have granted injunctive relief to future members of an association where the requested relief is narrow, the future members are not already covered by other litigation, and judicial efficiency weighs in favor of protecting future members. *See Catholic Benefits Ass'n v. Burrows*, 732 F. Supp. 3d 1014, 1028 (D.N.D. 2024). Here, Plaintiffs are seeking a narrow injunction enjoining only SB25-003's permit-to-purchase scheme that went into effect on August 1, 2026, until after a trial on the merits; CSSA only asks the Court to grant injunctive relief for future CSSA members who are not in litigation pertaining to the permitting scheme; and, given the indefinite delay that the prohibition causes in obtaining firearms, granting injunctive relief favors judicial efficiency by minimizing successive litigation by applicants.

## Conclusion

Plaintiffs ask the Court to enter a preliminary injunction enjoining the state from enforcing SB25-003's prohibition and permit-to-purchase scheme because it is unconstitutional. Alternatively, the Court should enjoin the permitting scheme as applied to Plaintiffs and CSSA's current and future members.[5]

---

[5] Courts have wide discretion under Rule 65(c) in determining whether to require a bond. A bond is unnecessary in a case that seeks to enforce a constitutional right against the government. *See Rocky Mountain Gun Owners v. Polis*, 2023 WL 5017253, at *20 (D. Colo. Aug. 7, 2023). Plaintiffs therefore respectfully request that no bond requirement be imposed.

Dated: August 11, 2026.          Respectfully submitted,


*s/ Julian R. Ellis, Jr.*

Julian R. Ellis, Jr.
Robert J. Bucknam
**First & Fourteenth PLLC**
2 N. Cascade Ave., Suite 1430
Colorado Springs, CO 80903
Phone: (719) 428-4937
Email: julian@first-fourteenth.com
      rob@first-fourteenth.com

Michael Francisco
**First & Fourteenth PLLC**
800 Connecticut Avenue, Suite 300
Washington, D.C. 20006
Phone: (202) 784-0522
Email: michael@first-fourteenth.com

Michael D. McCoy
William E. Trachman
**Mountain States Legal Foundation**
2596 South Lewis Way
Lakewood, Colorado 80227
Phone: (303) 292-2021
Email: mmccoy@mslegal.org
      wtrachman@mslegal.org

Joseph G.S. Greenlee
**NRA – Institute for Legislative Action**
11250 Waples Mill Road
Fairfax, VA 22030
Phone: (703) 267-1161
Email: jgreenlee@nrahq.org

*Attorneys for Plaintiffs*

26

## Certificate of Service

I certify that on August 11, 2026, the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*s/ Thailia Mederos*

FIRST & FOURTEENTH PLLC

27