**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:25-cv-02725-WJM-MDB

ISRAEL DEL TORO, et al.,
Plaintiffs,

v.

JARED SCHUTZ POLIS, in his official capacity as Governor of the State of Colorado, et al.,
Defendants.

---

**RESPONSE IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**

---

A person with a genuine intent to comply with SB25-03's requirements for obtaining a specified semiautomatic firearm ("SSF") can do so within a matter of days. In fact, since the law's licensing requirement became effective, more than 500 people have completed the process and are able to lawfully purchase a covered firearm. Over 1,100 have received eligibility cards entitling them to complete a safety training course. To date, zero applicants have "failed" the safety course's exam despite the test's 90% scoring requirement.

These facts confirm that SB25-03's "shall-issue" licensing scheme, the type of law deemed presumptively lawful in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1, 38 n.9 (2022), is constitutional. Plaintiffs' anecdotal evidence about partial or speculative attempts to meet the law's requirements cannot overcome that presumption. But even if the Act were not *presumptively* constitutional, it would survive scrutiny under the second step of *Bruen* because it finds an analogue in the nation's historical laws requiring a permit to carry. These laws, which gained widespread acceptance during the mid- to late-1800s, were consistent with, and an extension of, earlier outright public carry prohibitions. Indeed, SB25-03 would survive scrutiny

under the Second Amendment even if it operated as an outright ban on SSFs, as the First, Second, Fourth, and Seventh Circuits have all held.

On the remaining preliminary injunction factors, Plaintiffs fail to show that they will be irreparably harmed by being subject to a licensing scheme covering only certain firearms, and they cannot show that their interest in immediate access to SSFs outweighs the public interest in safety and violence reduction. Additionally, Plaintiffs seek relief they cannot get. This Court is without equitable authority to provide relief to all future Colorado State Shooting Association ("CSSA") members or against third parties (including county sheriffs) who are not before this Court. What's left—enjoining Defendants from their role in the implementing the Act—will only make it more difficult for law-abiding citizens, including CSSA members, to obtain an SSF.

## LEGAL STANDARDS

To warrant the "extraordinary remedy" of preliminary relief, Plaintiffs must show that they are likely to succeed on the merits, are likely to suffer irreparable harm in the interim, and that an injunction is both equitable and in the public interest. *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20, 24 (2008). Plaintiffs bear the burden of proof to demonstrate on all four factors. *Denver Homeless Out Loud v. Denver*, 32 F.4th 1259, 1278 (10th Cir. 2022).

## ARGUMENT

### I. Plaintiffs are not substantially likely to succeed on the merits.

The Second Amendment protects "the right of the people to keep and bear Arms." U.S. Const. amend. II. The right is "not unlimited." *District of Columbia v. Heller*, 554 U.S. at 570, 626 (2008). "[T]he '*central component*' of the Second Amendment right" is "individual self-defense." *Bruen*, 597 U.S. at 29 (quoting *McDonald v. City of Chicago*, 561 U.S. 727, 767 (2010), quoting

*Heller*, 554 U.S. at 599 (emphasis in original)). It does not confer "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.*; *accord United States v. Rahimi*, 602 U.S. 680, 691 (2024). "[R]easonable firearms regulations" can coexist comfortably with the Second Amendment. *McDonald*, 561 U.S. at 785.

*Bruen* established the two-step framework applicable to Second Amendment challenges. First, Plaintiffs must show that their challenge falls within the Second Amendment's "explicit text, 'as informed by history.'" *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 113 (10th Cir. 2024) ("*RMGO*") (quoting *Bruen*, 597 U.S. at 19). A regulation falls within the ambit of the Second Amendment only if the regulation "infringes" the Second Amendment right to keep and bear arms. *Md. Shall Issue, Inc. v. Moore ("MSI")*, 116 F.4th 211, 220 (4th Cir. 2024); *accord RMGO*, 121 F.4th at 114. Should the plaintiff fail to satisfy this burden, the analysis ends. *RMGO*, 121 F.4th at 114; *accord Bruen*, 597 U.S. at 18.

If plaintiff does meet their step-one burden, "the burden then shifts to the government to justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *RMGO*, 121 F.4th at 113. If the government satisfies its step-two burden, then "the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Bruen*, 597 U.S. at 24. Courts must ask (i) whether the challenged regulation "impose[s] a comparable burden on the right of armed self-defense" as historical regulations did, and (ii) whether it is "comparably justified." *Bruen*, 597 U.S. at 28-29. Because regulatory challenges posed by firearms today are not always the same as those facing the Founders in 1791 or the Reconstruction generation in 1868, the inquiry seeks only a "historical *analogue*, not a historical *twin*" or "dead ringer," *id.* at 27, 30 (emphases in original).

**A. SB25-03 is a lawful, shall-issue licensing scheme.**

*Bruen* controls the result of Plaintiffs' facial challenge to SB25-03. Because "shall-issue" licensing laws "do not necessarily prevent law-abiding, responsible citizens from exercising their Second Amendment right[s]," such laws are presumptively constitutional. *Bruen*, 597 U.S. at 38 n.9 (internal quotation marks and citation omitted). Because such laws employ "narrow, objective, and definite standards," they do not prevent law-abiding individuals from exercising their Second Amendment rights. *See id.*; *RMGO*, 121 F.4th at 122-23. The Motion does not identify any aspect of SB25-03 that is distinguishable from the shall-issue regimes sanctioned by *Bruen*. As written, therefore, Plaintiffs cannot demonstrate that "no set of circumstances exists under which [SB25-03] would be valid." *Rahimi*, 602 U.S. at 693.

Plaintiffs' fallback, as-applied arguments attempt to establish that SB25-03 serves "abusive ends" based on a handful of declarants' anecdotal experiences or speculations. Many of these arguments should be rejected as a matter of law as outside the scope of the operative Complaint and because Plaintiffs cannot demonstrate standing to raise them. More fundamentally, however, the declarants' subjective confusion and concerns about SB25-03's requirements are belied by the reality of SB25-03's implementation. Hundreds of Coloradans have successfully applied for eligibility cards and completed safety courses to comply with SB25-03, even in the first days and weeks after the law's scheme went into effect.

