**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:25-cv-02725-WJM-MDB

ISRAEL DEL TORO;
KATHLEEN CLAYTON;
LUKE SORENSEN;
NATHANAEL SKIVER;
JASON REEVES;
GARRETT FLICKER;
and the COLORADO STATE SHOOTING ASSOCIATION,

Plaintiffs,

v.

JARED SCHUTZ POLIS, in his official capacity as Governor of the State of Colorado;
PHILIP JACOB WEISER, in his official capacity as the Attorney General of the State of Colorado,
MICHAEL J. ALLEN, in his official capacity as the District Attorney for the Fourth Judicial District, and
LAURA CLELLAN, in her official capacity as the Acting Director of the Colorado Division of Parks and Wildlife,

Defendants.

---

**BRIEF OF BRADY CENTER TO PREVENT GUN VIOLENCE AND GIFFORDS LAW CENTER TO PREVENT GUN VIOLENCE AS *AMICI CURIAE* IN SUPPORT OF STATE DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**

---

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ i

INTEREST OF *AMICI CURIAE* ........ 1

INTRODUCTION ........ 2

BACKGROUND ........ 3

ARGUMENT ........ 4

I. An Injunction Would Harm the Public's Concrete Interest in Public Safety ........ 5

A. Assault Weapons Such as those Regulated by SB25-03 Pose a Distinctly Heightened Threat to Public Safety ........ 5

B. Permit-to-Purchase Statutory Schemes Like SB25-03 Are Effective ........ 9

II. The State's Ability to Address Gun Violence Is Quintessentially in the Public Interest ........ 11

CONCLUSION ........ 13

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1-800-411-Pain Referral Serv., LLC v. Otto*,
744 F.3d 1045 (8th Cir. 2014) ....................12

*Able v. United States*,
44 F.3d 128 (2d Cir. 1995)....................13

*Barnett v. Raoul*,
180 F.4th 1035 (7th Cir. 2026) ....................6

*Bevis v. City of Naperville*,
85 F.4th 1175 (7th Cir. 2023) ....................6

*Bevis v. City of Naperville*,
657 F. Supp. 3d 1052 (N.D. Ill. 2023), *aff'd*, 85 F.4th 1175 (7th Cir. 2023) ....................8

*Bianchi v. Brown*,
111 F.4th 438 (4th Cir. 2024) (en banc) ....................7, 8

*Capen v. Campbell*,
708 F. Supp. 3d 65 (D. Mass. 2023), *aff'd*, 134 F.4th 660 (1st Cir. 2025)....................8

*Comprehensive Health of Planned Parenthood of Kan. and Mid-Mo., Inc. v. Templeton*,
954 F. Supp. 2d 1205 (D. Kan. 2013)....................12

*Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*,
108 F.4th 194 (3d Cir. 2024) ....................4, 11

*Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*,
664 F. Supp. 3d 584 (D. Del. 2023)....................8

*District of Columbia v. Heller*,
554 U.S. 570 (2008)....................2

*Garland v. Cargill*,
602 U.S. 406 (2024) (Sotomayor, J., dissenting)....................2

*Gunnison Cnty. Stockgrowers' Ass'n, Inc., v. U.S. Fish & Wildlife Serv.*,
707 F. Supp. 3d 1056 (D. Colo. 2023)....................12

*Hartford v. Ferguson*,
676 F. Supp. 3d 897 (W.D. Wash. 2023)....8

*Heideman v. South Salt Lake City*,
348 F.3d 1182 (10th Cir. 2003) ....11, 12

*Hope v. Warden York Cnty. Prison*,
972 F.3d 310 (3d Cir. 2020)....5, 8

*Kolbe v. O'Malley*,
42 F. Supp. 3d 768 (D. Md. 2014), *vacated in part and remanded*, 813 F.3d 160 (4th Cir. 2016), *aff'd on reh'g en banc*, 849 F.3d 114 (4th Cir. 2017)....8

*Lawrence v. Colorado*,
455 F. Supp. 3d 1063 (D. Colo. 2020)....12

*Libertarian Party of Erie Cnty. v. Cuomo*,
970 F.3d 106 (2d Cir. 2020)....2

*McDonald v. City of Chicago*,
561 U.S. 742 (2010)....2

*Md. Shall Issue v. Hogan*,
353 F. Supp. 3d 400 (D. Md. 2018), *aff'd*, 963 F.3d 356 (4th Cir. 2020) ....2

*Md. Shall Issue, Inc. v. Hogan*,
2021 WL 3172273 (D. Md. July 27, 2021)....10

*Nat'l Ass'n for Gun Rts. v. Lamont*,
153 F.4th 213 (2d Cir. 2025) ....13

*Nat'l Ass'n for Gun Rts. v. Lamont*,
685 F. Supp. 3d 63 (D. Conn. 2023), *aff'd*, 153 F.4th 213 (2d Cir. 2025) ....2, 8

