**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:25-cv-02725-WJM-MDB

ISRAEL DEL TORO, LUKE SORENSEN, NATHANAEL SKIVER, JASON REEVES, GARRETT FLICKER, and the COLORADO STATE SHOOTING ASSOCIATION,

*Plaintiffs*,

v.

JARED SCHUTZ POLIS, in his official capacity as Governor of the State of Colorado; PHILIP JACOB WEISER, in his official capacity as Attorney General of the State of Colorado; MICHAEL J. ALLEN, in his official capacity as the District Attorney for the Fourth Judicial District; and LAURA CLELLAN, in her official capacity as the Acting Director of the Colorado Division of Parks and Wildlife,

*Defendants*.

---

**Reply in Support of Motion for Preliminary Injunction**

---

## Table of Contents

**Introduction** ........ 1

**Argument** ........ 1

I. Plaintiffs Have Article III Standing ........ 1

II. Plaintiffs Are Likely to Succeed on the Merits ........ 2

A. *Bruen* step 1 is satisfied; the state does not argue otherwise ........ 2

B. The state's scheme is not "presumptively constitutional," nor can the state overcome *Ortega* or *Bruen* footnote 9 ........ 3

C. The state fails *Bruen* step 2, because it can provide no historical analogue for SB25-003's scheme ........ 8

D. An outright ban on semiautomatic firearms is unconstitutional ........ 10

E. The scheme's unavailability to certain law-abiding purchasers makes it unconstitutional as applied ........ 10

III. Plaintiffs Will Suffer Irreparable Harm Absent Preliminary Relief ........ 12

IV. The Balance of Equities and Public Interest Favor Injunctive Relief ........ 13

V. An Injunction Against Defendants Affords Plaintiffs Complete Relief ........ 13

**Conclusion** ........ 15

The state's response confirms what Plaintiffs allege: SB25-003's permit-to-purchase scheme is not the narrow, shall-issue formality the state claims, but is a discretionary, months-long gauntlet that most applicants never complete. The state's numbers confirm that fewer than one in three applicants have cleared the first step of the scheme, there is a functioning eligibility-card process in only 39 of Colorado's 64 counties, and the scheme takes far longer than the seven-day waiting period the Tenth Circuit struck down in *Ortega*—yet, unlike in *Ortega*, it still leaves the applicant without a firearm. More problematic still, the scheme collapses under *Bruen*'s core inquiry: there is no single historical analogue for the state's combination of duplicative background checks, discretionary sheriff review, mandatory in-person training and testing, and compounding fees. Without a comparable regulation from the Founding era or Reconstruction, the scheme cannot survive *Bruen*'s history-and-tradition test, whatever label the state gives it. Nor does the state have a good answer for the irreparable constitutional injury its scheme inflicts every day it remains in effect. This Court should grant Plaintiffs' motion and enjoin Defendants from enforcing the permit-to-purchase scheme.

## Argument

### I. Plaintiffs Have Article III Standing

The state's standing argument is confined to a single footnote and is, at best, half-hearted. (Resp. 10, n.5.) It first claims Plaintiffs' injuries trace not to SB25-003's unlawful permit-to-purchase scheme, but rather to third-party sheriffs, citing *Murthy v. Missouri*, 603 U.S. 43, 57 (2024). But *Murthy* involved the federal government ***encouraging*** social-media companies to moderate platform content. SB25-003 ***requires*** applicants to receive approval from third-party sheriffs. Further, *Murthy* denied standing because redress would require "guesswork as to

how independent decisionmakers will exercise their judgment"; here, the sheriffs administer a mandatory scheme the state designed, and they operate under that scheme, not independently of it. *Id.*; *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019). There is no guesswork when sheriffs' conduct is defined by, and compelled by, the law Plaintiffs challenge. (*Compare* Resp. 10 & n.5.)

Nor do individual Plaintiffs lack sufficient intent to purchase or allege speculative injury. Four CSSA members—Brownlee, Burgess, Cummings, and Manson—are navigating SB25-003's scheme and have suffered delays and fees in exercising their right to acquire covered firearms. *See Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 109 (10th Cir. 2024) (*RMGO*) ("[A] plaintiff need not wait for the harm to occur[.]"). Other individuals have specific, dated plans to purchase firearms—on a birthday, for a business, within the coming quarter—which is the opposite of speculative. (FAC ¶¶ 4–6, Doc. 33.) Each satisfies Article III's injury-in-fact requirement: a concrete and imminent harm to a legally protected interest.

