**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 25-cv-2725-WJM-MDB

ISRAEL DEL TORO, *et al*.,

Plaintiffs,

v.

JARED SCHUTZ POLIS,
in his official capacity as Governor of the State of Colorado, *et al*.,

Defendants.

---

**ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

---

Plaintiffs Israel Del Toro, Luke Sorensen, Nathanael Skiver, Jason Reeves, Garrett Flicker ("Individual Plaintiffs"), and the Colorado State Shooting Association ("CSSA") (collectively, "Plaintiffs") bring this lawsuit against Defendants Jared Schutz Polis, in his official capacity as Governor of the State of Colorado; Philip Jacob Weiser, in his official capacity as Attorney General of the State of Colorado; Michael J. Allen, in his official capacity as the District Attorney for the Fourth Judicial District; and Laura Clellan, in her official capacity as the Acting Director of the Colorado Division of Parks and Wildlife ("CPW") (collectively, "Defendants"), to challenge the constitutionality of certain provisions in Colorado Senate Bill 25-003, now codified as the "Act Concerning the Prohibition of Certain Semiautomatic Firearms and Rapid-Fire Devices," Colorado Revised Statutes (C.R.S.) §§ 18-12-101 *et seq.* (2025) ("SB25-003" or the "Act") (ECF No. 33.)

Currently before the Court is Plaintiffs' Motion for a Preliminary Injunction ("Motion"), by which they seek to preliminarily enjoin enforcement of SB25-003's permit-to-purchase ("PTP") scheme, as provided by Sections Two and Three of SB25-003, C.R.S. §§ 18-12-16 & 33-9-15. (ECF No. 82.) The Motion has been fully briefed (ECF Nos. 82, 86, 90).[1] Thus, it is now ripe for adjudication.

For the reasons set forth below, the Motion is denied.

## I. BACKGROUND

### A. Findings of Fact

Plaintiffs' lawsuit challenges the constitutionality of Colorado's SB25-003, which was enacted by the Legislature of the State of Colorado and signed into law by Gov. Polis on April 10, 2025.[2] (ECF No. 33.) The Act consists of 13 sections: sections 1 through 9 either modify or amend a provision of an existing Colorado Revised Statute or create a new provision within a Colorado Revised Statute; sections 10 through 12 concern appropriations and severability; and section 13 declares that the Act is "necessary for the immediate preservation of the public peace, health, or safety or for appropriations for the support and maintenance of the departments of the state and state institutions." (*Id*. at 2; ECF No. 31-3.)

At a high level, SB25-003 imposes additional requirements on the purchase or sale of certain "specified semiautomatic firearms" ("SSFs"). (*See generally* ECF No. 31-

[1] With the Court's leave, *Amici Curiae* Brady Center to Prevent Gun Violence and Giffords Law Center to Prevent Gun Violence (collectively, the "*Amici*") also filed a brief in opposition to the Motion. (ECF No. 89.) Plaintiff CSSA filed a Response (ECF No. 93.)

[2] All sections of SB25-003 went into effect on April 10, 2025, with the exception of Sections Two and Three (C.R.S. §§ 18-12-116 & 33-9-15), which went into effect on August 1, 2026. (*See* ECF Nos. 33 at 3; 31-3 at 21.)

3.) Additionally, it includes provisions which prohibit the possession of "rapid-fire devices." (*Id.* at 19–20.) In the instant Motion, Plaintiffs challenge only the former aspect, SB25-003's PTP scheme under Sections Two and Three of SB25-003, §§ 18-12-116 & 33-9-15. (ECF No. 82 at 1.)

1. <u>SB25-003's PTP Scheme</u>

Section Two of SB25-003 added Colo. Rev. Stat. § 18-12-116, which makes it "unlawful for any person to knowingly manufacture, distribute, transfer, sell, or purchase a [SSF]," subject to certain enumerated exceptions. § 18-12-116(2). The SSFs covered by the statute include semiautomatic rifles with detachable magazines, shotguns with detachable magazines, and "gas-operated"[3] semiautomatic handguns with detachable magazines. § 18-12-116(2)(d)(I). Section Two excludes specified categories of firearms, including: firearms capable of operating only with .22 or lower caliber rimfire ammunition; firearms manually operated by bolt, pump, lever, or slide action; firearms with mixed magazines; certain recoil operated handguns; a list of enumerated firearm models in their existing configurations; as well as antique or permanently inoperable firearms. § 18-12-116(1)(d)(II)(A)–(G).

Aside from Section Two's general prohibition, it contains an exception for the sale or transfer of an SSF to—or the purchase or receipt of an SSF by—a prospective purchaser who has completed one of the three training options:

[3] A "gas-operated semiautomatic handgun" is a semiautomatic handgun that harnesses or traps a portion of the high-pressure gas from a fired cartridge to cycle the action through one of five specified mechanisms: a long-stroke piston system, a short-stroke piston system, a system that directs gas against the bolt or slide assembly, a hybrid gas system, or a blow-back-operated system that uses expanding propellant gasses acting on the cartridge case to drive the breech mechanism rearward. § 18-12-116(1)(c)(I)–(V).

- (A) a hunter education course in combination with a *basic* firearms safety course, completed *within* five years before making the purchase, § 18-12-116(3)(e)(I)(A);
- (B) an *extended* firearms safety course, completed *within* five years before making the purchase, § 18-12-116(3)(e)(I)(B); or
- (C) an *extended* firearms safety course completed *more than* five years before in combination with a basic firearms safety course completed *within* five years before making the purchase, § 18-12-116(3)(e)(I)(C).

Both the basic and extended firearms safety courses must be in-person and taught by a sheriff-verified firearms instructor. § 18-12-116(5)(a)(I). The "basic" firearms safety course must be at least four hours, while an "extended" firearms safety course must be at least 12 hours, over the course of two days. § 18-12-116(5)(a)(III)(A)–(B). Each course must include instruction on safe handling of semiautomatic firearms and magazines, safe firearm storage, child safety, firearm deaths associated with mental illness, extreme risk protection orders, and victim awareness and empathy. § 18-12-116(5)(a)(IV). At the conclusion of either course, students must complete an exam testing their knowledge of the subjects in the course. § 18-12-116(5)(a)(V). To complete the basic course, students must achieve a score of at least 90%. *Id*. Within three business days after a student has successfully completed either course, the instructor must report the completion to a statewide firearm safety record system, described in Section Three.[4]

---

[4] As applicable here, Section Three establishes a statewide firearms-training and safety-course record system, developed and operated by CPW, in consultation with the Colorado Bureau of Investigation. § 33-9-115(2)(a)–(b). The system records eligibility-card information and qualifying course completion for instructors to verify eligibility before course enrollment and

Before enrolling in the required firearms safety course, an individual must first obtain a firearms safety "course eligibility card" from the county sheriff. § 18-12-116(5)(a)(II), (5)(b)(I). This process requires an applicant to submit an application, provide their full name and date of birth, and attest: (1) that they have no state or federal conviction that would prohibit them from purchasing or possessing a firearm; (2) that they will comply with applicable state laws governing firearm ownership, and; (3) that they will transfer firearms only as permitted by law, and not allow a firearm in their possession to be accessed by another person whom they believe would be a danger to themselves or others. § 18-12-116(5)(b)(II).

The applicant must also provide a government ID, the results from a third-party background check, and pay a non-refundable fee to the sheriff, comprising the sheriff's processing fee and the firearms-training record-system fee. § 18-12-116(5)(b)(III)–(V). The fee amount "must reflect the actual direct and indirect costs to the sheriff for issuing a firearms safety course eligibility card." § 18-12-116(5)(b)(V).