**1. Plaintiff's facial challenge to SB25-03's presumptively lawful licensing scheme must fail.**

*Bruen* supplies the roadmap for distinguishing permissible "shall-issue" regimes like SB25-03 from impermissible "may-issue" ones. In *Bruen*, the Court struck down New York's law empowering licensing authorities to assess whether a citizen "demonstrate[d] a special need for

self-defense." 597 U.S. at 38. If the licensor determined no such "special need" existed, the applicant would be denied. *Id.* at 38-39. The law thus prevented "law-abiding citizens with ordinary self-defense needs from carrying arms in public for that purpose." *Id.* at 60. The Court contrasted may-issue regimes like New York's with the shall-issue regimes found in "the vast majority of States." *Id.* at 13. While may-issue laws like New York's gave licensing authorities unchanneled discretion to deny licenses based on asserted need for a weapon, shall-issue laws require licenses to be issued when applicants meet "narrow, objective, and definite standards" *Id.* at 13 38 n.19. Among permissible "shall-issue" standards are those that require applicants to (1) "undergo a background check", (2) "pass a firearms safety course", and those that (3) deny licenses to "individuals whose conduct has shown them to be lacking the essential character of temperament necessary to be entrusted with a weapon." *Id.* at 38 n.9; *see also id.* at 13 n.1.

The elements of SB25-03's shall-issue regime match the requirements *Bruen* approved point-for-point. To purchase an SSF in Colorado, an applicant must undergo a (1) background check, C.R.S. § 18-12-116(5)(b)(III), (2) pass a firearms safety course, C.R.S. § 18-12-116(3)(e)(I)(B), (C), and (3) attest that they do not have a conviction that would prohibit them from purchasing a firearm, will not violate state firearms laws, and will not unlawfully transfer that firearm after purchase, C.R.S. § 18-12-116(5)(b)(II)(A)-(C). Unless a sheriff (1) cannot identify the applicant, (2) determines the applicant cannot lawfully possess a gun, or (3) has a "reasonable belief" that the applicant may be a danger to himself or others, the sheriff "*shall issue*" the eligibility card. C.R.S. § 18-12-116(5)(b)(VI). That card entitles the applicant to complete a firearms safety course and purchase a firearm. *Id.* Under *Bruen*, SB25-03 necessarily *is* "constitutional in [at least] some of its applications," *Rahimi*, 602 U.S. at 693, i.e., whenever

Colorado officials comply with its shall-issue law as written.[1] Thus, it cannot be facially unconstitutional. *Cf. McRorey v. Garland*, 99 F.4th 831, 839 (5th Cir. 2024) ("Our law is plain as can be that some amount of time for background checks is permissible.").

Plaintiffs attempt to distinguish SB25-03's facial requirements in two ways, neither availing. First, they suggest *Bruen*'s approval of shall-issue licensing laws like SB25-03 was limited to those concerning public carry (as opposed to purchase) of firearms. Mot. at 14-15. *Bruen* itself rejects this distinction. 597 U.S. at 70 (noting the right to public carry was "not a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees") (citation omitted); *see MSI*, 116 F.4th at 223 ("[T]he rationale supporting the Supreme Court's 'shall-issue' discussion applies with equal force to 'shall-issue' licensing laws governing the possession of firearms, and nothing in that discussion signals a contrary intent."). Indeed, laws regulating public carry and laws regulating purchase are subject to the same constitutional framework because the rights to "keep" and "bear" are on equal footing; Plaintiffs offer no authority to the contrary.

Second, Plaintiffs contend SB25-03 has two "may-issue" features: (1) the requirement that, "[t]o complete the basic firearms safety course, a student must achieve a score of at least ninety percent on the exam," C.R.S. § 18-12-116(5)(a)(V); and (2) the ability of reviewing sheriffs to deny firearms safety course eligibility cards based on a "reasonable belief" that the applicant "present[s] a danger to themsel[ves] or others." *See* C.R.S. § 18-12-116(5)(b)(VI)(C); *also* Mot. at

[1] Since *Bruen*, federal courts have repeatedly upheld the constitutionality of shall-issue licensing regimes. *E.g.*, *MSI*, 116 F.4th at 222; *Giambalvo v. Suffolk Cnty.*, 155 F.4th 163, 181-82 (2d Cir. 2025); *Or. Firearms Fed'n v. Kotek*, 682 F. Supp. 3d 847, 940 (D. Or. 2023); *United States v. Peterson*, 161 F.4th 331, 340 (5th Cir. 2025); *United States v. Vishnevski*, No. 24-cr-40027-JPG, 2026 WL 1078194, at *5 (S.D. Ill. Apr. 21, 2026).

15. The first contention ignores *Bruen*, which acknowledges states may require applicants to "pass," not merely take, "a firearms safety course." 597 U.S. at 38 n.9. Moreover, Plaintiffs' belief that 90% is "too high" on its face is unsupported by any authority, and it is contradicted by the evidence before the Court. *See* Coil Decl. (Ex. 1) ¶ 13 (100% pass rate).

The second purported "may issue" feature— the ability of sheriffs to deny an applicant who represents a "danger to themself or others"—is also belied by *Bruen*. The Court included Connecticut among its list of "shall issue" jurisdictions despite its discretionary "suitable person" standard because it "preclude[d] permits only to those individuals whose conduct has shown them to be lack the essential character of temperament necessary to be entrusted with a weapon." *Bruen*, 597 U.S. at 13 n.1 (citation omitted). SB25-03's "danger to themself or others" standard serves the same function, as do other state laws with similar requirements approvingly cited by *Bruen*.[2] *See id*. Plaintiffs also ignore that any denial based on "reasonable belief" is ultimately subject to judicial review, upon which a sheriff "has the burden of proving that [the applicant presents a danger to himself or others] by clear and convincing evidence." C.R.S. § 18-12-116(5)(b)(X); *cf. Bruen*, 597 U.S. at 13 (noting that under New York's regime, "judicial review [was] limited," and its "arbitrary and capricious" standard left applicants "little recourse if their local licensing officer denies a permit"); *see Or. Firearms*, 682 F. Supp. 3d at 939 (finding shall-issue regime facially

[2] The permissibility of shall-issue laws like SB25-03—including its "danger to themself or others" standard—derives from the fact that such laws are "designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens." *See RMGO*, 121 F.4th at 122 (citation omitted); *cf. Ortega v. Lujan Grisham*, 148 F.4th 1134, 1151 (10th Cir. 2025) ("shall-issue licensing regimes [and] background checks" serve the purpose of limiting access to firearms to "responsible and law-abiding citizens"). This feature distinguishes them from indiscriminate standards, *see Ortega*, 148 F.4th at 1148 (holding seven-day "blanket" waiting period unconstitutional), or standards focused on an individual's "special need" for self-defense, *see Bruen*, 597 U.S. at 11.

constitutional despite discretionary standard in part because "judicial review . . . significantly limits the discretion" of licensing officials).