*Nken v. Holder*,
556 U.S. 418 (2009)....4

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
597 U.S. 1 (2022)....2, 9

*Or. Firearms Fed., Inc. v. Brown*,
644 F. Supp. 3d 782 (D. Or. 2022) ....7

*Oregon v. Ice*,
555 U.S. 160 (2009)....11

*Ortega v. Grisham*,
148 F.4th 1134 (10th Cir. 2025) ....................5

*Peruta v. Cnty. of San Diego*,
824 F.3d 919 (9th Cir. 2016) (en banc) ....................2

*Petrella v. Brownback*,
787 F.3d 1242 (10th Cir. 2015) ....................12

*Rocky Mountain Gun Owners v. Polis*,
121 F.4th 96, 128 (10th Cir. 2024) ....................11, 12

*Rocky Mountain Gun Owners v. Polis*,
701 F. Supp. 3d 1121 (D. Colo. 2023), *aff'd*, 121 F.4th 96 (10th Cir. 2024) ....................5

*Stimmel v. Sessions*,
879 F.3d 198 (6th Cir. 2018) ....................2

*United States v. Salerno*,
481 U.S. 739 (1987)....................5

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008)....................4

**Statutes**

Colo. Rev. Stat. § 18-12-116 ....................3

**Other Authorities**

Alex Lars Lundberg et al., *Public Mass Shootings: Counterfactual Trend Analysis of the Federal Assault Weapons Ban*, 10 JMIR Pub. Health & Surveillance 2 (2024)....................7

Archie Bleyer et al., *Retrospective Evidence for Pediatric Benefit of U.S. Assault Weapons Ban as Rationale for Implementing an Even More Effective Ban*, 115 J. Nat'l Med. Ass'n 528 (2023) ....................7

Cassandra Crifasi et al., *The association between permit-to-purchase laws and shootings by police*, 10 Inj. Epidemiology (2023)....................9

Charles DiMaggio et al., *Changes in US Mass Shooting Deaths Associated with the 1994-2004 Federal Assault Weapons Ban: Analysis of Open-Source Data*, 86 J. Trauma & Acute Care Surgery 11 (2019)....................7

Christopher Ingraham, *What 'arms' looked like when the 2nd Amendment was written*, Wash. Post (June 13, 2016), https://www.washingtonpost.com/news/wonk/wp/2016/06/13/the-men-who-wrote-the-2nd-amendment-would-never-recognize-an-ar-15/ ....7

Colorado Gun Laws, Giffords L. Ctr. to Prevent Gun Violence, https://giffords.org/gun-laws/states/colorado/ (last visited Sep. 5, 2026)....6

Daniel Webster et al., *Evidence concerning the regulation of firearms design, sale, and carrying on fatal mass shootings in the United States*, 19 Criminology & Pub. Pol'y 171 (2020) ....9

Daniel Webster et al., *Preventing the diversion of guns to criminals through effective firearm sales laws, in* Reducing Gun Violence In America: Informing Policy With Evidence And Analysis 109 (2013)....10

Daniel Webster, Cassandra Kercher Crifasi & Jon S. Vernick, *Effects of the Repeal of Missouri's Handgun Purchaser Licensing Law on Homicides*, 91 J. Urb. Health 2 (2014)....10

Devin Hughes & Evan DeFilippis, *How This Piece of Paper Fights Gun Crimes and Saves Lives*, The Trace (July 7, 2015), https://www.thetrace.org/2015/07/gun-permit-to-purchase-permits-van-hollen-federal/ ....10

Fast Facts: Firearm Injury and Death, U.S. Ctrs. for Disease Control (July 5, 2024), https://www.cdc.gov/firearm-violence/data-research/facts-stats/ ....5

Gun Violence in the United States 2022: Examining the Burden Among Children and Teens, Johns Hopkins Ctr. for Gun Violence Sols. (Sep. 12, 2024), https://publichealth.jhu.edu/sites/default/files/2024-09/2022-cgvs-gun-violence-in-the-united-states.pdf ....6

Johns Hopkins Ctr. for Gun Violence Sols., *Firearm Purchaser Licensing* 8 (2025)....9

John J. Donohue, *The Effect of Permissive Gun Laws on Crime*, 704 Annals Am. Acad. Pol. & Soc. Sci. 92 (2022)....7

Lori Post et al., *Impact of Firearm Surveillance on Gun Control Policy: Regression Discontinuity Analysis*, 7 JMIR Pub. Health & Surveillance 2 (2021)....7