Regardless, as argued below, CSSA has organizational standing. (*See* V.2, *infra*.) An association may sue on behalf of members who would have standing. *Friends of the Earth v. Laidlaw Env't Servs., Inc.*, 528 U.S. 167, 181 (2000). CSSA need only identify one member who has suffered or will suffer harm, *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009), and it has identified several.

## II. Plaintiffs Are Likely to Succeed on the Merits

### A. *Bruen* step 1 is satisfied; the state does not argue otherwise

SB25-003's scheme regulates the acquisition of specified semiautomatic firearms by law-abiding purchasers, and the Tenth Circuit has already said that acquisition is protected by the Second Amendment. *Ortega v. Grisham*, 148 F.4th 1134, 1144 (10th Cir. 2025) ("New Mexico's argument that limitations on firearm

sales ... do not implicate the Second Amendment's plain text is wrong[.]"); *e.g.*, *Gazzola v. Hochul*, 88 F.4th 186, 196 (2d Cir. 2023) ("The right to keep arms, necessarily involves the right to purchase them."). *Bruen* step 1 is thus satisfied.

### B. The state's scheme is not "presumptively constitutional," nor can the state overcome *Ortega* or *Bruen* footnote 9

The gravamen of the state's argument on the merits is that it can avoid *Bruen* step 2 altogether—and thus shed its heavy burden to identify a historical analogue—because SB25-003 is a presumptively lawful licensing scheme. (Resp. 4–7.) The state's avoidance is based entirely on *Bruen* footnote 9.

1. On its face, footnote 9 does not apply. The Supreme Court in *Bruen* (in a footnote no less) did not "suppl[y] the roadmap" for avoiding the Court's core teaching (the history-and-tradition analysis at step 2) for every "shall-issue" licensing scheme that burdens Second Amendment rights. (*See id.* at 4.) Footnote 9 did something entirely different. It told courts that, even though New York's discretionary public-carry licensing scheme was unconstitutional at step 2, that step-2 "analysis" did not mean the other 43 states' "shall-issue" public-carry schemes suffered a similar fate. *See Bruen*, 597 U.S. at 38, n.9 (citing Judge Hardiman's dissent in *Drake v. Filko*, 724 F.3d 426, 442 (3d Cir. 2013), and his "two dichotomies" of laws regulating "public carry of firearms")). Indeed, every sentence in that footnote refers to the topic sentence's "public carry" referent.[1] *See id.*

Further, the right to acquire arms "is a necessary predicate to keeping and bearing them," *Ortega*, 148 F.4th at 1143, and conditioning acquisition on

[1] The Tenth Circuit acknowledged this precise limitation in *RMGO*. 121 F.4th at 119 (quoting *Bruen*, 597 U.S. at 38 n.9, and *Drake*, 724 F.3d at 442 (Hardiman, J., dissenting))); *id.* at 122 (repeatedly stating footnote 9 applies to "'shall-issue' concealed carry permit" schemes).

government permission burdens a more fundamental interest than the "carry" issue in footnote 9, *see District of Columbia v. Heller*, 554 U.S. 570, 628 (2008) (stating the "central" self-defense interest the Second Amendment protects is rooted first in the home "where the need for defense of self, family, and property is most acute"). A citizen denied a permit to carry still keeps the firearm *Heller* protects. A citizen denied the acquisition of a firearm has nothing: no firearm to carry or to keep. The state's reliance on *Bruen* to confuse these rights (Resp. 6), misses the mark. *Bruen* "decid[ed] nothing about … the requirements that must be met to buy a gun," 597 U.S. at 72 (Alito, J., concurring), and the Court's dicta in a limiting footnote on public-carry schemes cannot displace *Heller* or resolve an issue that *Bruen* left open.

Nor is SB25-003's scheme a "shall-issue" scheme. The state's decision to vest sheriffs with may-issue discretion is central to the scheme and is disqualifying. Subsection 18-12-116(5)(b)(VI)(C) states that the sheriff "***shall*** deny" an application "if the applicant cannot lawfully possess a firearm" or "the sheriff cannot positively identify the applicant." Admittedly, these are shall-issue markers. But in the next sentence, the subsection continues that the sheriff "***may*** deny" an application if he has a "reasonable belief" the applicant "will present a danger to themself or others." *Id.* This "danger" veto has no definition, no listed factors, and, per sheriffs, "no objective standard or other criteria" governs it. (*See* Mot. 20.)