Under Section Two, a sheriff "shall" review each application, and subject to certain exceptions, "shall" issue an eligibility card to an applicant to submits the required application, information, and fee. § 18-12-116(5)(b)(VI)(A)–(B). If granted, an eligibility card is valid for five years after the date of issuance. § 18-12-116(5)(b)(I). The sheriff "shall" deny the application if the applicant cannot lawfully possess a firearm under state or federal law, or if the sheriff cannot positively identify the applicant. § 18-12-

---

federally licensed firearms dealers to verify that a prospective purchaser has complied with the statutory requirements. § 33-9-115(3). The system is not a record that a person has purchased or exchanged a specific firearm. § 33-9-115(2)(c). It also specifies how CPW must manage the funds collected pursuant to the firearms-training record-system fee. § 33-9-115(5).

116(5)(b)(VI)(C). The sheriff "may" deny an application upon a "reasonable belief that the documented previous behavior by the applicant makes it likely the applicant will present a danger to themselves or others" if issued a card. *Id*.

If the sheriff denies an application, the sheriff "shall" provide written notice stating the grounds for denial and informing the applicant of the right to seek judicial review of the denial. § 18-12-116(5)(b)(VI)(E). An applicant whose application is denied may seek review pursuant to Colorado Rule of Civil Procedure § 106(a)(4) and (b). § 18-12-116(5)(b)(X). In this proceeding, the sheriff bears the burden of proving the grounds for ineligibility by a preponderance of the evidence, except that a denial based on "reasonable belief" of danger must be proven by clear and convincing evidence. § 18-12-116(5)(b)(X)(B). The court may award attorney's fees to the prevailing party. § 18-12-116(5)(b)(X)(C).

2. <u>Plaintiff's Allegations Concerning SB25-003's Implementation</u>

Plaintiffs allege that there exist legal and practical problems with the PTP scheme's implementation, particularly as it pertains to training courses and curriculum, sheriff capacity, fees, and waiting periods. (ECF No. 82 at 7–10.) Concerning the training curriculum, Plaintiffs allege that CPW failed to release the PTP scheme's training curriculum until the second half of July 2026, two weeks before the scheme went into effect. (ECF No. 82-1 at ¶ 15.) For this reason, and others, Plaintiffs cite issues and uncertainty as to the availability of instructors, including discrepancies between the list of trainers listed on CPW's website and those actually providing training (ECF No. 82-1 at ¶¶ 14–16), limited availability for those actually providing training (ECF Nos. 82-1 at ¶ 17; 82-9 at ¶¶ 21–24), and counties in which there are no offerings (ECF

No. 82-1 at ¶¶ 9–12). Additionally, Plaintiffs allege that there are no apparent accommodations for applicants with disabilities. (ECF No. 82-10 at ¶¶ 32–33.)

As for sheriff capacity, Plaintiffs allege that Colorado's general assembly outsourced administration of the scheme to Colorado's 64 county sheriffs without providing adequate funding, staffing support, or operational guidance. (ECF Nos. 82-2 at ¶¶ 9–16, 23–24; 82-3 at ¶¶ 5, 10–11). As a result of these financial and staffing shortcomings, Plaintiffs allege, some sheriffs are expressly refusing to conduct intake, background screening, and card issuance; while others expressed confusion as to what the role scheme required of them. (ECF Nos. 82-1 at ¶¶ 23–36; 82-2 at ¶¶ 28–29; 82-3 at ¶ 18.) For sheriffs who have agreed to participate, Plaintiffs also allege that these sheriffs face confusion about other aspects of the scheme's requirements, including the third-party background check and whether it requires the applicant to appear in person to apply. (ECF Nos. 82-1 ¶ 34; 82-2 at ¶¶ 17–21; 82-3 at ¶¶ 14–16; 82-8 at ¶¶ 11–13.) This confusion also extends to the exercise of statutory discretion to approve or deny applications pursuant to the scheme's "reasonable belief" provision. (ECF Nos. 82-3 at ¶¶ 17–20; 82-2 at ¶¶ 23–24.)

Plaintiffs further allege that SB25-003 imposes financial and temporal burdens on prospective purchasers. (ECF No. 82 at 9–10). Plaintiffs point to one declarant who "researched the costs required," calculating a *potential* total cost of nearly $600 for the sum of the required fees and training costs. (ECF No. 82-11 at ¶¶ 8–11, 15.) Other declarants cite concerns with the potential timing of training courses, and the travel costs that those trainings would entail. (ECF Nos. 82-1 at ¶¶ 9–13; 82-12 at ¶¶ 9–10, 20.) Finally, Plaintiffs highlight declarant concerns with the requirement that students of

the basic course score of at least 90% on the exam. (ECF Nos. 82-8 at ¶¶ 19, 21; 82-10 at ¶¶ 28–29.)

### B. Procedural History

Plaintiffs filed this action on September 2, 2025. (ECF No. 1.) Plaintiffs amended their complaint on December 22, 2025. (ECF No. 33). The amended complaint removed Kathleen Clayton as a plaintiff, added as a defendant Laura Clellan, in her official capacity as the Acting Director of the Colorado Division of Parks and Wildlife, and removed a claim for damages pursuant to 42 U.S.C. § 1983. (*Id.*) The first amended complaint ("FAC") alleges that the requirements imposed by SB25-003 "infringe Plaintiffs' rights guaranteed by the Second Amendment, which is applicable to Colorado through the Fourteenth Amendment." (*Id*. at ¶ 52.) Plaintiffs bring a "facial" and "as-applied" challenge to SB25-003, seeking a declaratory judgment and injunctive relief. (*Id*. at ¶¶ 48–68). On March 3, 2026, Defendants filed a motion to dismiss the FAC. (ECF No. 51.)[5] On August 11, 2026, Plaintiffs filed the instant Motion, requesting that the Court preliminarily enjoin the enforcement of SB25-003's PTP scheme. (ECF No. 82). Defendants filed a Response on September 1, 2026, and Plaintiffs filed a Reply on September 8, 2026. (ECF Nos. 86; 90).

## II. LEGAL STANDARD

### A. Rule 65(a) Preliminary Injunction Standard

"Because a preliminary injunction is an 'extraordinary remedy never awarded as of right,'. . . the movant must make a 'clear and unequivocal' showing it is entitled to

[5] The Court will address Defendants' motion to dismiss in a separate, forthcoming order.

such relief." *Colorado v. U.S. Envtl. Protection Agency,* 989 F.3d 874, 883 (10th Cir. 2021) (quoting *Winter v. Natural Res. Def. Council,* 555 U.S. 7, 24 (2008)); *Port City Props. v. Union Pac. R.R. Co.,* 518 F.3d 1186, 1190 (10th Cir. 2008) (internal citation omitted)). "To obtain a preliminary injunction, the movant must show (1) it 'is substantially likely to succeed on the merits,' (2) it 'will suffer irreparable injury if the injunction is denied,' (3) its 'threatened injury outweighs the injury the opposing party will suffer under the injunction,' and (4) 'the injunction would not be adverse to the public interest.'" *Colorado,* 989 F.3d at 883 (quoting *New Mexico Dep't of Game & Fish v. U.S. Dep't of Interior,* 854 F.3d 1236, 1246 (10th Cir. 2017)).[6]

The likelihood-of-success and irreparable-harm factors are "the most critical" in the analysis. *Nken v. Holder*, 556 U.S. 418, 434 (2009) (discussing stays but acknowledging "substantial overlap" between the factors for stays and preliminary injunctions). The third and fourth factors merge when the government is the opposing party. *Denver Homeless Out Loud v. Denver, Colorado,* 32 F.4th 1259, 1278 (10th Cir. 2022) (citation omitted).