The remainder of Plaintiffs' complaints about SB25-03—including potential delays, costs, firearms class availability, and the conduct of certain sheriffs in reviewing applications—amount to a series of as-applied challenges by particular CSSA members to particular aspects of SB25-03's implementation. Mot at 16-18; *see Bruen*, 597 U.S. at 38 n.9 (Court would not "rule out" constitutional challenges to shall-issue regimes "put toward abusive ends"). Plaintiffs point to *nothing* in SB25-03 that, on its face, requires a "lengthy wait time" or "exorbitant fees" that could amount to facially "abusive ends" in *all* circumstances, as they must to succeed on their facial challenge. *See McRorey*, 99 F.4th at 839 (rejecting shall-issue challengers' facial claim that "*de facto* indefinite" wait times "longer than 10 days" were abusively "lengthy" because "that is not a requirement of the challenged law"); *Giambalvo*, 155 F.4th at 184 (plaintiffs unlikely to succeed on claim that licensing process "that takes more than 30 days" amounts to Second Amendment violation). Thus, nothing remains for Plaintiffs but Justice Kavanaugh's suggestion in his concurrence to pursue an "as-applied challenge" arguing that SB25-03 "does not operate" as a constitutionally permissible scheme "in practice." *Bruen*, 597 U.S. at 80.

**2. Plaintiffs cannot demonstrate that SB25-03 serves abusive ends.**

As an initial matter, many of the Motion's claims are outside the scope of the Complaint. The Motion devotes substantial attention, for example, to the availability of firearms training in Spanish and ASL, and it contends that SB25-03 is "unconstitutional as applied" to speakers of ASL or non-English speakers. Mot. at 21-22. Those claims are nowhere in the operative Complaint. *See* Doc. 33. And "[i]njunctive relief may be awarded based only on the claim and

grounds asserted in the complaint and the motion." *E.g.*, *Occupy Denver v. City & Cnty. of Denver*, No. 11-cv-03048-REB-MJW, 2011 WL 6096501, at *3 (D. Colo. Dec. 7, 2011); *Dobler v. Schwartz*, No. 21-cv-01509-PAB-NRN, 2022 WL 1303066, at *1 (D. Colo. Apr. 29, 2022) (same).

For any as-applied claims encompassed within the Complaint, *RMGO* holds that where a firearm regulation's requirements are "designed to ensure only that those who 'keep and bear' arms in Colorado are, in fact, law-abiding, responsible persons, that it is objectively applied, [it is] not being 'put toward abusive ends.'" 121 F.4th at 127.[3] Plaintiffs contend that "lengthy wait times," "exorbitant fees" and "[i]mplementation failures and confusion" render SB25-03 unconstitutional as applied to certain of their members. Mot. at 19-21. The anecdotal evidence and speculation Plaintiffs' offer in support of their "abusive ends" challenge is insufficient on its face to establish a likelihood of success on the merits. More importantly, however, it is thoroughly disproven by the data demonstrating SB25-03's successful implementation statewide.

First, Plaintiffs have produced evidence that only three of its members intend to purchase an SSF and have *attempted* to comply with SB25-03's requirements. *See* Mot. at 24 (citing Decls.

[3] Plaintiffs ignore *RMGO*'s (binding) abusive-ends analysis in favor of an imported hodgepodge of First Amendment jurisprudence. Mot. at 16-19. At the same time, they take pains to insist that First Amendment doctrine "does not substitute" for the Second Amendment inquiry established in *Bruen*. Mot. at 16 n.4. The Motion makes no attempt to reconcile these contradictory positions. In any event, *Bruen* relied on *Shuttlesworth* for the limited proposition that shall-issue regimes are characterized by "narrow, objective, and definite standards." 597 U.S. at 38 n.9 (quoting *Shuttlesworth v. Birmingham*, 394 U.S. 147, 151 (1969)). SB25-03's shall-issue requirements are of a piece with the "narrow, objective, and definite" standards *Bruen* expressly approved, as discussed above. Moreover, *Bruen* did not approve a "narrow tailoring" requirement for Second Amendment cases applicable to Plaintiffs' "prior restraint"-type analysis. *See* Mot. at 16-18 (arguing the court should determine whether SB25-03's shall-issue regime is "narrowly tailored to serve a significant governmental interest" with reference to First Amendment caselaw). In fact, *Bruen* repeatedly admonishes courts *not* to engage in any kind of means-ends scrutiny in the Second Amendment context. 597 U.S. at 19-22.

of Brownlee, Burgess, and Cummings). A fourth, Jeremy Manson, alleges that he will have successfully completed all the steps necessary to purchase an SSF as of August 14, but he asserts no intent to purchase. Manson Decl. ¶¶ 12-16. The remainder of the attached declarations speculate about delays, costs, and difficulties individuals *could* incur *if* they were to apply.[4] Declarants' speculation about difficulties someone could encounter complying with SB25-03 cannot carry their burden to demonstrate likelihood of success on the merits, or even standing, for purposes of an as-applied "abusive ends" challenge. *See Utah v. Babbitt,* 137 F.3d 1193, 1210 n.25 (10th Cir.1998) (future injury, contingent on matters "not presently known," too speculative for Article III standing); *cf. Adams v. City of Seattle*, No. 24-6505, 2025 WL 3081848, at *1 (9th Cir. Nov. 4, 2025) (holding plaintiff's "as-applied challenge" based on "speculative denial of a future waiver application" fails as premature).[5]