Mass Shootings, Colo. Dept. of Pub. Health & Env't, https://cdphe.colorado.gov/colorado-gun-violence-prevention-resource-bank/injury-and-death-involving-firearms/mass-shootings (last visited Sep. 6, 2026) ....................2

Mass Shootings in 2025, Gun Violence Archive, https://www.gunviolencearchive.org/reports/mass-shooting....................5, 6

Michael Siegel, *Universal Back-ground Checks, Permit Requirements, and Firearm Homicide Rates*, 7 J. Am. Med. Network Open 1 (2024)....................10

Mitchell L. Doucette et al., *Deregulation of public civilian gun carrying and violent crimes: A longitudinal analysis 1981-2019*, 23 Crim. & Pub. Pol'y 833, 853 (2024)....................10

Philip J. Cook & John J. Donohue, *Regulating Assault Weapons and Large-Capacity Magazines for Ammunition*, 328 JAMA 1191 (2022)....................7

Press Release, Colo. Governor's Off., Governor Polis Signs Laws to Improve Public Safety (Apr. 10, 2025), https://governorsoffice.colorado.gov/governor/news/governor-polis-signs-laws-improve-public-safety ....................3

Press Release, Colo. House Democrats, SB25-003 Goes Into Effect (July 29, 2026), https://www.cohousedems.com/news/sb25-003-goes-into-effect....................3

Stephen W. Hargarten, *The Bullets He Carried*, 21 W.J. Emerg. Med. 1036 (2020)....................7

Tessa Collins et al., *State firearm laws and the interstate transfer of guns in the USA, 2006-2016*, 95 J. Urb. Health 322 (2018)....................9

## INTEREST OF *AMICI CURIAE*

*Amici Curiae* Brady Center to Prevent Gun Violence and Giffords Law Center to Prevent Gun Violence (together, "Amici") respectfully submit this brief in support of the State Defendants' Response in Opposition to Plaintiffs' Motion for Preliminary Injunction (the "Motion"), Dkt. No. 86 ("Defendants' Brief").[1] Amici are two of the country's leading gun violence prevention organizations. Brady Center to Prevent Gun Violence is the Nation's longest-standing nonpartisan, nonprofit organization dedicated to reducing gun violence through education, research, and legal advocacy. Brady works to free the Nation from gun violence by passing and defending gun violence prevention laws, reforming the gun industry, and educating the public about responsible gun ownership. Giffords Law Center to Prevent Gun Violence is a survivor-led, nonprofit policy organization dedicated to researching, writing, enacting, and defending laws and programs proven to reduce gun violence and save lives, and to serving lawmakers, advocates, legal professionals, gun-violence survivors, and others who seek to reduce gun violence and improve the safety of their communities. It was founded over thirty years ago following a shooting at a San Francisco law firm and was renamed the Giffords Law Center in 2017 after joining forces with the gun-safety organization led by former Congresswoman Gabrielle Giffords.

[1] Amici have concurrently filed a motion for leave to file this brief. Pursuant to local rules, Amici certify as follows: The State Defendants consented to the filing of this brief and as of this filing, counsel to Defendant Allen had not responded to emails sent by Amici's counsel on September 3 and 4, 2026 requesting his position. Plaintiffs offered to consent if the brief were filed by September 4, but did not consent to later filing on grounds that they would have insufficient time to respond to Amici's brief in their Reply in support of their Motion. Amici endeavored to file as early as practicable and in advance of Plaintiffs' Reply deadline. No counsel for a party authored the brief in whole or in part, no party or party's counsel contributed money that was intended to fund preparing or submitting the brief, and no person other than Amici or their counsel made a money contribution to preparation and submission of this brief.

Both Amici have a substantial interest in protecting the authority and ability of democratically elected officials, within the bounds of the U.S. Constitution, to address the Nation's gun violence epidemic and improve public safety. Both Amici have filed numerous *amicus* briefs in cases involving the regulation of firearms,[2] and judges have regularly cited the organizations' research and expertise.[3]

## INTRODUCTION

According to the Colorado Department of Public Health & Environment, from 2014 to 2023, the State experienced 77 mass shootings in which 103 people were killed and 299 were injured.[4] In 2023, 54% of Colorado adults reported that they were concerned about mass shootings in their communities and 32% said that they avoided large crowds to protect themselves and their families from the threat of guns.[5]

There should be no dispute that the public has a substantial interest in ensuring that individuals who seek to acquire assault weapons are eligible to do so and qualified through appropriate training and education to possess them. Empirical evidence and common sense

---

[2] *See, e.g.*, *N.Y. State Rifle & Pistol Ass Inc. v. Bruen*, 597 U.S. 1 (2022); *McDonald v. City of Chicago*, 561 U.S. 742 (2010); *District of Columbia v. Heller*, 554 U.S. 570 (2008); *Libertarian Party of Erie Cnty. v. Cuomo*, 970 F.3d 106 (2d Cir. 2020).