2. Even crediting the state's presumption, *Ortega* forecloses the state's position. The Tenth Circuit has already held that a seven-day waiting period violates the Second Amendment and could not be justified by reference to history and tradition, including the history on waiting periods. *See Ortega*, 148 F.4th at 1150–54. *Ortega* is the Tenth Circuit's most recent relevant Second Amendment

precedent, and it both rejected and overcame, in the alternative, a "presumption" like the one the state invites here. *See id.* at 1148–49.

*Ortega*'s holding consists of three conclusions that are directly applicable: (1) a seven-day waiting period infringes on activity protected by the plain text of the Second Amendment; (2) a seven-day waiting period is not presumptively constitutional under Supreme Court precedent (and, even if it were, the restriction is still unconstitutional); and (3) the government cannot justify a seven-day waiting period under this nation's history and tradition of firearms regulations. *Id.* at 1144–50. These holdings dictate the same result here. If a seven-day waiting period does not pass Second Amendment scrutiny, then Colorado's regime, which by the state's own account, imposes a far longer restriction, cannot stand.

*First*, "[c]ommon sense dictates that the right to bear arms requires a right to acquire arms" *Id.* at 1143. There is no doubt that "acquiring, purchasing, and possessing firearms is a necessary predicate to keeping and bearing them" *Id.*; *see also id.* at 1143, n.3 ("One cannot keep or bear arms if one cannot acquire them. That is an infringement, even if it is not a direct prohibition or ban.").

*Second*, "[a] blanket waiting period is simply not of a kind with the conditions and qualifications imposed by other presumptively lawful measures" and the state law "falls far short of a presumptively constitutional law." *Id.* at 1146, 1148.

*Third*, New Mexico's waiting-period law is not consistent with this nation's history and tradition: "[W]e reject the notion that other waiting period laws themselves carve out a historically grounded principle. They are mostly a modern innovation." *Id.* at 1150. The Tenth Circuit examined other claimed analogues beyond waiting periods and found them all lacking. *Id.* at 1149–50.

*Ortega* forecloses the state's arguments. The state claims the period after sheriffs issue eligibility cards is, on average, 11 days. So, after a sheriff (1) "positively identif[ies] the applicant," (2) confirms the applicant is not one who "cannot lawfully possess a firearm," and (3) determines the applicant does not "present a danger," Colo. Rev. Stat. § 18-12-116(5)(b)(VI)(C), SB25-003 requires this ***law-abiding purchaser*** to wait another 14 days[2] to take possession. That's double the period that was unconstitutional in *Ortega*. But, unlike in *Ortega*, the purchaser in Colorado is not guaranteed possession: he must still attend in-person training and ace an exam before the state gives him permission to acquire the firearm. That makes Colorado's scheme far more constitutionally infirm than the New Mexico scheme that the Tenth Circuit struck down as unconstitutional.

3. Even if some "shall issue" presumption survives, it does not save SB25-003, because its scheme is put to abusive ends. Even when governed by "narrow, objective, and definite standards," a shall-issue scheme is unconstitutional if it imposes "lengthy wait times" and "exorbitant fees" such that it "den[ies] ordinary citizens" their Second Amendment rights. *Bruen*, 597 U.S. at 38, n.9. Applying this analysis,[3] the state's scheme fails across the board. (*See* Mot. 16–19.)

---

[2] This count includes the second, three-day waiting period mandated under state law. *See* Colo. Rev. Stat. § 18-12-115(1)(a)(I).

[3] If footnote 9 applies (it doesn't), the state must contend with the rest of the footnote, including the Court's abusive-ends guidelines. (*Compare* Resp. 9, n.3 (elevating *RMGO*'s abusive-ends analysis, which was not a "shall-issue" licensing case), *with* Mot. 15–19 (discussing guidelines, including First Amendment doctrine, the Court actually provided).) The state resists "import[ing]" prior-restraint doctrine as a "hodgepodge of First Amendment jurisprudence." (Resp. 9, n.3.) But the state must settle that score with the Supreme Court. *See Bruen*, 597 U.S. at 38, n.9. The state cannot pick and choose which parts of footnote 9 to ignore.