## B. The Second Amendment[7]

The Second Amendment protects an "individual right to keep and bear arms," of which a "central component" is self-defense, even if "unconnected to militia service."

---

[6] In their Motion, Plaintiffs request that no bond requirement be imposed. The Court agrees. *See Rocky Mountain Gun Owners v. Polis*, 685 F. Supp. 1033, 1061 (D. Colo. 2023) (finding that a bond is unnecessary in a case that seeks to enforce a constitutional right against the government.)

[7] The Second Amendment to the United States Constitution reads in full: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. CONST. amend. II.

*District of Columbia v. Heller*, 554 U.S. 570, 598, 601–02 (2008).[8] When ratified, the Second Amendment did not "lay down a novel principle" but rather "codified a *pre-existing* right" inherited from our English ancestors. *Id*. at 592, 599 (internal quotations omitted) (emphasis in original). In *Heller*, the Supreme Court held that the D.C. law banning handgun possession in the home violated the Second Amendment. *Id*. at 635. The Court clarified that the right to keep and bear arms "is not unlimited," noting that:

> nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id*. at 626–27. The Court described these measures as "presumptively lawful." *Id*. at 627 n.26.

1. <u>Bruen's History & Tradition Framework</u>

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022) replaced the prior means-end scrutiny approach in evaluating Second Amendment challenges—developed by courts of appeal in the wake of *Heller*—with a two-part burden-shifting framework grounded in "history and tradition." *Id*. at 22–24. **At step one**, the plaintiff bears the burden of establishing that "the Second Amendment's plain text covers" either the conduct they engaged or intended to engage in. *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 113–14 (10th Cir. 2024) ("*RMGO*") (quoting *Bruen*, 597 U.S. at 17). This requires showing: (1) whether the challenger is part of "the people" whom the

[8] In *McDonald v. City of Chicago*, 561 U.S. 742, 791 (2010), the Court subsequently held that this individual right was incorporated against the States through the Fourteenth Amendment.

Second Amendment protects, (2) whether the item at issue is an arm that is "in common use" today for self-defense," and (3) whether the "proposed course of conduct" falls within the Second Amendment." *RMGO*, 121 F.4th at 113–14 (citing *Bruen*, 597 U.S. at 31–32). If the plaintiff fails to meet this burden, the analysis ends. *RMGO*, 121 F.4th at 113 (citing *Bruen*, 597 U.S. at 17).

If the plaintiff satisfies step one, the Constitution "presumptively protects that conduct," and the burden shifts to the government at **step two** to demonstrate that its regulation is "consistent with the principles that underpin our" Nation's historical tradition of firearm regulation. *RMGO*, 121 F.4th at 113 (quoting *Bruen*, 597 U.S. at 17) (emphasis removed).

"Though some historical precursors may easily map onto their modern regulatory counterparts, others 'may require a more nuanced approach' due to 'unprecedented societal concerns or dramatic technological changes' since the founding." *United States v. Ogilvie*, 153 F.4th 1098, 1105 (10th Cir. 2025) (quoting *Bruen*, 597 U.S. at 27). The modern regulation "need not be a 'dead ringer' or a 'historical twin.'" *United States v. Rahimi*, 602 U.S. 680, 692 (2024) (quoting *Bruen*, 597 U.S. at 30). Instead, "the appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." *Rahimi*, 602 U.S. at 692 (2024) (quoting *Bruen*, 597 U.S. at 26–31).

This past term, the Supreme Court clarified "three important inquiries" that "courts should undertake in evaluating proffered analogues" at *Bruen*'s second step: (1) the number of jurisdictions in which they were adopted; (2) the extent to which they were well-accepted, either explicitly or tacitly; and (3) whether any analogue or

collection of analogues is "relevantly similar" to the modern law, considering both the "how" and "why" the analogue restricted the keeping or bearing of arms. *Wolford v. Lopez*, 609 U. S. 185, 196–97 (2026) (quoting *Bruen*, 597 U.S. at 29, 36, 67); *see also Ogilvie*, 153 F.4th at 1105. This determination is "not mechanical . . . [but rather] necessitates an exercise of judgment." *Wolford*, 609 U. S. at 197 (2026) (quoting *Bruen*, 597 U.S. at 22.) The "*central* considerations" here are "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified. . . ." *Bruen*, 597 U.S. at 29 (emphasis in original) (internal quotations omitted).

Ultimately, If the government satisfies this burden at *Bruen*'s second step, then "a court [may] conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Bruen*, 597 U.S. at 24 (internal citations omitted).

2. Presumptive Constitutionality of Shall-Issue Licensing Regimes

Beyond articulating a text-and-history framework for evaluating gun regulations, the Supreme Court has also recognized that certain categories of firearm regulations—including "shall-issue"[9] licensing regimes—are preemptively constitutional. *Bruen*, 597 U.S. at 38 n.9; *id*. at 80 (Kavanaugh, J., concurring); *Heller*, 554 U.S. at 626–27 & n.26; *McDonald*, 561 U.S. at 786 ("We made it clear in *Heller* that our holding did not cast

---

[9] The regulation at issue in *Bruen* was a New York law deemed by the Court a "may-issue" licensing regime because it gave authorities "*discretion* to deny concealed-carry licenses even when the applicant satisfies the statutory criteria, usually because the applicant has not demonstrated cause or suitability for the relevant license." 597 U.S. at 14 (emphasis added). As discussed in greater length *infra*, the *Bruen* Court distinguished this type of law with the presumably lawful "shall-issue" regimes—conferring limited to no discretion to officials issuing permits—that existed in 43 states. 597 U.S. at 38 n.9.

doubt on such longstanding regulatory measures as prohibitions on the possession of firearms by felons and the mentally ill, laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.") (internal quotations omitted).

Drawing on *Heller*'s non-exhaustive list of "presumptively lawful regulatory measures," *Bruen* specifically observed the general permissibility of "shall-issue" licensing regimes, "under which a general desire for self-defense is sufficient to obtain a [permit]." *Bruen*, 597 U.S. at 38 n.9 (internal quotations omitted); *see id*. at 80 (Kavanaugh, J., concurring) ("The Court's decision addresses only the unusual discretionary licensing regimes, known as 'may-issue' regimes, that are employed by 6 States including New York . . . . By contrast, 43 States employ objective shall-issue licensing regimes [which] may require a license applicant to undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements. Unlike New York's may-issue regime, those shall-issue regimes do not grant open-ended discretion to licensing officials and do not require a showing of some special need apart from self-defense. . . . [These] shall-issue licensing regimes are constitutionally permissible, subject of course to an as-applied challenge if a shall-issue licensing regime does not operate in that manner in practice.")[10]

[10] In *RMGO*, the Tenth Circuit confirmed that the "'presumptively lawful regulatory measures' language, first stated in *Heller*, has not been abrogated, [and thus] remains good law." 121 F.4th at 119 (citing 554 U.S. at 627 n.26) (internal quotations omitted). "[E]ven if it is dicta," the court instructs, "we are 'bound by Supreme Court dicta almost as firmly as by the Courts' outright holdings, particularly when the dicta is recent and not enfeebled by later statements.'" *Id*. (quoting *Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1125 (10th Cir. 2015)).

More than half of the circuits,[11] including the Tenth, have relied on these presumptions from *Bruen* and *Heller* in evaluating challenges to shall-issue licensing requirements. The circuits have differed, however, as to *when* they consider the shall-issue presumption in the *Bruen* analysis (with the Tenth Circuit addressing it at step one).[12] "Yet despite a wide range of methodological approaches to assessing shall-issue regulations, the circuit courts have converged on one unifying principle: *non-abusive, shall-issue laws comport with the Second Amendment*." *Yukutake*, 2026 WL 2834831, at *6 (9th Cir. Sept. 22, 2026) (emphasis added).