---

[4] *E.g.*, Daniel Fenlason Decl. ¶¶ 11-12 (alleging no pending attempt to complete SB25-03's application process but, for example, "someone in Walsh, Colorado . . . may have to drive [to Pueblo] to complete the required training"); Elliott Decl. ¶¶ 8-12 (same, but estimating costs he "would be subject to" if he attempted to obtain an eligibility card in Denver); Flanell Decl. ¶ 21 (same, but estimating costs an individual could incur attempting to purchase an SSF in Colorado Springs); Lockburner Decl. ¶¶ 45-50 (same, but estimating that 75% percent of customers are confused about SB25-03's requirements); Shaffer Decl. ¶ 28 (same, but expressing concern that "the 90% score requirement will limit the number of applicants who can successfully complete the training"); Hohnholz Decl. ¶¶ 10-21 (same, but estimating costs she could incur if she applied to the Pueblo County Sheriff and completed a firearms safety course); Newbill Decl. ¶¶ 12-26 (same, but expressing concern about passing a safety course exam); Sloan Decl. ¶¶ 9-22 (same); Moothart Decl. ¶¶ 8-22 (same); Laugesen Decl. ¶¶ 4-21 (same).

[5] Defendants raised standing in their Motion to Dismiss (Dkts. 51, 65). As discussed there, Plaintiffs do not allege that the law itself infringes their rights; but rather potential delay caused by third parties may do so. Dkt. 51 at 10-11; Dkt. 65 at 2. It is a "bedrock principle that a federal court cannot redress injury that results from the independent action of some third party not before the court." *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (quotation and citation omitted). Nor have the individual Plaintiffs alleged or demonstrated a specific intent to purchase an SSF sufficient to confer standing. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992) ("Such 'some day'

The four intended-purchaser declarants who have attempted to satisfy SB25-03 offer no factual support for Plaintiffs' speculative concerns about "lengthy waits" or "exorbitant" costs, and in many instances undercut them.[6] Mr. Manson, for example, alleges that he waited one day for a background check, Manson Decl. ¶ 10, and between one and thirteen days for approval of his eligibility card, *id.* ¶¶ 12-16 (alleging he applied on August 1 and received his eligibility card sometime before he "will tak[e] the safety course on August 14"). He alleges that he paid $30 for a background check and a $52 fee.[7] *Id.* ¶¶ 10, 13. Plaintiffs do not, and could not plausibly, allege that a total cost of less than $100 is "exorbitant," or that an application time of less than two weeks is "lengthy."

Second, as discussed at greater length in § IV below, the majority of costs and delays about which Plaintiffs complain are irrelevant to the Motion because they are attributable to third parties

---

intentions—without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require.") (emphasis omitted); *see also* Pls' Disc. Resp. (Ex. 9) at 3-8. These are yet additional reasons that Plaintiffs are unlikely to prevail on the merits of their claims.

[6] Mr. Brownlee does not claim that his application was delayed or expensive, but that he decided not to apply for an eligibility card based on his misunderstanding of SB25-03's requirements *despite* CPW's offer of correction and assistance. Brownlee Decl. ¶¶ 19-29. Mr. Burgess alleges that, as of August 10, his application to the El Paso County Sheriff has been pending for 20 days. Burgess Decl. ¶¶ 19-24. Mr. Cummings alleges that, as of August 10, his application to the Weld County Sheriff has been pending for 7 days. Cummings Decl. ¶¶ 27-28.

[7] The Motion, overwhelmingly reliant on the declarations of El Paso County residents, omits mention of the fact that the El Paso Sheriff has "chosen to waive the El Paso County Sheriff's Office processing fee for El Paso County residents." *See* https://epcsheriffsoffice.com/services/firearms-safety-card/ (accessed Sep. 1, 2026); *e.g.*, *N.M. ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 702 n.22 (10th Cir. 2009) (information on government websites is subject to judicial notice).

not before the Court, and therefore not susceptible to as-applied injunctive relief in this case.[8] The refusal of a particular sheriff to meet SB25-03's requirements may subject them to injunctive relief by affected persons in a different lawsuit; it does nothing to demonstrate the law's unconstitutionality in this case. *See* Mikesell Decl. ¶ 28.

Finally, contrast the CSSA's anecdotal evidence with the facts of SB25-03's implementation, as established by CPW's declarations. As of September 1, 3,574 applications have been submitted to sheriffs' offices and 1,125 eligibility cards have been issued by 39 different county sheriffs. Teklits Decl. (Ex. 2) ¶ 8. The average time between an individual's completion of an application and the sheriff's issuance of an eligibility card is 10.9 days. *Id.* ¶ 11. The average time between a sheriff's issuance of an FSEC and an individual's completion of a firearms safety course is 11 days. *Id.* Weeks after SB25-03 took effect, over five hundred Coloradans have successfully met the law's requirements to purchase SSFs. ¶ 8. None has failed the course exam. ¶ 10. In short, Plaintiffs' claims of "mayhem" are divorced from reality. Any costs or delays are minor, and merely incidental to the administration of a constitutional, shall-issue licensing scheme.

[8] As to cost, Plaintiffs make no effort to establish that CPW's $52 fee is exorbitant. Nor, on their constitutional theory, could they make such a showing. *See* Mot. at 18 (citing *Murdock v. Pennsylvania*, 319 U.S. 105, 113 (1943)). As *Cox v. New Hampshire* held, there is "nothing contrary to the Constitution" in charging a fee "to meet the expense incident" to managing constitutionally protected activities. 312 U.S. 569, 577 (1941). This is precisely what SB25-03 does, allowing CPW and the Sheriff to establish fees reflecting "the actual direct and indirect costs" of implementing SB25-03. *See* C.R.S. §§ 18-12-116(5)(b)(V); 33-9-115(5)(a).

**B. SB25-03's licensing scheme is "consistent with the Nation's historical tradition."**

Even if SB25-03 were not a presumptively lawful "shall-issue" law, it would pass constitutional muster under *Bruen*'s second step because it is consistent with the Nation's historical firearm regulations including 19th century permitting and taxation regimes.

*Bruen* instructs that governments must "identify a well-established and representative historical *analogue*" for modern firearm regulations that implicate the Second Amendment, "not a historical *twin*." 597 U.S. at 30 (emphasis in original). Thus, "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.*; *accord Rahimi*, 602 U.S. at 691-92 (The "Second Amendment permits more than just those regulations identical to ones that could be found in 1791."). "Particularly when the modern law addresses a situation that could not have arisen when the Second or Fourteenth Amendment was adopted, it is too much to demand such a close match." *Wolford v. Lopez*, 146 S. Ct. 2032, 2044 (2026). When dealing with a regulation aimed at addressing a problem of "unprecedented societal concern[]," a flexible and "nuanced" examination of historical analogues is in order. *Bruen*, 597 U.S. at 27-28.