[3] *See, e.g.*, *Garland v. Cargill*, 602 U.S. 406, 432 (2024) (Sotomayor, J., dissenting); *Stimmel v. Sessions*, 879 F.3d 198, 208 (6th Cir. 2018); *Peruta v. Cnty. of San Diego*, 824 F.3d 919, 943 (9th Cir. 2016) (en banc) (Graber, J., concurring); *Nat'l Ass'n for Gun Rts. v. Lamont*, 685 F. Supp. 3d 63, 85 & n.7, 96, 97 n.30, 104, 110 & n.52 (D. Conn. 2023), *aff'd*, 153 F.4th 213 (2d Cir. 2025) *Md. Shall Issue v. Hogan*, 353 F. Supp. 3d 400, 403–05 (D. Md. 2018), *aff'd*, 963 F.3d 356 (4th Cir. 2020).

[4] *Mass Shootings*, Colo. Dep't of Pub. Health & Env't, https://cdphe.colorado.gov/colorado-gun-violence-prevention-resource-bank/injury-and-death-involving-firearms/mass-shootings (last visited Sep. 6, 2026).

[5] *Id.*

confirm that permitting and background check regimes promote these interests. It is thus unsurprising that similar statutory schemes are widespread and deeply ingrained across the United States. Where the public, through its democratically elected officials, acts to address the threat of mass shootings with assault weapons through well-established permitting and background check tools, the public interest clearly supports allowing those tools to take effect. Amici submit this brief to assist the Court as it considers whether Senate Bill 25-003 should be enjoined. The public interest clearly shows that it should not be.

## BACKGROUND

Plaintiffs challenge Senate Bill 25-003 ("SB25-03"), enacted by the Colorado General Assembly in 2025. Plaintiffs' motion for preliminary injunction is limited to one of the Statute's provisions, implementing a permit-to-purchase scheme for specified semiautomatic firearms, which went into effect as of August 1, 2026. C.R.S. § 18-12-116(2). To obtain a license under SB25-03, applicants must undergo a background check, obtain a firearms safety course eligibility card, and complete a firearms safety course. *See id.* § 18-12-116(5).

After the Colorado General Assembly carefully deliberated and ultimately passed the bill, Governor Jared Polis signed it into law in April 2025. As the Governor announced when he signed the bill, SB25-03 was enacted "to improve public safety by enhancing gun safety education," and designed to help "ensure an educated and trained gun owner community."[6] One of SB25-03's sponsors in the General Assembly likewise explained that "[Coloradans have] raised a generation

---

[6] Press Release, Colo. Governor's Off., Governor Polis Signs Laws to Improve Public Safety (Apr. 10, 2025), https://governorsoffice.colorado.gov/governor/news/governor-polis-signs-laws-improve-public-safety.

on lockdown drills, and 1 in 15 people have experienced a mass shooting."[7] Assault weapons and large-capacity magazines have been used in numerous mass shootings in Colorado, including the shootings at Club Q in 2022, Boulder King in 2021, Aurora in 2012, and Columbine High School in 1999. SB25-03 directly responded to this public safety epidemic, reinforcing Colorado's existing regulations "by adding safeguards prior to the purchase of the types of semi-automatic weapons that are most lethal when paired with a large-capacity magazine."[8]

**ARGUMENT**

The "extraordinary remedy" of preliminary injunctive relief requires Plaintiffs to show that they are likely to succeed on the merits, that they would suffer irreparable harm absent an injunction, and that an injunction is supported by the balance of equities and in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Where a State is the opposing party, like here, the balancing of equities merges with the Court's assessment of the public interest, because "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Nken v. Holder*, 556 U.S. 418, 435 (2009); *see also Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, 108 F.4th 194, 205 (3d Cir. 2024) (affirming denial of a preliminary injunction in challenge to Delaware's assault weapon bans because "[t]he challengers seek to enjoin enforcement of two democratically enacted state laws" and "[c]ourts rightly hesitate to interfere with exercises of executive or legislative authority").

---

[7] Press Release, Colo. House Democrats, SB25-003 Goes Into Effect (July 29, 2026), https://www.cohousedems.com/news/sb25-003-goes-into-effect.