*First*, there is nothing “narrow, objective, and definite” about SB25-003’s permitting scheme. There are no deadlines or guarantees on when, or if, the sheriff will issue an eligibility card. (*See* Mot. 16 (citing sheriff-declarant).) The state’s data confirm Plaintiffs’ evidence: only 39 of Colorado’s 64 sheriffs have issued a single eligibility card (Teklits Decl. ¶ 8), meaning that in 25 counties, 39% of the state, there is no evidence of a functional process (*see* Fenlason Decl. ¶¶ 23–24 (reaching that conclusion after calling all sheriffs)). Nor is there certainty whether training will be provided, when it will be offered, or where it will be held. (*See* Mot. 16 (citing declarants’ experience and absence of training).) The state offers no evidence in response but rather shifts the blame “to third parties” (Resp. 11–12)—the same third parties the state made necessary to the scheme, some of whom have discretion to deny an application altogether, Colo. Rev. Stat. § 18-12-116(5)(b)(VI)(C). These requirements and the 90%-exam threshold look nothing like the “minimum age requirement” in *RMGO*, which ***is*** “narrow, objective, and definite” and “eliminat[es] any possibility for subjective interpretation or exceptions.” 121 F.4th at 123.

*Second*, the state’s data confirm the delays are neither minor nor hypothetical. Using the state’s math, an applicant waits, on average, 10.9 days after applying merely to receive an eligibility card, and another 11 days after that to complete the mandatory training. (Teklits Decl. ¶ 11.) These averages describe only the fraction of applicants who get that far. Of the 3,574 applications the state reports, only 1,125—fewer than one in three—have completed the initial eligibility-card step (*id.* ¶ 8), which only grants the applicant permission to find, attend, and pay for mandatory training, sit for an exam for which he must score higher than state police officers, and then submit to yet another background check and three-day wait. To that end, the state reports only 502, roughly 14%, of applicants have

completed SB25-003's requirements. (*Id.*) Whatever "minor" delay footnote 9 might tolerate, a scheme where the ordinary applicant's experience is not delay but failure to finish at all goes too far. (*See, e.g.*, Brownlee Decl. ¶¶ 28–29.)

*Third*, the state cannot avoid *Bruen* footnote 9's "exorbitant fees" guardrail by isolating its own $52 charge and waving off the rest as costs imposed by "third parties." (Resp. 11–12.) The state made those third parties mandatory to ***its*** scheme, conditioning state permission on paying for two background checks, a sheriff-specific fee, and fees for state-approved training. (Mot. 18–19.) Taken together, these costs can exceed $600—more than the firearm itself. (Elliott Decl. ¶¶ 8–11, 14–15.) A fee scheme is "exorbitant" when it dwarfs the value of the right it conditions. In *Bullock v. Carter*, the Supreme Court held that, despite Texas primary filing fees ($1,400 and up) being tied to election administration, the fee was unconstitutional because "the very size of the fees … gives it a patently exclusionary character." 405 U.S. 134, 143 (1972). In *Lubin v. Panish*, the Supreme Court held a $700 filing fee, serving real ballot-management interests, was unconstitutional "in the absen[ce] of reasonable alternative means of ballot access." 415 U.S. 709, 718 (1974). To be sure, some circuits have upheld modest, cost-tethered fees in response to Second Amendment challenges, *e.g., Bauer v. Becerra*, 858 F.3d 1216, 1223–24 (9th Cir. 2017) (upholding $19 transfer fee tied to transaction costs), but those cases applied means-end scrutiny that *Bruen* rejected and pale in comparison to a $600-aggregate fee that exceeds the value of the to-be-purchased arm it burdens.

### C. The state fails *Bruen* step 2, because it can provide no historical analogue for SB25-003's scheme

The state next argues SB25-003's scheme is grounded in this nation's historical firearms regulations. (Resp. 13.) It is not. There is simply no historical

analogue for Colorado's unprecedented combination of background checks, fees, testing, wait times, ill-defined discretionary review, and training requirements.