According to the Tenth Circuit, a shall-issue licensing regime must (1) be "designed to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens"; and (2) "contain only narrow, objective, and definite standards' guiding licensing officials, rather than requiring the appraisal of facts, the exercise of judgment, and the formation of an opinion." *RMGO*, 121 F.4th at 122 (quoting *Bruen*, 597 U.S. at 38 n.9) (internal quotations omitted). But the presumption of lawfulness does not foreclose a constitutional challenge when the regime is "put toward abusive ends," such as through "lengthy wait times in processing license

---

[11] *Yukutake v. Lopez*, 2026 WL 2834831 (9th Cir. Sept. 22, 2026); *Maryland Shall Issue, Inc. v. Moore*, 116 F.4th 211 (4th Cir. 2024); *McRorey v. Garland*, 99 F.4th 831 (5th Cir. 2024); *Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024); *Beckwith v. Frey*, 171 F.4th 560 (1st Cir. 2026); *RMGO*, 121 F.4th 96 (10th Cir. 2024).

[12] In *RMGO*, the majority reasoned that the court need not proceed to *Bruen*'s second step of the analysis because the challenged law was presumptively constitutional "because the [regulation at issue's] condition or qualification on the conduct it proscribes falls outside the scope of the plain text of the Second Amendment." 121 F.4th at 122; *see also Ortega*, 148 F.4th at 1145–49 (analyzing the applicability of "presumptively lawful conditions on firearm sales" between *Bruen*'s first and second steps.)

applications or exorbitant fees deny ordinary citizens their right to public carry." *Id.* (quoting *Bruen*, 597 U.S. at 38 n.9).

With this doctrinal landscape in mind, the Court turns to SB25-003's PTP scheme.

## III. ANALYSIS

Plaintiffs seek a Preliminary Injunction seeking to enjoin enforcement of the Act's PTP scheme. (ECF No. 82.) On the record before it, the Court concludes that Plaintiffs have not demonstrated that they are substantially likely to succeed on the merits of their Second Amendment challenge to this portion of the Act. Accordingly, Plaintiffs are unlikely to suffer irreparable injury, which rises and falls here with its likelihood of success on the merits. Finally, the balance of the equities and public interest—construed together—tips in favor of Defendants.

### A. The Plaintiffs Have Not Established a Substantial Likelihood of Success on the Merits

Plaintiffs argue that they are substantially likely to succeed on the merits of their Second Amendment challenge to SB25-003's PTP scheme. (ECF No. 82 at 11.) The Court disagrees, given the evidence presently before it.

#### 1. Bruen Step One

The Court's first consideration is whether "the Second Amendment's plain text covers" the conduct curtailed by the enactment, "as informed by history." *Ortega*, 148 F.4th at 1143 (citing *Bruen*, 597 U.S. at 17, 19); *RMGO*, 121 F.4th at 113. In making this determination, the Court asks (1) whether challenger is part of people whom Second Amendment protects, (2) whether item at issue is arm that is in common use

today for self-defense, and (3) whether proposed course of conduct falls within Second Amendment (i.e., the right to "keep and bear" arms). *RMGO*, 121 F.4th at 113–14.

a. *The "people" and "conduct" are encompassed by the Second Amendment*

Here, there is little question that the "people" and "conduct" implicated by SB25-003's PTP scheme is protected by the Second Amendment. Individual Plaintiffs are adult residents of Colorado who seek to enjoin enforcement of the Act's PTP provisions.[13] (ECF Nos. 33 at ¶¶ 1–7 & 82 at 2); *United States v. Harrison*, 153 F.4th 998, 1014 (10th Cir. 2025) ("we hold the 'people' for purposes of the Second Amendment include, at least, all Americans."). The Parties do not appear to dispute this element. Likewise, the "proposed course of conduct"—the purchase and sale of SSFs—falls within the ambit of the Second Amendment. The Tenth Circuit recently held that "the right to bear arms requires a right to acquire arms. . . . [as] acquiring, purchasing, and possessing firearms is a necessary predicate to keeping and bearing them." *Ortega*, 148 F.4th at 1143.

b. *The "arms" are not encompassed by the Second Amendment*

Plaintiffs have not successfully shown, however, that the "arms" regulated by Section Two—SSFs—are covered by the Second Amendment, as required under *Bruen* step one. *See RMGO*, 121 F.4th at 114 (quoting *Bruen*, 597 U.S. at 31–32). Plaintiffs argue that "[t]here can be little doubt that Colorado's sweeping definition of [SSFs]

---

[13] Alongside the Individual Plaintiffs, CSSA is the "official state association of the National Rifle Association (NRA)," which brings this lawsuit on behalf of its members, including Individual Plaintiffs. (ECF No. 33 at ¶ 8). Although this Court will address CSSA's organizational standing in a separate, forthcoming order, it will assume for the purposes of this Order that CSSA has organizational standing.

covering over 800 models including the most popular rifle in America (AR-15s), regulates 'Arms' under the Second Amendment," citing to *Smith & Wesson Brands, Inc. v. Estados Unidos Mexicanos*, 605 U.S. 280, 297 (2025), which in their words, "unanimously recogniz[ed] [that] the AR-15 is 'the most popular rifle' in America." (ECF No. 82 at 12 n.3). In their Reply, they add: "the state does not attempt to show all 800+ models under Colorado's sweeping definition of "SSFs," including pistols and shotguns, fall outside the Second Amendment," point to "*Heller*'s holding that arms 'in common use,' . . . cannot be banned." (ECF No. 90 at 10) (quoting *Heller*, 554 U.S. at 624–25). But in so arguing, Plaintiffs not only confuse Defendants' burden with *their own* (*see RMGO*, 121 F.4th at 114 ("At step one, the *plaintiff* is tasked with establishing that the Second Amendment's explicit text, 'as informed by history,' encompasses the conduct they seek to engage in.") (quoting *Bruen*, 597 U.S. at 17, 19) (emphasis added)); Plaintiffs apparently confuse the necessary and sufficient conditions concerning "common use" firearms as discussed in *Heller* (and *Bruen*).

As the Supreme Court instructed in *Bruen*, "Second Amendment protects *only* the carrying of weapons that are those 'in common use at the time,' as opposed to those that 'are highly unusual in society at large.'" 597 U.S. at 47 (quoting *Heller*, 554 U.S. at 627) (emphasis added). In other words, if a gun is *not* in common use, then it is not protected by the Second Amendment; but the reverse is not also true. And yet, Plaintiffs appear to argue it is, suggesting common use implies Second Amendment protection. (ECF Nos 82 at 12 n.3 & 90 at 10). This construction of the binding case law is not correct.

To be fair, Plaintiffs identify authority from the Third Circuit, which holds that

"[b]ecause semi-automatic rifles are firearms, they are "Arms" within the meaning of the Second Amendment." *See Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*, 183 F.4th 211, 239 (3d Cir. 2026).[14] But Defendants highlight Fourth and Seventh Circuit holdings saying precisely the opposite. (ECF No. 86 at 19.) (citing *Bianchi v. Brown*, 111 F.4th 438, 461 (4th Cir. 2024) ("the AR-15 is a combat rifle that is both ill-suited and disproportionate to self-defense. It thereby lies outside the scope of the Second Amendment"); *Bevis v. City of Naperville*, 85 F.4th 1175, 1195 (7th Cir. 2023) ("Coming directly to the question whether the weapons and feeding devices covered by the challenged legislation enjoy Second Amendment protection, at the first step of the Bruen analysis, we conclude that the answer is no."). Indeed, it appears that circuits are split on this question, and that the Supreme Court is likely to resolve the question this term. *See Viramontes v. Cook County*, No. 25-238 (U.S.).