Recently in *Wolford*, the Supreme Court clarified that the second *Bruen* step consists of three sub-inquiries. First, courts should consider "the number of jurisdictions in which [the analogues] were adopted." 146 S. Ct. at 2044. Second, courts consider "the extent to which [the analogues] were well-accepted." *Id.* Finally, courts must assess "how" and "why" the historical analogue restricted the Second Amendment right and ensure that these two reference points are "relevantly similar." *Id.* This is not a "mechanical" determination; rather it requires "an exercise of judgment." *Id.* The question is whether the modern and historical regulations "impose a

comparable burden on the right of armed self-defense" and "whether that burden is comparably justified." *Bruen*, 597 U.S. at 29 (citations omitted).

Before acquiring or carrying certain weapons, laws throughout the nation's history required Americans to obtain a license from a state or municipal government. That process, which became increasingly commonplace in the mid- to late-1800s,[9] in some cases involved the exercise of government discretion in determining who was a "law abiding" citizen. These laws evolved from earlier outright prohibitions on concealed carry of certain types of arms; became necessary due to the increase in gun violence in the mid- to late-1800s; and were only made possible beginning during this era due to evolving government sophistication. Further, governments historically taxed the ownership of firearms. These are direct analogues to SB25-03.

**1. Individual licensing schemes were widespread and well accepted.**

"[L]icensing with respect to weapons has a long provenance in America." Spitzer Decl. (Ex. 3) ¶ 111. From the 1600s through the early 1900s, governments licensed weapons possession, carry, discharge, hunting, commercial sales, gunpowder storage, and sales to named groups. *Id.* ¶¶ 113-14; Spitzer Decl. Exhibits D, E. "Colonial, state, and local laws encompassing the licensing or permitting of dangerous weapons and substances date to the 1600s and 1700s, but became more

---

[9] "Constitutional rights are enshrined with the scope they were understood to have when the people adopted them," *Bruen*, 597 U.S. at 34 (emphasis, citation omitted), so courts look to both Reconstruction-era and Founding-era history, *Antonyuk v. James*, 120 F.4th 941, 972-74 (2d Cir. 2024), *cert. denied*, 145 S. Ct. 1900 (2025) ("[T]he prevailing understanding of the right to bear arms in 1868 and 1791 are both focal points of our analysis."); *accord McDonald*, 561 U.S. at 778. Laws enacted in the period after the Fourteenth Amendment's ratification may be evidence of the public understanding of the Second Amendment. *See Heller*, 554 U.S. at 605; *see also id.* at 614-19 (discussing post-Civil War sources); *Bruen*, 597 U.S. at 35-36. As such, courts should not "reflexively discount evidence from the latter half of the 19th century" especially where such evidence is consistent with the nation's historical tradition. *Antonyuk*, 120 F.4th at 1029.

wide-ranging and widespread in the 1800s and early 1900s." Spitzer Decl. ¶ 112. Taxation of weapons by states and local governments was also widespread. *Id.* ¶¶ 158-59, 161, 163. Taxes were imposed on weapons dealers, shooting galleries and ranges, gunpowder, ownership, carrying, and ammunition as a means of regulating public safety and raising revenue. *Id.* ¶¶ 164-197.

> [Beginning in 1866] California municipal governments began passing ordinances that provided for licensing in order to carry a pistol in public. The policy proved popular, and by the turn of the twentieth century a majority of California residents lived in municipalities that had implemented a permitting process for the public carry of concealed weapons. Municipalities elsewhere during the nineteenth century implemented licensing policies: Jersey City, New Jersey did so in 1873, as did the District of Columbia in 1892.

Rivas Decl. (Ex. 4) ¶ 18. Nineteen examples of such licensing laws from the late 1800s are included on the attached **Appendix** (Ex. 5). Many of these laws were municipal. "[F]rom the Revolutionary period up to the time of the Civil War localities bore an even greater burden of governance, including maintaining the public peace, as compared with state governments, enhancing their significance." Spitzer Decl. ¶ 159. These examples continue into the early 20th century. *See, e.g.,* Spitzer Decl. (Ex. E at 11-12 (California); 28 (Georgia); 40-41 (Chicago, IL); 52-53 (Portland, ME); 56 (Massachusetts); 80-21 (New Jersey); 89-90 (New York).

**2. The "how" and "why" were relevantly similar to SB25-03.**

The adoption and expansion of licensing indicates that people at that time understood it to be an acceptable mode of regulating the types of arms (particularly concealable ones) that posed the greatest threat to public safety. Rivas Decl. ¶ 27; Spitzer Decl. ¶ 118. Individualized licensing requirements became particularly widespread in the beginning of the 18th century and accelerating post-Civil War. Rivas Decl. ¶¶ 10, 15-22, 26-27. Rising interpersonal violence and the spread of new concealable firearms (especially revolvers) after the Civil War created problems that earlier,

blanket public-carry prohibitions could not solve. *Id.*; Roth Decl. (Ex. 6) ¶¶ 26, 29-38. States and municipalities responded with licensing laws in addition to weapons prohibitions. Spitzer Decl. ¶¶ 67-71, 118-139; *see also* Rivas Decl. ¶ 27.

Thus, despite occurring in the later part of the century, these laws are fully consistent with earlier, near universal efforts to ban concealed carry. Spitzer Decl. ¶ 120 ("The licensing of weapons carrying that emerged in the latter part of the nineteenth century is significant because it was a more sophisticated way for states and localities to control otherwise barred weapons carrying."). SB25-03 is also analogous to these historical licensing laws designed to minimize the risk of gun violence by ensuring that owners who carry "are, in fact, law-abiding responsible citizens." *Bruen*, 597 U.S. at 38 n.9 (citation omitted). From the beginning of the Nation, jurisdictions limited the ownership and use of guns to those who were not considered dangerous by their communities. *See Rahimi*, 602 U.S. at 693-98 (summarizing same).