[8] *Id.*

As with all the preliminary injunction elements, Plaintiffs bear the burden of establishing that such relief is warranted here. Conclusory invocations of constitutional rights are insufficient to carry this burden, in particular where an injunction would impair concrete public interests. *See Rocky Mountain Gun Owners v. Polis*, 701 F. Supp. 3d 1121, 1147 (D. Colo. 2023), *aff'd*, 121 F.4th 96 (10th Cir. 2024). "[A court's] consideration of risk to the public's safety before providing preliminary injunctive relief is crucial." *Hope v. Warden York Cnty. Prison*, 972 F.3d 310, 332 (3d Cir. 2020); *see also United States v. Salerno*, 481 U.S. 739, 745 (1987) (finding that the government has "compelling interests in public safety").[9]

Amici agree with the State Defendants that Plaintiffs fail to show likelihood of success on the merits or any irreparable harm absent an injunction. For that and other reasons stated in Defendants' Brief, the Court need not reach the remaining preliminary injunction factors—the balance of equities and the public interest. Should the Court find it necessary to reach those factors, however, Amici respectfully submit this brief to call to the Court's attention certain matters and case law that should inform the Court's analysis.

## I. An Injunction Would Harm the Public's Concrete Interest in Public Safety

### A. Assault Weapons Such as Those Regulated by SB25-03 Pose a Distinctly Heightened Threat to Public Safety

In 2022, there were more than 48,000 firearm-related deaths in the United States.[10] In

[9] In *Ortega v. Grisham*, the Tenth Circuit considered the threat to public safety posed by enjoining New Mexico's waiting period law when balancing the public interest factor. 148 F.4th 1134, 1154 n.13 (10th Cir. 2025). The court recognized that "New Mexico ha[d] put forth evidence that waiting periods save lives and prevent impulsive violence." *Id.* While the court ultimately found the balance of equities favored the challengers in that case, the decision still demonstrates that the effects an injunction may have on public safety should be considered in crafting equitable relief.

[10] *Fast Facts: Firearm Injury and Death*, U.S. Ctrs. for Disease Control (July 5, 2024), https://www.cdc.gov/firearm-violence/data-research/facts-stats/.

2025, the country endured 407 mass shootings, an average of more than one per day.[11] As of this filing, there have been 325 mass shootings so far in 2026.[12] Since 2020, gun violence has been the leading cause of death among children ages 1 to 17 in the United States.[13]

Colorado is unfortunately part of this gun violence crisis—in an average year, 1,000 people die from gun violence in the state, meaning that someone dies from gun violence every nine hours.[14] Colorado's traumatic history of mass shootings, *see supra* at 3–4, includes multiple shootings carried out with assault weapons, in combination with large-capacity magazines, including the 2012 massacre inside a movie theatre in Aurora, which left 12 people dead and dozens more injured and remains the deadliest mass shooting by a lone gunman in the state's history.

Courts and researchers throughout the nation have consistently concluded that assault weapons play a particularly acute role in this public safety epidemic. Assault weapons represent a major advance in gun technology that contribute to the rise in mass shootings. *See Barnett v. Raoul*, 180 F.4th 1035, 1056 (7th Cir. 2026). Indeed, "the presence of assault weapons and large-capacity magazines is strongly correlated with the severity of the societal problem." *Id*. at 1058. A typical AR-15 rifle, a paradigmatic example of the types of assault weapons regulated by

[11] *Mass Shootings in 2025*, Gun Violence Archive, https://www.gunviolencearchive.org/reports/mass-shooting.

[12] *Id.*

[13] Deaths from guns have increased in this age group by 106% since 2013. *Gun Violence in the United States 2022: Examining the Burden Among Children and Teens*, Johns Hopkins Ctr. for Gun Violence Sols. (Sep. 12, 2024), https://publichealth.jhu.edu/sites/default/files/2024-09/2022-cgvs-gun-violence-in-the-united-states.pdf.

[14] *Colorado Gun Laws*, Giffords L. Ctr. to Prevent Gun Violence, https://giffords.org/gun-laws/states/colorado/ (last visited Sep. 5, 2026).

SB25-03, can hold 30 rounds, can shoot accurately from around 400 yards, produces a muzzle velocity of around 3,251 feet per second, and can be reloaded in as little as three seconds. *See Bevis v. City of Naperville*, 85 F.4th 1175, 1196 (7th Cir. 2023) (discussing the extreme lethality of the AR-15, which has a firing rate of 300 rounds per minute and delivers the same kinetic energy, muzzle velocity, and effective range as the U.S. Army's M16 automatic rifle); *see also Bianchi v. Brown*, 111 F.4th 438, 455–56 (4th Cir. 2024) (en banc) (discussing the "phenomenal lethality" of AR-15 rifles) (citation omitted).[15] One study calculated that "the number of bullets and their energy fired by the Sandy Hook shooter [who used an AR-15-style rifle] equaled an estimated 171 [late 1700s] militiamen storming the school."[16] Courts and researchers both agree that following the expiration of the federal Assault Weapons Ban in 2004, mass shootings increased substantially around the country.[17]

As the en banc Fourth Circuit noted recently, despite making up about five percent of total

[15] *See, e.g.*, Christopher Ingraham, *What 'arms' looked like when the 2nd Amendment was written,* Wash. Post (June 13, 2016), https://www.washingtonpost.com/news/wonk/wp/2016/06/13/the-men-who-wrote-the-2nd-amendment-would-never-recognize-an-ar-15/ (cataloguing founding-era firearm capabilities and comparing them with those of a typical modern-day AR-15).