To start, the earliest licensing law requiring a permit ***before*** acquiring a firearm—Florida's, in 1893, decades past Reconstruction (*see* Resp., Ex. 3 (Spitzer Report), Ex. at D)—was a discriminatory outlier that "was never intended to be applied to the white population," *see Watson v. Stone*, 148 Fla. 516, 524 (1941) (Buford, J., concurring). The state's other historical licensing exemplars relate to securing a license ***after*** acquisition for some unique or additional purpose (*e.g.*, concealed carry). As Plaintiffs' expert, Professor Lee Francis, points out:

> Of the Founding era statutes Spitzer cites, none actually required one to postpone taking possession of a firearm. Even where a permit or license was required to hunt [for example], there is no evidence that an individual was required to wait … before taking possession of his firearm, regardless of whether he would be permitted to hunt.

(Francis Decl. ¶ 22.) This case does not concern obtaining a special use permit for a firearm after the fact; it concerns the acquisition of the firearm itself, directly infringing an individual's right to keep it for self-defense. *Heller*, 554 U.S. at 628.

Licensing laws that required "individuals to obtain government permission before purchasing a firearm were virtually unknown in early America." (Francis Decl. ¶ 29.) The principal exceptions were Founding, antebellum, and Reconstruction era licensing laws in slave states that limited—if not outright barred—firearm ownership by Black Americans and other marginalized groups. *Id.* The Supreme Court in *Wolford v. Lopez*, refused to consider these overtly racist laws as viable analogues to support modern-day regulations. 146 S. Ct. 2032, 2053 (2026). These laws "carr[y] no weight" because they were "neither widespread nor widely accepted," and were used as tools for disarming portions of the population because of the color of their skin or ethnic origin. *Id.* Here, the state is attempting

what the Supreme Court has already rejected: using racist laws to justify its scheme. (*See* Resp., Ex. 3 (Spitzer Report) at 75 & n.243, 76, and Table of Weapons Licensing Laws.) Those efforts should be resoundingly rejected.

### D. An outright ban on semiautomatic firearms is unconstitutional

The state also attempts to defend the constitutionality of SB25-003's scheme by contending "Colorado ***could*** prohibit possession of SSFs outright" (Resp. 20 (emphasis added)), and portends "[t]his Court can and should" come to that "conclusion" (*id.* at 19). This argument gives away the game on the state's true motivation: at its core, SB25-003's scheme is a firearms ban with an exception designed to be so burdensome that few will endure the regulatory gauntlet.

*First*, the state does not attempt to show all 800+ models under Colorado's sweeping definition of "SSFs," including pistols and shotguns, fall outside the Second Amendment. *Second*, on the merits, the en banc Third Circuit was right: semiautomatic rifles are "in common use for lawful purposes," and bans are inconsistent with the historical tradition. *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Att'y Gen. of N.J.*, 183 F.4th 211, 250 (3d Cir. 2026) (en banc). Indeed, this term the Supreme Court is likely to reaffirm *Heller*'s holding that arms "in common use," 554 U.S. at 624–25, which repeating arms are and were at the Founding, cannot be banned, *see Viramontes v. Cook County*, No. 25-238 (U.S.).

### E. The scheme's unavailability to certain law-abiding purchasers makes it unconstitutional as applied

Plaintiffs also challenge SB25-003 as applied because the scheme's dysfunction in certain areas of the state, and its training and exam requirements, function as a prohibition on law-abiding purchasers. The state initially labels this an "ASL or non-English speaker" theory and claims it is "outside the scope of the

Complaint." (Resp. 8–9.) But disability has always been part of Plaintiffs' claims: the complaint alleges that SB25-003 "provides no accommodations or exceptions to the onerous safety courses and exams for disabled persons." (FAC ¶¶ 1–2.) Sloan and Moothart, both CSSA members, are disabled—both are profoundly Deaf—and the motion's evidence about their inability to access an ASL interpreter for mandatory training proves up a theory already alleged.