In any case, Plaintiffs have not shown that law-abiding citizens commonly use SSFs today for self-defense. As an initial matter, historical tradition did not include widespread civilian use of SSFs (or their historical analogue, multi-shot firearms). (ECF No. 86 at 19–20) (citing ECF No. 86-3 at ¶¶ 46–66). Professor Robert J. Spitzer—Defendants' expert—opines that while *single-shot*, muzzle loading firearms were ubiquitous in America from initial settlement through the latter nineteenth century, multi-

---

[14] In *Ass'n of N.J. Rifle & Pistol Clubs, Inc.*, the Fourth Circuit addressed the issue of "common use" at step two, concluding that "prohibitions on possessing or carrying of a class of weapons in *common use* for lawful purposes fail to find support in our Nation's tradition of firearm regulation." *Id.* at 233. This Court is bound by neither the *Ass'n of N.J. Rifle & Pistol Clubs, Inc.* case, nor its reasoning. Instead, the Tenth Circuit has addressed the "common use" question at *Bruen* step one. *See RMGO*, 121 F.4th at 113–14; *United States v. Morgan*, 150 F.4th 1339, 1345 (10th Cir. 2025) (concluding that a criminal defendant seeking to dismiss his criminal charges for possessing a machinegun in violation of federal law failed to show that said machineguns were in common use at *Bruen* step one).

shot firearms, on the other hand, were generally experimental, designed for military use, or too rare to achieve widespread civilian circulation.[15] (*Id.* at ¶¶ 46–57.) And neither the Colt revolver nor the Winchester repeating rifle—the closest historical examples of widely used multi-shot firearms—demonstrates the widespread civilian use of modern semi-automatic firearms in early America.[16] (*Id.* at ¶¶ 57–66.) Plaintiffs' expert, Professor F. Lee Francis, does little to rebut this scant historical record.[17]

---

[15] For example, the Puckle Gun, developed in 1718, was a tripod-mounted military weapon that never advanced beyond the prototype stage and was never used in America. (ECF No. 86-3 at ¶ 47.) The Belton flintlock, another cited example of an early multi-shot firearm, was really an experimental concept floated to Congress in 1777 for military application; given its "discredited and dead-end technology" there is little reason to believe it had been produced. (*Id.* at ¶¶ 49–50.) (internal quotations omitted). Both the Jennings multi-shot (developed in 1821) and Girandoni (introduced to the Austrian army in the late 18th century) were exceedingly rare, with the former suffering from fatal defects and the latter being characterized as "extremely expensive, fragile, and complex [and thus] inoperable." (*Id.* at ¶¶ 52–54.) Similarly, the Volcanic repeating pistol (patented in 1854) was a commercial failure due to its "radical defects," while the Mannlicher semi-automatic gun was a "failure, never seeing anything even resembling mass production. (*Id.* at ¶¶ 55–56.) Even the "Pepperbox," which enjoyed some civilian popularity, was quickly eclipsed by the Colt revolver because of its design flaws.

[16] Although the Colt revolver introduced a more reliable, affordable multi-shot option in the 1830s, it remained less prevalent than single-shot pistols during the Civil War era. (ECF No. 86-3 at ¶ 59.) Moreover, Colt revolvers generally required the shooter to "cock" the hammer before each shot, unlike modern semi-automatic firearms. (*Id.* at ¶ 60.) The Winchester rifle similarly provides little support for Plaintiff's position. Although capable of firing up to fifteen rounds without reloading, the Winchester was a lever-action rifle, not a semi-automatic firearm, requiring the shooter to manually operate the lever in between shots. (*Id.* at ¶¶ 63, 65.) Further, its early production was directed largely towards military markets, leaving comparatively few available to civilians. (*Id.* at ¶ 64.) Thus, neither firearm demonstrates that modern semi-automatic technology was widely available or commonly used by civilians during either the Founding or Reconstruction eras.

[17] According to Professor Francis, "repeating arms predate the Founding by nearly three centuries." (ECF No. 97-1 at ¶ 8.) He lists six instances, spanning from the 15th to the 18th centuries, in which there were historically documented accounts of pre-Twentieth century firearms. (*Id.* at ¶¶9–14.) For instance, he notes: "[o]ne of the first invention of a repeating arm was the 15th century German breech-loading matchlock arquebus capable of firing 10 rounds"; and "[i]n 1736, the estate of Joseph Massey included a firearm capable of repeating six times." (*Id.* at ¶¶ 9, 12–13.) While these anecdotal examples may "indicat[e] the development and history of repeating arms," they hardly establish a tradition of popular civilian use. (*Id.* at ¶ 15.)

Rather, Defendants argue that the widespread development of modern "assault-type weapons" arose only after World War II, beginning with the military StG 44, followed by the AK-47 and AR-15. (ECF Nos. 82 at 19; 86-7 at ¶¶ 40–62). James Yurgealitis—another of Defendants' experts—contends that semiautomatic firearms were developed and upgraded to increase their effectiveness in military application. (ECF No. 86-7 at ¶¶ 40–84.) Today, these weapons "have not changed since their initial incarnation as military weapons." (*Id*. at ¶ 84.) To pick one example: the AR-15—which Plaintiffs argue is "presumptively protected" by virtue of its designation as the "most popular rifle" in America (ECF No. 82 at 12, n.3)—can cause "catastrophic injuries" to living tissue, including the "severing of limbs." (ECF No. 86-7 at ¶ 56.) Although marketed and sold for civilian use today, this weapon, Yurgealitis contends, maintains the same "basic configuration, appearance, construction and operation of the internal gas operating system (as designed) . . . since its initial design and introduction as a military weapon." (*Id*. at ¶ 73.)

Not only are these semiautomatic firearms particularly devastating to living tissue (*Id*. at ¶¶ 58–62), not to mention commonly used in mass shootings (ECF No. 86-8 at ¶¶ 30–41); but there is also limited evidence to support them being necessary weapons for the self-defense of civilians. (ECF No. 86-8 at ¶¶ 7–29.) Lucy P. Allen—an additional expert witness for Defendants—found that it is "extremely rare" for a person to fire more than 10 to 15 rounds when using a firearm in self-defense. (*Id*. at ¶ 5.); *see also* *Bianchi*, 111 F.4th at 461 ("the AR-15 is a combat rifle that is both ill-suited and

disproportionate to self-defense. It thereby lies outside the scope of the Second Amendment.")

In sum, the Court finds that Plaintiffs have failed to satisfy their burden at *Bruen*'s first step of showing that the SSFs at issue in the Act are "arms" as contemplated by the Second Amendment. For this reason, the inquiry ends. Even if Plaintiffs make a successful showing that the SSFs contemplated by Section Two were entitled to Second Amendment Protection, Plaintiffs would still need to overcome the presumption of constitutionality for "shall-issue" licensing regimes. But, as discussed below, Plaintiffs do not do so.

2. <u>"Shall-Issue" Constitutionality Presumption</u>

Turning to apply the "shall-issue" framework, the Court next considers (1) whether SB25-003's PTP qualifies as a presumptively constitutional "shall-issue" law, and if so, (2) whether Plaintiffs have rebutted that presumption by demonstrating that the scheme was "put toward abusive ends." *See RMGO*, 121 F.4th at 122 (citing *Bruen*, 597 U.S. at 38 n.9). Per *RMGO*'s directive, the Court conducts this analysis at step one. *Id*. at 120–21.

a. *SB25-003's PTP scheme is a presumptively constitutional "shall-issue" regime*.