In most cases, historical licensing was discretionary on the part of the government, often requiring proof of good moral character or necessity for self-defense. Spitzer Decl. ¶¶ 121-25. "The overall justification for licensing was the same as the police power generally—the public good and the people's welfare." *Id.* ¶ 112. Licensing issuance criteria for concealed weapons carrying included those who were "proper," "suitable," of "good moral character," "peaceable," "law-abiding," "temperate," a "citizen," "responsible," and who exercised "self-control." *Id.* ¶ 125. "At times, licensing laws required that applicants be "peaceable" or "law-abiding," terms which government authorities and officials had to define, apparently based on an applicant's criminal history, reputation, and appearance." Rivas Decl. ¶ 25. "Generally speaking, the process of obtaining a license from the government usually included the payment of some kind of fee,

marrying license record-keeping with the payment of fees to the governing authority." Spitzer Decl. ¶ 181; *id.* ¶ 187 (discussing example of St. Paul, Minnesota).

The administrative complexity of licensing laws was not possible until the latter 19th century, which explains why earlier analogues to this more nuanced approach are unavailable. "Administering an individualized handgun licensing program far surpassed the capacity of early police departments to perform detailed administrative tasks like comprehensive, indexed recordkeeping and intra-agency communication. They also had to develop, improve, and systematize policing strategies for identifying criminals and gathering evidence." Rivas Decl. ¶ 35. For instance, the earliest form of background checks began serving the Chicago area in the early 1890s and attracted the participation (by subscription) of outside police departments at the turn of the 20th century. *Id.* "Once innovations in communication, record-keeping, and policing occurred (which in turn made the necessary administrative processes feasible), Americans turned to licensing as a viable way of regulating firearms." *Id.* ¶ 37.

**3. Additional analogue: regulatory taxes**

In addition to the license or permit requirements discussed above, many states also enacted regulatory taxes on weapons. Spitzer Decl. ¶ 155. Under these laws, individual weapons owners were assessed a tax on various types of weapons they owned with the dual goal of raising revenue as well as monitoring the ownership or use of weapons. *Id.* In addition, "from the 1800s to the early 1900s, at least 20 states enacted measures to tax individuals who sought to carry a weapon." *Id.* ¶ 183. Several early examples of these taxes are included on **Appendix A.**

In addition to taxes imposed on the right to carry, at least nine states imposed a tax on personal property that extended specifically to weapons ownership, with four doing so in the 1800s

and six in the 1900s. Spitzer Decl. ¶ 189. At least five states also imposed a tax on specific types of weapons. *Id.* ¶¶ 190-93. As these examples illustrate, taxation was both widespread and well-accepted. The burden is also both comparable and comparably justified to the expenses associated with SB25-03. *Accord Bruen*, 597 U.S. at 28-29. "In addition to the manifest purpose of raising revenue, these taxes also served the purpose of protecting public safety, insofar as they were using the policy tool of taxation to identify and monitor functions like the handling, storage, or operation of activities that could pose a threat to public safety[.]" *Id.* ¶ 158.

**C. SB25-03 would pass constitutional muster even if it were a de facto ban.**

Colorado's licensing regulation for SSFs is lawful for another reason: the state could, like ten other states have, prohibit possession of SSFs outright. All but one circuit to consider assault weapons bans since *Bruen* have upheld those laws' constitutionality. Some courts have done so at *Bruen*'s first step, concluding that semiautomatic weapons like AR-15s are not arms protected by the Second Amendment. *See Bianchi v. Brown*, 111 F.4th 438, 461 (4th Cir. 2024); *Bevis v. City of Naperville*, 85 F.4th 1175, 1195 (7th Cir. 2023). Others have assumed, without deciding, that semiautomatic weapons are arms, but have upheld the constitutionality of bans at *Bruen*'s second step, concluding prohibitions are consistent with the nation's historical tradition of regulating dangerous and unusual weapons. *See Capen v. Campbell*, 134 F.4th 660, 676 (1st Cir. 2025); *Nat'l Ass'n for Gun Rts. v. Lamont*, 153 F.4th 213, 247 (2d Cir. 2025), *cert. granted sub nom. Grant v. Higgins*, No. 25-566, 2026 WL 1871312 (U.S. June 30, 2026).[10]

---

[10] The one case to find a prohibition unconstitutional, *Association of New Jersey Rifle & Pistol Clubs, Inc. v. Attorney General of New Jersey*, 183 F.4th 211 (3d Cir. 2026), did so at *Bruen*'s second step—albeit without conducting its own historical analysis and by simply concluding

This Court can and should reach the same conclusion. The SSFs subject to SB25-03 are not arms protected by the Second Amendment.[11] Historical tradition simply did not include widespread civilian use of high-capacity semiautomatics. Spitzer Decl. ¶¶ 46-66. Earlier multi-shot or repeating firearms were technologically flawed curiosities and not in common civilian use. *Id.*; *accord Friedman v. City of Highland Park*, 784 F.3d 406, 410 (7th Cir. 2015) ("Most guns available [in 1791] could not fire more than one shot without being reloaded; revolvers with rotating cylinders weren't widely available until the early 19th century. Semi-automatic guns and large-capacity magazines are more recent developments").

Assault-type weapons first arose at the end of World War II, beginning with the German StG 44. Yurgealitis Decl. (Ex. 7) ¶ 40. That weapon had features designed to make it an effective and powerful weapon of war. *Id.* ¶¶ 41-48. Many of its features were first utilized in the design and manufacture of mid-20th century submachine guns. *Id.* ¶ 64. In 1947, the Soviet Union developed the AK-47, which built on the features of the StG 44. *Id.* ¶ 51. The United States eventually developed the AR-15, beginning with military use in the Vietnam War. *Id.* ¶¶ 56-57. Bullets used by the AR-15 are particularly damaging. *Id.* ¶¶ 58-62. Assault-type weapons first became commonplace in military use, *id.* ¶ 71, only later being marketed and sold for civilian use, *id.* ¶ 72. The civilian versions maintain the features that make them especially effective as military weapons. *Id.* ¶¶ 73, 83. Not only are these weapons particularly lethal, Allen Decl. (Ex. 8) ¶¶ 37-

*Heller* and *Bruen* already decided the question. Given that the Supreme Court just granted certiorari to answer the question, *see Viramontes v. Cook County*, No. 25-566, 2026 WL 1871322 (U.S. June 30, 2026), the Third Circuit cannot be right.