[16] Stephen W. Hargarten, *The Bullets He Carried,* 21 W.J. Emerg. Med. 1036 (2020).

[17] *See e.g.*, *Or. Firearms Fed., Inc. v. Brown*, 644 F. Supp. 3d 782, 803 (D. Or. 2022); Charles DiMaggio et al., *Changes in US Mass Shooting Deaths Associated with the 1994-2004 Federal Assault Weapons Ban: Analysis of Open-Source Data*, 86 J. Trauma & Acute Care Surgery 11 (2019); Lori Post et al., *Impact of Firearm Surveillance on Gun Control Policy: Regression Discontinuity Analysis*, 7 JMIR Pub. Health & Surveillance 2 (2021); Philip J. Cook & John J. Donohue, *Regulating Assault Weapons and Large-Capacity Magazines for Ammunition*, 328 JAMA 1191 (2022); John J. Donohue, *The Effect of Permissive Gun Laws on Crime*, 704 Annals Am. Acad. Pol. & Soc. Sci. 92 (2022); Archie Bleyer et al., *Retrospective Evidence for Pediatric Benefit of U.S. Assault Weapons Ban as Rationale for Implementing an Even More Effective Ban*, 115 J. Nat'l Med. Ass'n 528 (2023); Alex Lars Lundberg et al., *Public Mass Shootings: Counterfactual Trend Analysis of the Federal Assault Weapons Ban,* 10 JMIR Pub. Health & Surveillance 2 (2024).

firearms in the U.S., AR-15s are used in twenty-five percent of mass shootings. *Bianchi*, 111 F.4th at 456. "Four of every five mass shootings that resulted in more than 24 deaths involved the use of assault rifles, as did every single mass shooting involving more than 40 deaths" and assault weapons "are the preferred weapons for those bent on wreaking death and destruction upon innocent civilians." *Id.* (internal quotation marks omitted). Multiple district courts across different circuits have reached the same conclusions, after considering extensive academic research and other evidentiary support. *See, e.g.*, *Hartford v. Ferguson*, 676 F. Supp. 3d 897, 907 (W.D. Wash. 2023) (disproportionate use of assault weapons is linked to disproportionately greater likelihood of death); *Nat'l Ass'n for Gun Rts.*, 685 F. Supp. 3d at 99–100 (there is correlation between use of assault weapons and higher fatalities), *aff'd*, 153 F.4th 213; *Bevis v. City of Naperville*, 657 F. Supp. 3d 1052, 1073 (N.D. Ill. 2023) (characteristics specific to assault weapons pose an "exceptional danger"), *aff'd*, 85 F.4th 1175 (7th Cir. 2023); *Kolbe v. O'Malley*, 42 F. Supp. 3d 768, 788 (D. Md. 2014) ("[A]ssault weapons and [large-capacity magazines] are disproportionately represented in mass shootings"), *vacated in part and remanded*, 813 F.3d 160 (4th Cir. 2016), *aff'd on reh'g en banc*, 849 F.3d 114 (4th Cir. 2017).

Mass shootings carried out with assault weapons have become "a modern societal problem" that poses a "significant—and growing—threat to American public safety" and has a significant psychological impact on Americans. *Nat'l Ass'n for Guns Rts.*, 685 F. Supp. 3d at 105–07; *see also Capen v. Campbell*, 708 F. Supp. 3d 65, 82 (D. Mass. 2023) (the "development of modern assault weapons . . . has created unprecedented social problems"), *aff'd*, 134 F.4th 660 (1st Cir. 2025); *Del. State Sportsmen's Ass'n, Inc. v. Del. Dep't of Safety & Homeland Sec.*, 664 F. Supp. 3d 584, 598–99 (D. Del. 2023), *aff'd*, 108 F.4th 194 (same); *Hartford*, 676 F. Supp. 3d at

907 (same).

Plaintiffs address none of these considerations when articulating the public interest and balance of the equities at stake in this litigation. But "consideration of risk to the public's safety before providing preliminary injunctive relief is crucial." *Hope*, 972 F.3d at 332.