True, Laugesen's claim—that limited English proficiency, rather than a disability, prevents her from passing a written exam offered only in English—rests on different grounds. To the extent the state presses that this theory is not addressed in the complaint, Rule 15(b)(1) allows amendment, which the court "should freely permit" where "the objecting party fails" to show "that the evidence would prejudice" its defense. Fed. R. Civ. P. 15(b)(1). The state offers no prejudice. Further, proceedings assessing preliminary-injunctive relief involve "procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

Plaintiffs' underserved-counties theory needs no amendment: the state does not contest it is within the complaint, and its own evidence corroborates it. The state touts an average 10.9-day turnaround and over 500 Coloradans who have completed the process—but, by its own admission, eligibility cards have been issued in only 39 of Colorado's 64 counties. (Teklits Decl. ¶¶ 8, 11.) It says nothing about the other 25 counties (nearly 40% of the state), and Plaintiffs' evidence suggests no functional process due to a host of factors: confusion, rote nonparticipation, or silence. (Fenlason Decl. ¶ 25–33.) At bottom, describing the counties where the scheme functions says nothing about the counties where it does not.

## III. Plaintiffs Will Suffer Irreparable Harm Absent Preliminary Relief

Like other circuits, the Tenth Circuit "consider[s] the infringement of a constitutional right enough and require[s] no further showing of irreparable injury." *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 805 (10th Cir. 2019). Circuits have applied that principle to Second Amendment rights. *E.g.*, *Baird v. Bonta*, 81 F.4th 1036, 1046-47 (9th Cir. 20230; *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011). Courts have also held that the temporary loss of a constitutional right, "for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality op.).

Despite this "well-settled law," *see Free the Nipple-Fort Collins*, 916 F.3d at 806, the state claims Plaintiffs' irreparable constitutional injury is relieved or mitigated because Plaintiffs could access firearms not covered by SB25-003 and Plaintiffs "delay[ed] in seeking preliminary relief." (Resp. 20–21.) The state's first argument is equivalent to saying an unconstitutional prohibition on gathering near medians and offramps is "reparable" because protestors can protest in a nearby field, *see Brewer v. City of Albuquerque*, 18 F.4th 1205, 1209 (10th Cir. 2021); or an unconstitutional prohibition on standing on public rights-of-way near abortion clinics is "reparable" because gatherers could advocate outside a grocery store instead, *McCullen v. Coakley*, 573 U.S. 464, 495 (2014). That argument has no merit under the First Amendment; the same goes for the Second Amendment.

As to the "delay," the scheme went into effect on August 1, 2026. Plaintiffs moved 10 days later. The state has argued that any challenge before August 1 was "premature" "[b]ecause the Act's licensing requirement d[id] not take effect until August 2026, [and] many of the parameters of this program ha[d] yet to be finalized,

including the amount of any fees and the specifics of the required firearm safety training." (Mot. to Dismiss 2, Doc. 51.) There was no delay.

## IV. The Balance of Equities and Public Interest Favor Injunctive Relief

That leaves only the balance of equities and the public interest. The state has no legitimate interest in enforcing an unconstitutional law. *See Chamber of Com. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010) ("the public interest will perforce be served by enjoining the enforcement of the invalid provisions of state law").

And the state's policy exegesis misses the point. True, reasonable minds may disagree about whether limiting through license the right to acquire a firearm "is ***really worth*** insisting upon." *Heller*, 554 U.S. at 634. But the state does not write freely: "The Second Amendment 'is the very product of an interest balancing'" that "'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense." *Bruen*, 597 U.S. at 26 (quoting *Heller*, 554 U.S. at 635). This case thus is not about whether mass shootings are a public-policy problem. They are. Nor is it about whether states need "a variety of tools for combating that problem." *Heller*, 554 U.S. at 636. They do. This case is about whether the Founders would have approved the state's judgment to subject law-abiding purchasers to a permit-to-purchase scheme so burdensome that it denies many the right to acquire. They would not. The state cannot defeat injunctive relief by insisting it knows better than those who enshrined the Second Amendment.

## V. An Injunction Against Defendants Affords Plaintiffs Complete Relief

1. The state first refashions Plaintiffs' injunction request into a "universal injunction" against "the world at large" and (rightfully) knocks down that strawman. (*See* Resp. 23–24.) But Plaintiffs do not seek a universal injunction. "Complete relief" only requires an injunction against the governor (as the chief

executive of the state), the attorney general (as the chief legal officer who ensures state law is uniformly and adequately enforced), and the CPW (as the implementing agency). *See Trump v. CASA, Inc.*, 606 U.S. 831, 852 (2025). That injunction will "bind[]" Defendants' "officers, agents, servants, employees, and attorneys" and "other persons who are in active concert or participation" with them. Fed. R. Civ. P. 65(d)(2). So, the nonparties the state is concerned about will be covered.