A shall-issue licensing regime must (1) be "designed to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens"; and (2) "contain only narrow, objective, and definite standards guiding licensing officials, rather than requiring the appraisal of facts, the exercise of judgment, and the formation of an opinion." *RMGO*, 121 F.4th at 122 (quoting *Bruen*, 597 U.S. at 38 n.9) (internal

quotations omitted). In discussing existing "shall-issue" regimes, the *Bruen* Court noted that permissible standards could require applicants to "undergo a background check or pass a firearms safety course . . . ." *Bruen*, 597 U.S. 38 n.9. Separately, the Court approvingly discussed a Connecticut law denying licenses to individuals "whose conduct has shown them to be lacking the essential character of temperament necessary to be entrusted with a weapon." *Id*. at 13 n.1. As Defendants note, SB25-003's regime matches those qualities "point-for-point." (ECF No. 86 at 5.)

At the very core of SB25-003's PTP scheme—as reflected in what it requires of prospective SSF purchasers—is an effort to ensure only that those keeping and bearing SSFs in Colorado are, in fact, law-abiding, responsible citizens. *RMGO*, 121 F.4th at 122 (quoting *Bruen*, 597 U.S. at 38 n.9); *see also Maryland Shall Issue, Inc.* v. *Moore*, 116 F.4th 211, 225 (4th Cir. 2024) ("the very requirements on which the plaintiffs focus their constitutional attack are the same requirements the Supreme Court cited as presumptively constitutional components of a 'shall-issue' licensing law, namely, background checks and firearms safety courses.").

First, the scheme requires individuals to complete a "name-based background check of national and Colorado public criminal history," a measure necessary to ensure that only those who are acquiring SSF's in Colorado are those who are lawfully entitled to. § 18-12-116(5)(b)(III)(B); *see McRorey v. Garland*, 99 F.4th 831, 836 (5th Cir. 2024) ("*Bruen* and *Heller* make clear that background checks preceding firearm sales are presumptively constitutional.") Similarly, prospective SSF purchasers under SB25-003 must attest that: they do not have a state or federal conviction that would prohibit them from purchasing a firearm; they will not violate state laws concerning firearm

possession, storage and use; and that they will not ultimately transfer that firearm after purchase in circumvention of existing gun law, or to an individual who may cause danger to themself or others. § 18-12-116(5)(b)(II)(A)–(C).

Perhaps most notably, the scheme requires prospective SSF purchasers to undergo one of three prescribed firearm safety training pathways, with course topics including safe handling of semiautomatic firearms, safe firearm storage, child safety, and firearm deaths associated with mental illness. § 18-12-116(5)(a)(IV). The CPW, as authorized by § 33-9-15(5)(a), developed additional subject matter based on consultation from experienced handgun permit instructors. (ECF No. 86-1 at ¶ 10). Upon completion of the course, students take an open book exam, during which they are allowed to review notes and course materials. (*Id*. at ¶ 13.) While a 90% score or above is required to pass, as of the date of Defendant's Response (September, 1 2026), 502 people have completed the course, and none have failed the exam. (*Id*.) Despite the speculated "abusive ends" that Plaintiffs raise, and which this Court examines below, this too is a qualification and condition on gun ownership that ordinarily passes constitutional muster. *See Maryland Shall Issue*, 116 F.4th at 225 (citing *Bruen*, 597 U.S. at 38 n.9). Taken together, these provisions of SB25-003's PTP scheme help ensure that Coloradans keeping or bearing SSFs are not only "law-abiding," but also "responsible." *RMGO*, 121 F.4th at 122 (quoting *Bruen*, 597 U.S. at 38 n.9).

Although the PTP scheme operates as a "shall-issue" regime, Plaintiffs lodge two arguments as to why the "shall-issue" analysis cannot resolve the constitutional inquiry here. (ECF No. 82 at 14–15). The Court rejects both. First, Plaintiffs argue that the

presumptively constitutional shall-issue licensing regimes contemplated by *Bruen* concerned only "the right 'to public carry,' not the antecedent right to acquire a firearm." (ECF No. 82 at 14) (citing *Bruen*, 597 U.S. at 38, n.9). But this is just a distinction without a difference. Like the Fourth Circuit in in *Maryland Shall Issue*, the Court dismisses this distinction because it "rests on a false premise, namely, that the Supreme Court has recognized different levels of constitutional protection for the Second Amendment right to 'keep' arms and the Second Amendment right to 'bear' arms." 116 F.4th 211, 223 (4th Cir. 2024). As Defendants note, laws regulating the purchase of firearms and laws regulating the public carrying of firearms are both subject to the same Second Amendment framework. *See Bruen*, 597 U.S. at 32 ("[t]he constitutional right to bear arms in public for self-defense is not 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.'") (quoting *McDonald*, 561 U.S. at 780.)

Next, Plaintiffs contend that the Act's licensing scheme is not really a "shall-issue" regime at all, but really a "may-issue" regime in sheep's clothing. Plaintiffs point to two characteristics: (1) the provision providing that reviewing sheriffs "*may* deny an application if [they] ha[ve] a reasonable belief that documented previous behavior by the applicant makes it likely the applicant will present a danger to themselves or others" (*see* Colo. Rev. Stat. § 18-12- 116(5)(b)(VI)(C)); and (2) the Act's requirement that citizens pass a 90% score. *See* Colo. Rev. Stat. § 18-12- 116(5)(a)(V)).

The second challenge can be dismissed with little concern, as *Bruen* itself noted that presumptively constitutional shall-issue regimes "often require applicants to . . . *pass a firearms safety course*, [and] are designed to ensure only that those bearing

arms in the jurisdiction are, in fact, law-abiding, responsible citizens." *Bruen*, 597 U.S. at 38 n.9 (emphasis added). Plaintiffs offer no evidence of the exam's onerous conditions, beyond speculative accounts of what the exam and its requirements *might* entail. (ECF Nos. 82-4, 82-6, 82-8, 82-9, 82-10, 82-13, 82-14, 82-15, 82-16); *cf.* (ECF No. 86-1 at ¶ 13) ("As of September 1, 2026, data from the Firearm Safety System indicates that 502 people have successfully completed a firearm safety course (which indicates that they each passed the exam) *and none have failed*.") (emphasis added).

Nor have Plaintiffs persuaded the Court that the narrow provision in § 18-12-116(5)(a)(VI)(C)–(D) is sufficient to render the scheme a "may-issue" scheme. Although this narrow provision provides that a reviewing sheriff "may deny" an application—or "may revoke" an issued eligibility card—upon "reasonable belief" that the applicant "will present danger to themselves or others," it comes nowhere near to granting the level of discretion as did New York's law in *Bruen*. *See* Colo. Rev. Stat. § 18-12-116(5)(b)(VI)(C). Under the law at issue in *Bruen*, an applicant had to demonstrate "proper cause," meaning a "special need for self-protection distinguishable from that of the general community" to obtain an unrestricted license to carry a concealed handgun in public. *Bruen*, 597 U.S. at 12.

Furthermore, as the *Bruen* Court noted, "judicial review [of an application denial by an officer] [was] limited" and the "arbitrary and capricious" standard left applicants with "little recourse if their local licensing officer denies a permit." *Id*. at 13. Under SB25-003, a sheriff "shall issue" a firearms safety course eligibility card to an applicant who submit the application information and fee, just as he or she "shall" deny an application for the eligibility card if the applicant cannot lawfully possess a firearm. *See*

Colo. Rev. Stat. § 18-12-116(5)(b)(VI)(B). Discretion is afforded to sheriffs only in the narrow circumstance in which they have a "reasonable belief" that the applicant will present danger to themselves or others. *See* Colo. Rev. Stat. § § 18-12-116(5)(b)(VI)(C)–(D). In other words, discretion under SB25-003 is the exception, not the rule. Moreover, a denial based on this "reasonable belief" provision is ultimately subject to judicial review, upon which a sheriff "has the burden of proving that [the applicant presents a danger to himself or others] by *clear and convincing evidence*." *See* Colo. Rev. Stat. § 18-12-116(5)(b)(X)(A)–(B).