[11] S.B. 25-03 applies to specific semiautomatic rifles, shotguns, and handguns that use ammunition larger than .22 caliber and can accept a detachable magazine with greater than 15 rounds of ammunition, including semiautomatic AR- and AK-style pistols. C.R.S. § 18-12-116(1)(d)(II).

39, they are rarely necessary as weapons self-defense, *id.* ¶¶ 7-29. For these reasons, they are not "arms" in common use for self-defense, and they fail *Bruen*'s step-one analysis.

SB25-03 also finds a compelling analogue in historical prohibitions on dangerous and unusual weapons. Regulations such as those prohibiting trap guns, as well as bowie knives and other dangerous weapons were ubiquitous in the 1800s. *See* Spitzer Decl. ¶¶ 72-81 (trap guns), 82-106 (bowie knives and other dangerous weapons). Laws restricting the sale of deadly weapons were also common and generally upheld in the pre- and post-bellum eras. Rivas Decl. ¶¶ 12-14. These laws, effectively outright prohibitions, arose in response to increased levels of homicide at a time of increasing urbanization in America. Roth Decl. ¶¶ 26-27.

In short, because Colorado could prohibit possession of SSFs outright, it can impose a licensing scheme, which operates as a "shall-issue" law.

## II. Plaintiffs will not suffer irreparable harm without an injunction.

Irreparable harm "is the single most important prerequisite for the issuance of a preliminary injunction." *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1268 (10th Cir. 2005) (quotations omitted). To support a preliminary injunction, the alleged injury must be "certain, great, actual and not theoretical." *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (quotations omitted). Plaintiffs rely on only the alleged violation of constitutional rights to assert irreparable harm. *See* Mot. at 19-21. Because they are unlikely to succeed on the merits of their Second Amendment claim, that argument is insufficient. *See RMGO*, 121 F.4th at 128.

As to the constitutional claims, the "central component" of the Second Amendment is "individual self-defense." *Bruen*, 597 U.S. at 29 (citation omitted); *accord Heller*, 554 U.S. at 599. But declarants have not proven they need SSFs now to realize that interest. Plenty of non-

semiautomatic weapons are purchasable, and declarants have not asserted that non-semiautomatic weapons are insufficient. Moreover, personal self-defense rarely, if ever, requires the type of firepower and volume of bullets of a semiautomatic weapon. *See* Allen Decl. ¶¶ 7-29.

In addition, Plaintiffs' delay in seeking preliminary relief undermines their claim of irreparable harm. *E.g.*, *Fish v. Kobach*, 840 F.3d 710, 753 (10th Cir. 2016). Plaintiffs seek facial enjoinment of certain provisions of SB25-03, Mot. at 25, but Plaintiffs filed their complaint in September of 2025—nearly a year ago—and waited until after the law went into effect to move for facial relief. Where a party waits until the last second to seek relief, expedited consideration is inappropriate. *See, e.g.*, *Colo. Union of Taxpayers v. Griswold*, No. 20-cv-02766-CMA-SKC, 2020 WL 6290380, at *3 (D. Colo. Oct. 27, 2020). To the extent they seek facial relief, their delay is dispositive. To the extent Plaintiffs justify their motion based on SB25-03's actual implementation, they concede that they seek only as-applied relief for the declarants. And to the extent they seek faster processing of applications, that relief will be best achieved by allowing implementation to proceed, not by enjoining CPW's ongoing work.

## III. Public interest in safety outweighs Plaintiffs' desire for unusually dangerous guns on demand.

The last two factors, the balance of equities and the public interest, "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Public interest strongly favors Defendants. Plaintiffs' requested preliminary injunction would enjoin a public safety law enacted in response to the occurrence of deadly mass shootings, including in Colorado. Mass shootings are a significant threat to public safety, the incidence of which has increased over time. Allen Decl. ¶ 43. They are also a threat enabled by military-style semiautomatic weapons equipped with large-capacity magazines. Approximately 87% of mass shootings involve the use

of a semiautomatic weapon. *Id.* ¶ 35. And semiautomatic weapons are deadly: the average number of fatalities or injuries per mass shooting is 18 with a semiautomatic firearm compared to 7 without. *Id*. ¶ 37. Thus, the public interest will be affirmatively harmed by enjoining enforcement of SB25-03 and its training and background check requirements.

This harm to the public-safety interest significantly outweighs Plaintiffs' modest interests. To the extent the declarants claim an interest in enjoining SB25-03, it is based on an interest in armed self-defense. *See, e.g.*, Brownlee Decl. ¶ 4; Burgess Decl. ¶ 5; Cummings Decl. ¶ 5.[12] But semiautomatic weapons were designed for military use, not civilian self-defense. Yurgealitis Decl. ¶¶ 63, 73, 84. Semiautomatic weapons are rarely necessary for self-defense. Allen Decl. ¶ 5. Moreover, if declarants believe a semiautomatic weapon is necessary for self-defense, SB25-03 excepts several types of semiautomatic weapons from the licensing requirement. § 18-12-116(1)(d)(II)(E). Those weapons could be purchased now. Thus, SB25-03's regulation of semi-automatic weapons does not impede the core right of armed self-defense.

## IV. Plaintiffs seek impermissible, overbroad relief.

Plaintiffs seek sweeping relief: a declaration that SB25-03's licensing provision is facially unconstitutional and an injunction preventing "the state" from "enforcing" it. Mot. at 25. Alternatively, they seek an injunction against "the permitting scheme" as applied to Plaintiffs and CSSA's current *and* future members. *Id*. But the preliminary injunction motion does not justify, and this Court's equitable powers do not permit, such a broad remedy.

---

[12] To the extent declarants claim other interests, for example a gun dealer's financial interest in selling SSFs, *see* Flanell Decl. ¶ 8, that interest is not constitutionally protected, not an injury claimed in the Complaint, and not an interest that outweighs the public's safety interest.