### B. Permit-to-Purchase Statutory Schemes Like SB25-03 Are Effective

The elements of SB25-03 are specifically tailored to address the threats to public safety discussed above. Colorado has an obvious interest in reducing gun violence, promoting public safety, and ensuring responsible gun ownership. SB25-03's permit-to-purchase requirements help ensure an educated and trained firearm-owner community, and add safeguards to the purchase of specific weapons that have proven uniquely lethal. *See supra* at 4. Similar permit-to-purchase programs from around the Nation have consistently proven to serve SB25-03's intended ends. *See generally N.Y. State Rifle & Pistol Ass'n*, 597 U.S. at 38 n.9 (recognizing that shall-issue licensing laws that "require applicants to undergo a background check or pass a firearms safety course" are presumptively constitutional because they "are designed to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens.")

Research shows that firearm licensing laws have substantial impacts on public safety. For example, they reduce homicides, reduce suicides, prevent guns from being diverted into crime, reduce mass shootings, and reduce officer involved shootings.[18] A survey of Massachusetts local

---

[18] *See* Johns Hopkins Ctr. for Gun Violence Sols., *Firearm Purchaser Licensing* 8 (2025) (collecting findings from researchers across the country concluding, among other things, that firearms purchaser licensing laws were associated with measurable decreases in homicides and mass shootings); *see also, e.g.*, Cassandra Crifasi et al., *The association between permit-to-purchase laws and shootings by police*, 10 Inj. Epidemiology (2023); Daniel Webster et al., *Evidence concerning the regulation of firearms design, sale, and carrying on fatal mass shootings in the United States*, 19 Criminology & Pub. Pol'y 171 (2020); Tessa Collins et al., *State firearm*

police chiefs noted that the officers were "particularly cautious when a permit-seeker had a history of assault, domestic abuse, mental illness, or substance abuse," risk factors not always fully accounted for by federal background checks.[19] Likewise, the North Carolina Sheriffs Association opposed a measure that would have removed a gun permitting system because the permitting regime gave them "access to significantly more information about the applicant's criminal record, pending criminal charges, mental health record, and other relevant data than is contained in the federal NICS system."[20]

Firearm safety training also promotes public safety by "reducing accidental discharges, promoting responsible gun storage, reducing firearm access by criminals, and encouraging responsible gun ownership." *Md. Shall Issue, Inc. v. Hogan*, 2021 WL 3172273, at *7 (D. Md. July 27, 2021).[21] Indeed, evidence indicates that *repealing* a purchaser licensing law increases both firearm homicide and suicide rates.[22]

---

*laws and the interstate transfer of guns in the USA, 2006-2016,* 95 J. Urb. Health 322 (2018); Daniel Webster et al., *Preventing the diversion of guns to criminals through effective firearm sales laws*, *in* Reducing Gun Violence in America: Informing Policy with Evidence and Analysis 109 (2013).

[19] Devin Hughes & Evan DeFilippis, *How This Piece of Paper Fights Gun Crimes and Saves Lives*, The Trace (July 7, 2015), https://www.thetrace.org/2015/07/gun-permit-to-purchase-permits-van-hollen-federal/.

[20] *Id.*

[21] *See also, e.g.*, Mitchell L. Doucette et al., *Deregulation of public civilian gun carrying and violent crimes: A longitudinal analysis 1981-2019*, 23 Crim. & Pub. Pol'y 833, 853 (2024) (noting that permitless carry regimes increase gun violence by 32% when they replace a firearm safety training requirement); Michael Siegel, *Universal Back-ground Checks, Permit Requirements, and Firearm Homicide Rates*, 7 J. Am. Med. Network Open 1, 5 (2024) ("Laws requiring a permit for the purchase of all firearms were associated with significantly lower over-all homicide rates" when compared to laws simply requiring point-of-sale background checks).

[22] *See* Daniel Webster, Cassandra Kercher Crifasi & Jon S. Vernick, *Effects of the Repeal of Missouri's Handgun Purchaser Licensing Law on Homicides*, 91 J. Urb. Health 2 (2014).

Colorado's SB25-03 does not prohibit anyone who is otherwise eligible to purchase a firearm from doing so. In its decision addressing a separate Colorado firearm safety law, the Tenth Circuit was clear that the balance of "non-existent harms against the real harms of non-enforcement" of the law weighed "strongly" in favor of the government, "particularly as guns became the leading cause of death in Colorado among [the class of plaintiffs]." *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 128 (10th Cir. 2024) (internal quotation marks omitted). So too here.

## II. The State's Ability to Address Gun Violence Is Quintessentially in the Public Interest

Nearly a century ago, Justice Brandeis praised "Our Federalism" for empowering state governments to "devise[] solutions to difficult legal problems." *See Oregon v. Ice*, 555 U.S. 160, 171 (2009) (citing *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting)). To grant an injunction against SB25-03 would strip Colorado, and its citizens, of a constitutional and vital tool for combatting gun violence and protecting public safety.