This is standard. On remand in *Ortega*, the district court enjoined New Mexico's governor and attorney general "and each of their respective officers, agents, servants, and employees, and those persons in active concert or participation with them, as well as those duly sworn state law enforcement officers who gain knowledge of this injunction order." Order 3, *Ortega v. Grisham*, No. 1:24-cv-00471-JB-SCY (D.N.M. Aug. 27, 2026), Doc. 126.[4] That order correctly reaches New Mexico's sheriffs. Plaintiffs ask this Court to enter the same relief.

2. Next, the state takes issue with the scope of relief CSSA is entitled to as an organizational plaintiff. It is settled that associations may "have standing solely as the representative of its members." *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Brock*, 477 U.S. 274, 281 (1986) (citation omitted). Associational standing exists because "the primary reason people join an organization is often to create an effective vehicle for vindicating interests that they share with others." *Id.* at 290. CSSA easily fits that description. (*See* Mot. 24.)

The only question then is which CSSA members are entitled to injunctive relief. That, of course, will depend on the injunction. *See Warth v. Seldin*, 422 U.S.

[4] *Accord Bella Health & Wellness v. Weiser*, 793 F. Supp. 3d 1320, 1338 (D. Colo. 2025) (enjoining attorney general and other state defendants and "their officers, agents, servants, employees, attorneys, and any others who are in active concert or participation with them").

490, 515 (1975). An injunction based on facial relief should extend to all CSSA's current members, like Brownlee, Burgess, and Cummings (*id.* at 24 (citing CSSA-member-declarants)), and future[5] members who are would-be purchasers. An injunction based on Plaintiffs' as-applied challenges should extend to similarly situated members, which the state appears to concede (Resp. 25).

3. Last, the state argues further narrowing is required because enjoining SB25-003's permit-to-purchase scheme would afford "far more than is necessary." (Resp. 25.) But Plaintiffs' claim is that SB25-003's prohibition on acquiring specified semiautomatic firearms without a permit obtained through a burdensome, time-consuming, and costly permitting scheme is unconstitutional. (FAC ¶ 59, Doc. 33.) The unavailability of training, sheriff delays and nonparticipation, the 90% exam threshold, duplicative background checks, predictable delays, and excessive fees are evidence that the system imposes an unconstitutional burden. True, discrete parts may also violate the Second Amendment, but Plaintiffs' claim is that SB25-003's entire permit-to-purchase scheme is unconstitutional. That is a far easier constitutional question, and awarding complete relief on that claim means enjoining the scheme that causes the burden, not stitching together fixes to its parts.

**Conclusion**

Plaintiffs respectfully ask the Court to grant their motion and enjoin Defendants consistent with relief outlined in this reply.

[5] The state disputes that relief should extend to CSSA's future members but does not contend with Plaintiffs' authority. (Mot. 25 (citing *Catholic Benefits Ass'n v. Burrows*, 732 F. Supp. 3d 1014, 1028 (D.N.D. 2024)).) Instead, it cites a Sixth Circuit case that did not reach the scope of relief (*see* Resp. 24, n.14).

Dated: September 8, 2026.

Respectfully submitted,

*s/ Julian R. Ellis, Jr.*

Julian R. Ellis, Jr.
Robert J. Bucknam
**First & Fourteenth PLLC**
2 N. Cascade Ave., Suite 1430
Colorado Springs, CO 80903
Phone: (719) 428-4937
Email: julian@first-fourteenth.com
rob@first-fourteenth.com

Michael Francisco
**First & Fourteenth PLLC**
800 Connecticut Avenue, Suite 300
Washington, D.C. 20006
Phone: (202) 784-0522
Email: michael@first-fourteenth.com

Michael D. McCoy
**Mountain States Legal Foundation**
2596 South Lewis Way
Lakewood, CO 80227
Phone: (303) 292-2021
Email: mmccoy@mslegal.org

Joseph G.S. Greenlee
**NRA – Institute for Legislative Action**
11250 Waples Mill Road
Fairfax, VA 22030
Phone: (703) 267-1161
Email: jgreenlee@nrahq.org

*Attorneys for Plaintiffs*

**Certificate of Service**

I certify that on September 8, 2026, the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

*s/ Thalia Mederos*
FIRST & FOURTEENTH PLLC