Moreover, the *Bruen* Court also acknowledged that some limited discretion was not sufficient to render a regime unconstitutional. In *Bruen*, the Court recognized three states—Connecticut, Delaware, and Rhode Island—with "discretionary criteria but [nevertheless] appear[ed] to operate like 'shall issue' jurisdictions." *Bruen*, 597 U.S. at 13 n.1. As for Connecticut's law, the Court noted that while the law gave officials discretion to deny a concealed-carry permit to anyone who is not a "suitable person," the "suitable person" standard "preclude[d] permits only to those individuals whose conduct has shown them to be lacking the essential character of temperament necessary to be entrusted with a weapon." *Id.* (internal citations omitted). At the very least, the narrow "reasonable belief" standard under Colorado's scheme is no more discretionary than the Connecticut law explicitly sanctioned by the Supreme Court.

In sum, the Court finds that Plaintiffs have failed to demonstrate that the PTP scheme—notwithstanding the narrow discretion it grants sheriffs to deny permits based on a "reasonable belief" that the applicant could harm themselves or others—is anything but a "shall-issue" licensing regime. Accordingly, Plaintiffs constitutional challenge to

the PTP scheme can survive step one of the *Bruen* analysis only if they can show that the law was put to "abusive ends." *Bruen*, 597 U.S. at 38 n.9. Plaintiffs fail to make that showing.

b. *SB25-003's PTP scheme is not "put toward abusive ends"*

Notwithstanding the presumption of constitutionality afforded to "shall-issue" regimes, such a presumption does not foreclose a constitutional challenge when the regime is "put toward abusive ends," such as through "lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry." *Id*. (quoting *Bruen*, 597 U.S. at 38 n.9). Plaintiffs contend that the PTP scheme is "facially" unconstitutional due to: (1) delays; (2) "exorbitant" cumulative costs; (3) lack of objective criteria; and (4) absence of prompt judicial review. (ECF No. 82 at 11–19.) They next lodge an "as-applied challenge" on the scheme's (1) implementation failures and (2) failure to provide accommodations for disabled and non-English speakers. (ECF Nos. 82 at 19–22).

But before addressing these arguments, the Court must explain the scope of Plaintiff's Second Amendment challenge. "This is a threshold issue because it determines what [Plaintiffs] must 'establish' in order to 'succe[ed].'" *Harrison*, 153 F.4th at 1006 (quoting *Rahimi*, 602 U.S. at 693). This Court "emphasize[s] the difficulty of challenging the facial constitutionality of a statute." *Maryland Shall Issue*, 116 F.4th at 225. "[A]n as-applied challenge concedes that the statute may be constitutional in many of its applications, but contends that it is not so under the *particular circumstances* of the case." *Harrison*, 153 F.4th at 1007 (quoting *United States v. Carel*, 668 F.3d 1211, 1217 (10th Cir. 2011)) (emphasis in original). A "facial challenge," on the other hand is

"a head-on attack [of a] legislative judgment, an assertion that the challenged statute violates the Constitution in all, or virtually all, of its applications." *Id*. (internal citations omitted). To succeed on a facial challenge, Plaintiffs would need to "establish that no set of circumstances exists under which the Act would be valid." *Id*. (internal citations omitted). On their facial challenge, Plaintiffs fail to make these showings for purposes of their challenges to the PTP scheme. As for their as-applied challenges, Plaintiffs repeat speculative arguments about the scheme's "implementation failures" and bring concerns that are well outside the scope of the operative Complaint.

(i) As-Applied Challenges

Beginning first with Plaintiff's as-applied challenges, the Court dismisses Plaintiff's argument that "[t]he scheme is unconstitutional as applied to disabled and non-English speaker purchasers." (ECF No. 82 at 21.) Whether or not that may be, such challenges do not fall within the ambit of Plaintiffs' FAC. (*See* ECF No. 33.) And "[i]njunctive relief may be awarded based only on the claim and grounds asserted in the complaint and the motion." *See e.g., Occupy Denver v. City & Cnty. of Denver*, 2011 WL 6096501, at *3 (D. Colo. Dec. 7, 2011); *Dobler v. Schwartz*, 2022 WL 1303066, at *1 (D. Colo. Apr. 29, 2022) (same). Plaintiffs contend that "disability has always been part of [their] claims: the complaint alleges that SB25-003 'provides no accommodations or exceptions to the onerous safety courses and exams for disabled persons.'" (ECF No. 90 at 11) (quoting ECF No. 33.) The FAC does indeed mention disability-related barriers, but only in the context of what *Mr. Del Toro* anticipated facing in seeking to comply with SB25-003's PTP scheme and "rapid-fire device" prohibitions. (ECF No. 33 at ¶ 2). Otherwise, there are no other disability-related barriers alleged in the FAC,

including from CSSA on behalf of its deaf members. (*See generally* ECF No. 33.)

Even assuming arguendo that CSSA has associational standing, it must "allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit." *Warth v. Seldin*, 422 U.S. 490, 511 (1975). For this reason, CSSA cannot premise its as-applied challenge on the basis of an alleged failure to provide accommodations for its deaf members—allegations not discussed in the FAC—on Mr. Del Toro's mere passing mention of his unrelated disability. Likewise, because the FAC contains no allegations of language-barriers related to compliance with the PTP scheme—which Plaintiffs appear to concede in their Reply (ECF No. 90 at 11)—Plaintiffs' arguments to that effect in their as-applied challenge are likewise rejected. (*See generally* ECF NO. 33.)

As for the as-applied challenge concerning the scheme's broad swath of "implementation failures," Plaintiffs rest on insufficient anecdotal evidence and speculation. Most of the submitted declarations detail purely speculative concerns with what the PTP scheme *would* require—made only ten days after its August 1 implementation. (*See* ECF Nos. 82-17; 82-11; 82-8; 82-9; 82-10; 82-12; 82-13; 82-14; 82-15; 82-16). Only a handful discussed an intent to purchase a covered SSF *paired with* attempted compliance with the PTP scheme's requirements. (ECF Nos. 82-4 at ¶¶ 4–28, 82-5 at ¶¶ 5–36, 82-6 at ¶¶ 5–33.) But even these accounts are insufficient to establish abusive ends. Of these declarants, one has completed the required background check, submitted his application to the sheriff, and reserved a place in a firearms safety course set for only several days after the filing of Plaintiff's Motion (ECF

No. 82-6 at ¶¶ 5–33); another cites that he is still "Awaiting Sherif Review," but hasn't yet even completed the firearms safety course (ECF No. 82-5 at ¶¶ 24–25.); while the third has not even submitted an eligibility-card application, declining to pursue the recommendation by CPW to seek one through a neighboring county after allegations that his own was not accepting applications. (ECF No. 82-4 at ¶¶ 21–28.) At the very worst, these declarations reflect ordinary administrative challenges that may accompany the initial implementation of a new regulatory program in the very first days of its existence. To the Court's mind they do not establish that the PTP scheme is being brought to "abusive ends."