### A. Facial or universal relief is impermissible.

As established throughout this Response, Plaintiffs have not shown that the law is facially unconstitutional. The other core flaw with Plaintiffs' requested relief is that it necessarily seeks relief against non-parties. Ordinarily, an injunction may run against (1) the parties, (2) the parties' officers, agents, or the like, and (3) persons who are in active concert with the parties. Fed. R. Civ. P. 65(d)(2). Here, the named defendants—the Governor, Attorney General, and CPW—are not the primary "enforcers" of SB25-03's shall-issue licensing scheme. CPW's role is limited to drafting course requirements, hosting the database tracking training and licensure, creating an application form, and setting CPW's administrative fee. C.R.S. § 33-9-115. CPW is complying with its duties under the law. Coil Decl. ¶ 6. The sheriffs who process applications and grant eligibility cards; instructors who offer the required classes and can provide accommodations for test-takers; firearm dealers who must verify a potential purchaser is properly licensed; and District Attorneys (besides Michael Allen) who would prosecute anyone alleged to have violated SB25-03 are all beyond the reach of preliminary injunctive relief because they are not parties.[13]

Plaintiffs attempt to sidestep the problem of enjoining non-parties by asking this Court to declare SB25-03 facially unconstitutional and enjoin "the state" from "enforcing" the law. Mot. at 25. But "the state" is not a party. And just as this Court cannot enjoin non-parties, it cannot enjoin a law as such. "Consistent with historical practice, a federal court exercising its equitable authority

[13] Plaintiffs likewise lack standing for the preliminary relief they seek because their alleged harm is not caused by or redressable to the Governor, Attorney General, or CPW. "At the preliminary injunction stage . . . the plaintiff must make a 'clear showing' that []he is 'likely' to establish each element of standing." *Murthy*, 603 U.S. at 58 (citation omitted). When the Plaintiff does not have standing, the Court need not address the preliminary injunction factors. *See Hardre v. Markey*, No. 20-cv-3594-PAB-KMT, 2021 WL 1541714, at *7 (D. Colo. Apr. 19, 2021).

may enjoin *named defendants* from taking *specified unlawful actions*." *Whole Woman's Health v. Jackson*, 595 U.S. 30, 44 (2021) (emphasis added). "But under traditional equitable principles, no court may lawfully enjoin the world at large, or purport to enjoin challenged laws themselves[.]" *Id*. (citations omitted). The injunction Plaintiffs propose—against "the state," against non-parties, or against the law itself—is not within this Court's equitable powers.

Relatedly, in keeping with the "party-specific principles that permeate" equitable relief, this Court is without authority to enter universal injunctions. *Trump v. CASA, Inc.*, 606 U.S. 831, 844, 847 (2025). "Neither declaratory nor injunctive relief … can directly interfere with enforcement of contested statutes or ordinances except with respect to the particular federal plaintiffs." *Id*. at 844 (citation omitted). The declaratory relief Plaintiffs seek—to justify enjoining the "state" from "enforcing" SB25-03, presumably against *anyone*—is impermissible.[14]

**B. Plaintiffs' requested relief as to all CSSA members is overbroad.**

Plaintiffs ask for an injunction against "the permitting scheme" as applied to "Plaintiffs and CSSA's current and future members." *Id*. at 25. But courts may administer only "complete relief *between the parties*." *CASA*, 606 U.S. at 851 (emphasis in original, citation omitted). Under the complete relief principle, "the question is not whether an injunction offers complete relief to *everyone* potentially affected by an allegedly unlawful act; it is whether an injunction will offer complete relief *to the plaintiffs before the court*." *Id*. at 852 (emphasis in original, citation omitted).

[14] For this reason, too, CSSA is not entitled to relief on behalf of unidentified future members. *See, e.g., Ass'n of Am. Physicians & Surgeons v. FDA*, 13 F.4th 531, 540-41 (6th Cir. 2021) ("[U]nlike with a certified class action in which the unnamed class members 'are considered parties to the litigation in many important respects,' . . . the Supreme Court has not characterized an association's members as 'parties' to the suit. So relief to these nonparties might also exceed constitutional bounds.") (citations omitted).

Plaintiffs claim that they meet this standard because CSSA has standing to sue on behalf of its members. Here, even assuming that CSSA has standing to sue on behalf of its members, it has not established that an injunction for each of those members (current *or* future) is necessary to provide them with "complete relief." Plaintiffs ignore the other holding of *CASA* that an injunction should be "[no] broader than necessary to provide complete relief to each plaintiff with standing to sue." *Id.* at 861. Plaintiffs refused to provide any information pertaining to their specific members with their discovery responses, leaving the Defendants unable to gauge how many intend to purchase an SSF; have taken the steps necessary to be eligible to purchase a SSF; or how they claim to have been injured by S.B.25-03, if at all. Ex. 9 at 3-6, 7-8, 20-22. Relief need not be directed to all current and future CSSA members because they are not all similarly situated—that is, not all members could claim to have a disability or be non-English speaking, or to suffer the specific harm of living geographically distant from a sheriff or course.

Similarly, enjoining the entire "permitting scheme," or even asking that certain plaintiffs be excepted from the entire permitting scheme, asks for far more than is necessary. For instance, as to any complaints that certain sheriffs are not participating or that courses are being offered without accommodation, Mot. at 19-22, "complete relief" could be achieved through an affirmative injunction aimed at sheriffs or course instructors (if they were parties susceptible to an injunction). And any complaints pertaining to a course requirement could be achieved while leaving the background check and eligibility card process in place. An injunction of the entire law is not necessary to remedy the limited, speculative complaints of the declarants.

**CONCLUSION**

The Motion for Preliminary Injunction should be denied.

Respectfully submitted this 1st day of September, 2026.

PHILIP J. WEISER
Attorney General

s/ Lily E. Nierenberg

s/ Kyle M. Holter

s/ Lane Towery

***Emily Burke Buckley***
First Assistant Attorney General
***Lily E. Nierenberg***
Senior Assistant Attorney General
***Kyle M. Holter***
***Lane Towery***
***David Cooperstein***
Assistant Attorneys General
Colorado Department of Law
Ralph L. Carr Colorado Judicial Center
1300 Broadway
Denver, CO 80203
Telephone: 720.508.6000
emily.buckley@coag.gov; lily.nierenberg@coag.gov;
kyle.holter@coag.gov; lane.towery@coag.gov;
david.cooperstein@coag.gov

*Attorneys for State Defendants*