The Third Circuit recognized this principle and explained how federal courts should be wary about enjoining democratically enacted state gun violence prevention laws:

> A federal court must weigh how best to deal with state laboratories of democracy. On a complete record, the duty of the federal court sometimes includes correcting a state that goes beyond the U.S. Constitution's bounds. Without the clarity of a full trial on the merits, though, we must err on the side of respecting state sovereignty. Delaware's legislature passed these bills, and Delaware's governor signed them into law. Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury.

*Del. State Sportsmen's Ass'n*, 108 F.4th at 206 (citations omitted).

Courts in the Tenth Circuit likewise echo the virtues of respecting laws passed by the states as the "laboratories of democracy." *See, e.g.*, *Petrella v. Brownback*, 787 F.3d 1242, 1268 (10th

Cir. 2015). The primary defense against alleged government abuse is "generally not litigation, but rather in the Constitution's structural mandates, particularly regular elections and federalism." *Lawrence v. Colorado*, 455 F. Supp. 3d 1063, 1078 (D. Colo. 2020) (noting that state lawmakers are "the ones who have been selected by Colorado's voters to make [legislative] choices" and that the violations alleged by the plaintiff did not justify a preliminary injunction). A robust electoral process yields legislators who can resolve policy questions through democratic means. *See Comprehensive Health of Planned Parenthood of Kan. & Mid-Mo., Inc. v. Templeton*, 954 F. Supp. 2d 1205, 1218–19 (D. Kan. 2013). In the preliminary injunction context, the Tenth Circuit has underscored that the "public interest strongly favors" enforcement of firearms safety laws given the "real harms of non-enforcement" amidst the gun violence epidemic in Colorado. *Rocky Mountain Gun Owners*, 121 F.4th at 128.

Enforcing democratically enacted laws is a legitimate public interest that courts consider. *See, e.g.*, *Gunnison Cnty. Stockgrowers' Ass'n, Inc., v. U.S. Fish & Wildlife Serv.*, 707 F. Supp. 3d 1056, 1068 (D. Colo. 2023) (finding that it is contrary to public interest to enjoin a Colorado statute that was passed pursuant to a state ballot measure). Even recognizing the public's interest in pursuing constitutional claims, courts have weighed in favor of allowing duly enacted laws to go into effect so as to not "second-guess democratic determinations of the public interest." *Heideman v. South Salt Lake City,* 348 F.3d 1182, 1191 (10th Cir. 2003).

Other jurisdictions have consistently adhered to the same principle. *See, e.g.*, *1-800-411-Pain Referral Serv., LLC v. Otto*, 744 F.3d 1045, 1053–54 (8th Cir. 2014) (noting that the more rigorous threshold for enjoining a validly enacted statute is designed so that preliminary injunctions only "thwart a state's presumptively reasonable democratic processes after an

appropriately deferential analysis") (internal citations and emphasis omitted); *Able v. United States*, 44 F.3d 128, 131 (2d Cir. 1995) ("[G]overnment[] policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly"); *see also Nat'l Ass'n for Gun Rts. v. Lamont*, 153 F.4th 213, 249 (2d Cir. 2025) (affirming denial of a preliminary injunction where "the government's interest in enforcing laws enacted by duly-elected legislators and in protecting the lives of its citizens" weighed heavily in the balance).

Where, like here, the public's safety is at stake and the State's democratically elected legislators have acted to protect it within the confines of the Constitution, this Court should not at this preliminary stage disturb the democratic judgment of Coloradans.

## CONCLUSION

Amici respectfully urge the Court to deny Plaintiffs' Motion for Preliminary Injunction.

Dated: September 6, 2026

Respectfully submitted,

*/s/ Austin R. Evers*
Austin R. Evers
700 13th Street, NW, 10th Floor
Washington, DC 20005
(202) 777-4500
austin.evers@freshfields.com

Abhinaya Swaminathan
3 World Trade Center
175 Greenwich Street, 51st Floor
New York, NY 10007
abhinaya.swaminathan@freshfields.com

*Counsel for Amici Curiae*

*Of Counsel:*
Douglas N. Letter
Shira Lauren Feldman
Tess M. Fardon
BRADY CENTER TO PREVENT GUN VIOLENCE
840 First Street NE, Suite 400
Washington, D.C. 20002
(202) 370-8160
dletter@bradyunited.org
sfeldman@bradyunited.org
tfardon@bradyunited.org

Leigh Rome
William T. Clark
GIFFORDS LAW CENTER
TO PREVENT GUN VIOLENCE
244 Madison Ave., Suite 147

New York, N.Y. 10016
(415) 433-2062
lrome@giffords.org
wclark@giffords.org

**CERTIFICATE OF SERVICE**

I certify that on September 6, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will generate notice by electronic mail of such filing to all counsel of record.

*/s/ Austin R. Evers*
Austin R. Evers