Nor have Plaintiffs shown that the PTP scheme authorizes "unbridled discretion," based on accounts by two Sheriffs. (ECF No. 82 at 20.) The Teller County sheriff described uncertainty about the guidance available to sheriffs, including how to evaluate whether an applicant presents danger to himself or others. (ECF No. 82-2 at ¶¶ 23–24.) The Custer County Sheriff likewise described a lack of guidance but explained that he intended to approve applicants unless they were convicted felons or had been adjudicated mentally incompetent. (ECF No. 82-3 at ¶¶ 17–20.) Plaintiffs identify no declaration describing a named applicant who was denied an eligibility card because a sheriff applied an arbitrary or inconsistent standard. The declarations, instead, described sheriffs' questions about implementations and, for one, the specific criteria they intend to apply. (*Id.*) That evidence may support a request for clearer administrative guidance, but it does not establish that the PTP scheme was brought to "abusive ends."

In sum, the Court finds that Plaintiffs have failed to make a showing of abusive

ends on their as-applied challenge such that they are likely to succeed on the merits.

(ii) Facial Challenges

To succeed on a facial challenge, Plaintiffs need to "establish that *no set of circumstances* exists under which the Act would be valid." *Harrison*, 153 F.4th at 1007 (emphasis added). Although Plaintiffs' declarations describe uneven implementation across counties, varying fees and training costs, and uncertainty among some sheriffs, they do not establish that the PTP scheme cannot be successfully implemented under any circumstances.

Plaintiffs first argue that the PTP scheme is brought to abusive ends as "delay is baked into the scheme at every step." (ECF No. 82 at 16.) But, as discussed above, Plaintiffs have not established that the statute's procedures are *necessarily* lengthy or create indefinite delays. Nor can Plaintiffs overcome the data demonstrating SB25-003's successful implementation statewide: as of September 1, 2026, 3,574 applications have been submitted to sheriffs' offices, and 1,125 eligibility cards have been issued by 39 different county sheriffs. (ECF 86-2 at ¶ 8.) The average time between an individual's completion of an application and the sheriff's issuance of an eligibility card is 10.9 days. (*Id.* at ¶ 11.) The average time between a sheriff's issuance of an eligibility card and an individual's completion of a firearms safety course is 11 days. (*Id.*) In the weeks after the PTP scheme took effect, 502 individuals who successfully completed safety courses each passed the requisite course exam. (*Id.* at ¶ 10.) None have failed the exam. (*Id.*)

Nor do Plaintiffs' declarations establish that the fees are categorically exorbitant or prohibitive. Many declarations offer estimates of *potential* expenses rather than

evidence of costs that every applicant must incur. (ECF No. 82-11 at ¶¶ 8–11; 82-2 at ¶¶ 15–16; 82-3 at ¶¶ 11, 23; 82-12 at ¶ 20.) And among the declarants who identify actual expenses, none alleges anything approaching an "exorbitant" amount. For instance, some declarants allege that they were charged $30 for a third-party background check (ECF No. 82-4 at ¶¶ 14–16; 82-6 at ¶ 18; 82-7 at ¶ 10; 82-8 at ¶ 14; 82-12 at ¶ 16); another paid $35 (ECF No. 82-5 at ¶¶ 13–14); while yet another alleges that he paid a $52 firearms-training record-system fee directed towards CPW (ECF No. 82-6 at ¶ 25.) Based on the evidence before it, the Court easily rejects the contention that those who have sought to comply with the PTP scheme's requirements have paid "exorbitant" fees.

Plaintiffs' facial challenge also rests on an asserted "lack of objective criteria." (ECF No. 82 at 17.) But this runs at-odds with Defendants' account. Defendants submitted a declaration stating that "CPW staff worked with experienced concealed handgun permit instructors to develop detailed course curricula," and provides course material to instructors once they've completed a "train-the-trainers" education session focused on the curricula. (ECF No. 86-1 at ¶ 10.) Further, as discussed above, sheriff's eligibility determinations are subject to judicial review, upon which a sheriff "has the burden of proving that [the applicant presents a danger to himself or others] by clear and convincing evidence." § 18-12-116(5)(b)(X); *cf. Bruen*, 597 U.S. at 13 (noting that under New York's regime, "judicial review [was] limited," and its "arbitrary and capricious" standard left applicants "little recourse if their local licensing officer denies a permit").

Still, Plaintiffs contend that the process "will take months and can be cost prohibitive" and that the scheme's attorney fee provision "effectively conditions that review on winning." (ECF No. 82 at 17.) These arguments depend on a speculative chain of events: a law-abiding, responsible citizen triggers law enforcement's "*reasonable* belief" that the applicant poses a danger to themselves or others and then, in a subsequent judicial proceeding, *fails* to rebut the basis for ineligibility by clear and convincing evidence. Plaintiffs offer no factual basis to suggest that this sequence of events is likely, must less that it renders the statutory scheme constitutionality infirm. The Court therefore rejects these arguments.

Ultimately, Plaintiffs have not met their burden to show that SB25-003's PTP scheme was put towards "abusive ends" such that it infringes the Second Amendment right to keep and bear arms. Thus, they have failed to rebut the presumption of constitutionality afforded to the scheme. As such, the Court rejects both Plaintiffs' facial and as-applied constitutional challenges for failure to survive step one of the *Bruen* framework. Accordingly, the Court does not reach Plaintiffs' arguments under step two of *Bruen* that the PTP scheme lacks an analogue in our Nation's historical tradition of firearm regulation.

**B. Irreparable Injury**

The Court turns next to the second preliminary-injunction factor, which asks "whether irreparable injury will befall the movants without an injunction." *RMGO*, 121 F.4th at 128 (quoting *Free the Nipple-Fort Collins v. City of Fort Collins, Colorado*, 916 F.3d 792, 805 (10th Cir. 2019)). "Most courts consider the infringement of a constitutional right enough and require no further showing of irreparable injury." *Id*;

*Ortega*, 148 F.4th at 1142. Plaintiffs have not established a substantial likelihood of success on the merits of their Second Amendment claim, and likewise cannot establish irreparable injury in the enforcement of SB25-003's PTP scheme. Plaintiffs point to no other irreparable injury other than the alleged violation of their Second Amendment right, which the Court has resolved against them. (ECF No. 82 at 22–23.) Accordingly, Plaintiffs have also not established irreparable injury.

**C. Balance of the Harms & Public Interest**

The third preliminary-injunction factor involves "balancing the irreparable harms identified [by Plaintiffs] against the harm that the preliminary injunction causes" Governor Polis and the State of Colorado. *RMGO*, 121 F.4th at 128 (citation omitted). And the "last preliminary-injunction factor requires that the injunction not be against the public interest." *Id*. (citation omitted). These factors merge when the government is the opposing party. *Denver Homeless Out Loud*, 32 F.4th at 1278 (citation omitted); *Nken*, 556 U.S. at 435. Balancing Plaintiffs' non-existent harms against the real harms of non-enforcement of SB25-003 tips in favor of Defendants. Beyond that, there is a substantial public interest favoring enforcement of SB25-003's PTP scheme. According to *Amici*, from 2014 to 2023, Colorado experienced 77 mass shootings in which 103 people were killed and 299 were injured. (ECF No. 89 at 2.) In fact, Colorado has a devastating and tragic history of mass shootings—including Columbine High School, the Aurora theater shooting, the Boulder King Soopers shooting, and the Club Q shooting. (*Id*. at 4.) Many of the firearms used in these mass shootings would be covered by SB25-003's PTP Scheme. In the Court's view, these events underscore Defendants'

substantial interest in reducing gun violence in our State, and in imposing reasonable additional safeguards on the purchase, sale, and transfer of SSFs.

## IV. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1. Plaintiffs' Motion for a Preliminary Injunction (ECF No. 82) is DENIED; and
2. Plaintiff's Motion for Hearing/Conference regarding the Motion for Preliminary Injunction is DENIED AS MOOT.

Dated this 4th day of November, 2026.

BY THE COURT:

William J. Martínez
Senior United States District Judge