**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Civil Action No. 25-cv-2725-WJM-MDB

ISRAEL DEL TORO, *et al*.,

Plaintiffs,

v.

JARED SCHUTZ POLIS,
in his official capacity as Governor of the State of Colorado, *et al*.,

Defendants.

---

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(1) AND 12(b)(6)**

---

This matter is before the Court on a Rule 12(b) Motion to Dismiss ("Motion") brought by Defendants Jared Schutz Polis, in his official capacity as Governor of the State of Colorado; Philip Jacob Weiser, in his official capacity as Attorney General of the State of Colorado; Michael J. Allen, in his official capacity as the District Attorney for the Fourth Judicial District; and Laura Clellan, in her official capacity as the Acting Director of the Colorado Division of Parks and Wildlife ("CPW") (collectively, "Defendants"), in this action against Plaintiffs Israel Del Toro, Luke Sorensen, Nathanael Skiver, Jason Reeves, Garrett Flicker ("Individual Plaintiffs"), and the Colorado State Shooting Association ("CSSA") (collectively, "Plaintiffs"). (ECF No. 51.)

For the following reasons, the Motion is granted in part and denied in part.

# I. BACKGROUND

## A. Factual Background[1]

This lawsuit concerns Plaintiffs Second Amendment challenges to certain provisions of Colorado Senate Bill 25-003, now codified as the "Act Concerning the Prohibition of Certain Semiautomatic Firearms and Rapid-Fire Devices," Colorado Revised Statutes (C.R.S.) §§ 18-12-101 *et seq.* (2025) ("SB25-003" or the "Act") (ECF No. 33.) The parties should be familiar with the background of this case as it pertains to Section Two of SB25-003's "permit-to-purchase" ("PTP") scheme from the Court's Order denying Plaintiffs' Motion for Preliminary Injunction ("Preliminary Injunction Order"), the sole focus of which was that scheme. (ECF No. 99.) Beyond the constitutional challenge to the PTP scheme, this Motion also concerns SB25-003's criminalization of "rapid-fire devices" under Section Nine. For this reason, the Court incorporates the background from its Preliminary Injunction Order and adds the following pertinent facts concerning the criminalization of "rapid-fire devices."

### 1. SB25-003's Section Nine "rapid-fire devices" prohibition

Section Nine of SB25-003 amends the definition of "dangerous weapons" under Colo. Rev. Stat. § 18-12-101 by replacing "machine gun conversion devices" with a new category, "rapid-fire devices." § 18-12-101. SB25-003 defines "rapid-fire devices" as:

> any device, part, kit, tool, accessory, or combination of parts that has the effect of increasing the rate of fire of a semiautomatic firearm above the standard rate of fire for the semiautomatic firearm that is not otherwise equipped with that device, part, or combination of parts.

[1] For purposes of this Order, the Court accepts as true the well-pleaded factual allegations of the non-moving party and draws all reasonable inferences in its favor. *See Nelson v. State Farm Mut. Auto. Ins. Co.*, 419 F.3d 1117, 1119 (10th Cir. 2005).

§ 18-12-101. Plaintiffs' First Amended Complaint ("FAC") alleges that this definition includes items such as "bump stocks, forced reset triggers, super safeties, and binary triggers." (ECF No. 33 at ¶ 28(f).) Pursuant to § 18-12-102(3)—which was not amended by SB25-003—"[a] person who knowingly possesses a dangerous weapon [including a rapid-fire device] commits a class 5 felony." § 18-12-102(3).

2. <u>Plaintiffs' Factual Allegations</u>

Individual Plaintiffs Del Toro, Sorensen, Skiver, Reeves, and Flicker are all adult, law-abiding residents of Colorado who intend to purchase "specified semiautomatic firearms" ("SSFs"). (ECF No. 33 at ¶¶ 1–7.) Furthermore, Del Toro and Reeves specifically currently either "rel[y] on" or "own[] several" devices that Plaintiffs allege are encompassed by the definition of "rapid-fire devices." (*Id*. at ¶¶ 2, 6, 28(f).) Organizational Plaintiff CSSA is the "official state association of the National Rifle Association (NRA)." (*Id*. at ¶ 8.) Its mission is to "to advance, preserve, and exercise the natural right of gun ownership by all Coloradans." (*Id*.) All Individual Plaintiffs are members of the CSSA. (*Id*.)

Del Toro is a "100% disabled" veteran, who lost one hand and most of the fingers of his other hand while serving in the United States Air Force in Afghanistan. (*Id*. at ¶ 1.) He thus "relies on common firearm accessories like force-reset triggers to enable him to operate a firearm." (*Id*. at ¶ 2.) Additionally, "due to the difficulty that he experiences trying to hold a more traditional-style handgun with only one partially intact hand, [he] has come to rely on the more versatile AR platform semiautomatic pistol with stabilizing brace." (*Id*.) He alleges that the PTP scheme "provides no accommodations or exceptions to the onerous safety courses and exams for disabled persons." (*Id*.) He

further alleges that the "training and additional financial burdens of the Act will make it significantly more difficult for him" to purchase SSFs after the PTP scheme goes into effect, and "may even dissuade him entirely from purchasing another semiautomatic firearm after August 1, 2026." (*Id*. at ¶ 3.)

Sorensen is a 19-year-old college student with "limited financial resources." (*Id*. at ¶ 4.) He alleges specific plans to purchase a .357 semiautomatic handgun, covered by the PTP Scheme, on his twenty-first birthday. (*Id*.)

Skiver is a firearms instructor "whose current role as a firearms instructor requires him to frequently acquire semi-automatic firearms." (*Id*. at ¶ 5.) He avers that "depending on his business income over the coming year, [he] intends to purchase additional 9mm semiautomatic handguns to have available for his clients' firearms training purposes." (*Id*.) These firearms, Skiver alleges, fall under the statutory definition of SSFs. (*Id*.) He further alleges that he will see declining rates in job opportunities and income because the Act will "likely cause the semiautomatic firearm purchase rate to decline in Colorado over the coming years." (*Id*.)

Flicker alleges that he "feels the need to continue to arm himself for protection against those who wish him harm due to his sexual orientation, ethnic background, or religious faith." (*Id*. at ¶ 7.) He alleges an intention to purchase SSFs after August 1, 2026. (*Id*.) Likewise, Reeves is a "frequent firearms purchaser," who also alleges an intention both to purchase SSFs after August 1, but also that he "owns several rapid-fire devices, including a forced reset trigger, 'super-safety' trigger systems, and binary triggers. . . ." (*Id*. at ¶ 6.)

According to the FAC, House Minority Leader Jarvis Caldwell made a statement

that the state was experiencing a backlog of approximately 120 days for Coloradans seeking their Hunter's Safety Training card through the CPW. (*Id*. at ¶ 41.) Plaintiffs allege that the CPW is the "same administrative agency that has been tasked with establishing and administering the Firearms Safety Course Eligibility Card application process, the Firearms Training and Safety Course Record System, as well as the course requirements for the various mandatory firearms safety courses." (*Id*.)

**B. Procedural History**

Plaintiffs filed this action on September 2, 2025. (ECF No. 1.) Plaintiffs amended their complaint on December 22, 2025. (ECF No. 33). The FAC removed Kathleen Clayton as a plaintiff, added as a defendant Laura Clellan, in her official capacity as the Acting Director of the Colorado Division of Parks and Wildlife, and removed a claim for damages pursuant to 42 U.S.C. § 1983. (*Id*.) Plaintiffs claim that the requirements imposed by SB25-003 "infringe [their] rights guaranteed by the Second Amendment, which is applicable to Colorado through the Fourteenth Amendment." (*Id*. at ¶ 52.) Plaintiffs bring a "facial" and "as-applied" challenge to SB25-003, seeking injunctive relief (Second Claim for Relief) and a declaratory judgment (Third Claim for Relief). (*Id*. at ¶¶ 48–68). On March 3, 2026, Defendants filed a motion to dismiss the FAC. (ECF No. 51.) On April 3, 2026, Plaintiffs filed a Response (ECF No. 58), and Defendants filed a reply on May 1, 2026. (ECF No. 65.) Separately, Plaintiffs filed a Motion for Preliminary Injunction on August 11, 2026,

seeking to enjoin enforcement of Section Two's PTP scheme, (ECF No. 82.), which motion the Court denied on November 4, 2026. (ECF No. 99.)

## II. LEGAL STANDARD

### A. Rule 12(b)(1)

"Federal courts are courts of limited jurisdiction, possessing only that power authorized by the Constitution and statute." *Gunn v. Minton,* 568 U.S. 251, 256 (2013) (internal quotation marks omitted). Rule 12(b)(1) thus empowers a court to dismiss a complaint for "lack of subject-matter jurisdiction." Fed. R. Civ. P. 12(b)(1). Dismissal under Rule 12(b)(1) is not a judgment on the merits of a plaintiff's case but instead calls for a determination that the court lacks authority to adjudicate the matter. *See Castaneda v. INS,* 23 F.3d 1576, 1580 (10th Cir. 1994) (recognizing federal courts are courts of limited jurisdiction and may only exercise jurisdiction when specifically authorized to do so). "The party invoking a federal court's jurisdiction bears the burden of establishing subject-matter jurisdiction." *Caballero v. Fuerzas Armadas Revolucionarias de Colombia,* 945 F.3d 1270, 1273 (10th Cir. 2019). "A court lacking jurisdiction cannot render judgment but must dismiss the cause at any stage of the proceedings in which it becomes apparent that jurisdiction is lacking." *Safe Streets All. v. Hickenlooper,* 859 F.3d 865, 878 (10th Cir. 2017) (brackets and internal quotation marks omitted). A Rule 12(b)(1) motion to dismiss "must be determined from the allegations of fact in the complaint, without regard to mere conclusory allegations of jurisdiction." *Groundhog v. Keeler,* 442 F.2d 674, 677 (10th Cir. 1971).

**B. Rule 12(b)(6)**

Pursuant to Rule 12(b)(6), a party may move for dismissal if the complaint fails "to state a claim upon which relief can be granted . . . ." Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, (2007)).

"This pleading standard does not impose a probability requirement but demands 'more than a sheer possibility that a defendant has acted unlawfully.'" *Brown v. City of Tulsa,* 124 F.4th 1251, 1263 (10th Cir. 2025) (quoting *Ashcroft,* 550 U.S. at 570). Mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" will not suffice. *Twombly*, 550 U.S. at 555. "Although the court must accept the truth of all properly alleged facts and draw all reasonable inferences in the plaintiff's favor, the plaintiff still 'must nudge the claim across the line from conceivable or speculative to plausible.'" *Brown,* 124 F.4th at 1263 (quoting *Brooks v. Mentor Worldwide LLC*, 985 F.3d 1272, 1281 (10th Cir. 2021)).

The Tenth Circuit has emphasized that "[g]ranting [a] motion to dismiss is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading but also to protect the interests of justice." *Clinton v. Sec. Benefit Life Ins. Co.,* 63 F.4th 1264, 1276 (10th Cir. 2023) (quoting *Dias v. City & Cnty. of Denver,* 567 F.3d 1169, 1178 (10th Cir. 2009)) (second alteration in original). It accordingly "impose[s] a low bar of surviving a motion to dismiss,' and a 'well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is

improbable, and that a recovery is very remote and unlikely.'" *Brown,* 124 F.4th at 1264 (quoting *Quintana v. Santa Fe Cnty. Bd. of Comm'rs,* 973 F.3d 1022, 1034 (10th Cir. 2020)).

**III. ANALYSIS**

Plaintiffs challenge the constitutionality of SB25-003. (*See generally* ECF No. 33.) They first contend that the PTP scheme (Section Two), which imposes additional requirements on the purchase, sale, or transfer of certain SSFs, infringes upon the Second Amendment right of law-abiding citizens to "keep" and "bear" arms. (*Id*. at ¶¶ 23, 25, 40–43.) They also contend that the Act's criminalization of "rapid-fire devices" (Section Nine) violates the Second Amendment. (*Id*. at ¶¶ 44–47.) Plaintiffs bring both a "facial" and "as-applied" challenge to both Sections Two and Nine, seeking a declaratory judgment and injunctive relief. (*Id*. at ¶¶ 28, 65–66.) Defendants move to dismiss the FAC under Fed. R. Civ. P. 12(b)(1), arguing that Plaintiffs' FAC is not justiciable (ECF No. 51 at 9–15); separately, they seek to dismiss the FAC under Fed. R. Civ. P. 12(b)(6), arguing that Plaintiffs have failed to state a claim upon which relief may be granted, both as to their Section Two and Section Nine challenges. (*Id*. at 19–23.) The Court turns first to Defendants' challenge to Plaintiffs' standing, followed by Defendants' contention that Plaintiffs have failed to state a claim.

**A. Defendants' 12(b)(1) Arguments**

The Court must first consider whether it has jurisdiction. Article III of the U.S. Constitution restricts federal courts to deciding "cases" and "controversies." *See* U.S. Const. art. III, § 2, cl. 1. A "case" or "controversy" must be justiciable. *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 108 (10th Cir. 2024) ("*RMGO*"). "To satisfy Article

III's justiciability requirements, (1) a plaintiff must have standing, (2) their claims must not have become moot, and (3) their case must be ripe for review." *Id*. (citing *Ass'n of Data Processing Serv. Organizations, Inc. v. Camp*, 397 U.S. 159, 171 & n.3 (1970) (Brennan, J., concurring and dissenting). Defendants assert that Plaintiffs' FAC should be dismissed both because the Plaintiffs fail to demonstrate Article III Standing for all claims, and separately, because the challenge to Section Two of SB25-003, specifically, is not ripe. (ECF 51 at 9, 15.)

1. Standing

The Court turns first to the question of Plaintiffs' standing to challenge the provisions in SB25-003. "It is axiomatic that standing is evaluated as of the time a case is filed." *Rio Grande Found. v. Oliver*, 57 F.4th 1147, 1161 (10th Cir. 2023). "Standing ensures the plaintiff ha[s] a personal stake in the dispute, distinguishing them from a mere bystander." *RMGO*, 121 F.4th at 108 (citing *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 379 (2024) (internal quotation marks omitted). "This personal stake requirement guarantees 'that courts decide litigants' legal rights in specific cases, as Article III requires,' and 'do not opine on legal issues in response to citizens who might 'roam the country in search of governmental wrongdoing.'" *Id*. (citing *All. for Hippocratic Med.*, 602 U.S. at 379). To safeguard this requirement, the Supreme Court has articulated a three-element test for "Article III standing":

> First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) "actual or imminent, not 'conjectural' or 'hypothetical.'" Second, there must be a causal connection between the injury and the conduct complained of . . . . Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a

favorable decision."

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (citations omitted; certain alterations incorporated). Importantly, "[e]ach plaintiff must have standing to seek each form of relief in each claim." *RMGO*, 121 F.4th at 107 (citing *Bronson v. Swensen*, 500 F.3d 1099, 1106 (10th Cir. 2007)).

In challenging Plaintiffs' standing, Defendants argue that Plaintiffs have failed to allege an injury-in-fact arising from their pre-enforcement challenge of Section Two and that Sorensen, specifically, cannot establish redressability as to his challenges to Section Two. (ECF No. 51 at 9–14.) Next, Defendants argue that plaintiffs Del Toro, Sorensen, Skiver, and Flicker have failed to allege an injury-in-fact arising from their challenge to Section Nine. (*Id*. at 15.) Defendants do not appear to contest causation.

a. *Injury-in-fact*

To establish an "injury in fact," each plaintiff must show that they have suffered "an invasion of a legally protected interest," which is both "concrete and particularized," and "actual or imminent, not 'conjectural' or 'hypothetical.'" *Lujan*, 504 U.S. at 560. To establish injury in the context of a pre-enforcement challenge to a criminal statute, a plaintiff must establish two requirements: (1) "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by [the challenged] statute," and (2) that "there exists a credible threat of prosecution thereunder." *Colo. Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 545 (10th Cir. 2016) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014)).

Under the former pre-enforcement challenge requirement, a plaintiff must present "concrete plans to engage in conduct that ha[s] [the] potential to violate" the challenged

statute once it goes into effect. *RMGO*, 121 F.4th at 110 (quoting *Colo. Outfitters Ass'n*, 823 F.3d at 551). "Speculative plans or vague intentions to *potentially* violate the challenged statute are insufficient." *Id*. (emphasis in original) (citing *Lujan*, 504 U.S. at 564) ("'[S]ome day' intentions—without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require."). Under the latter requirement, "[t]he mere presence on the statute books of an unconstitutional statute, in the absence of enforcement or credible threat of enforcement, does not entitle anyone to sue, even if they allege an inhibiting effect on constitutionally protected conduct prohibited by the statute." *Id.* (quoting *Winsness v. Yocom*, 433 F.3d 727, 732 (10th Cir. 2006)). However, "[t]he threat of prosecution is generally credible where the defendant 'has not disavowed any intention of invoking' the statute against the plaintiff." *Id*. (citing *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 302 (1979)).[2]

In *RMGO*, the Tenth Circuit held that, while a Plaintiff must demonstrate a "sufficiently . . . concrete plan to engage in conduct that has the potential to violate" a challenged statute, a plaintiff need not detail every aspect of his intended conduct. 121 F.4th at 110. The law at issue was a minimum age requirement of 21 to purchase a

[2] As for the second pre-enforcement challenge requirement—a credible threat of prosecution thereunder—the Court finds that the Individual Plaintiffs who have satisfied the first element, discussed *infra*, have satisfied this requirement too. Nothing in the record indicates that Governor Polis, or any other Defendants, have disavowed enforcing the relevant provisions of Section Three (the "unlawful manufacture, distribution, transfer, sale, or purchase of a specified semiautomatic firearm is a class 2 misdemeanor; except that a second or subsequent offense is a class 6 felony," § 18-12-116(4)(b)) or Section Nine ("A person who knowingly possesses a dangerous weapon [including a rapid-fire device] commits a class 5 felony," §§ 18-12-101; 18-12-102(3)).

firearm. *Id*. at 104. There, the plaintiff (an individual under 21) established his intention to "purchase a firearm for lawful purposes, including self-defense in [his] home[]." *Id*. at 105. The court rejected the defendants' argument that the plaintiff's "bare allegation of an intent to purchase guns at some unspecified time in the future [fell] short of establishing a concrete plan to engage in allegedly protected conduct." *Id*. Rather, the plaintiff's stated present intention to purchase a firearm, coupled with the statute's prohibition on such purchases for individuals under 21, was sufficient to demonstrate a concrete plan to engage in conduct that has the potential to violate the challenged statute. *Id*. From this, it appears that a sufficient pleading for a pre-enforcement challenge falls somewhere between establishing every "granular" detail of a contemplated intention to violate the challenged statute and demonstrating more than "speculative plans or vague intentions to *potentially* violate" it. *Id*.

The Court now turns to these justiciability requirements as they pertain to Plaintiffs' challenge to Section Two and, separately, Section Nine.

(i) Section Two: PTP scheme

Defendants argue that the individual Plaintiffs' allegations "fall far short of establishing 'concrete plans' which implicate S.B. 25-03 Section 2." (ECF No. 51 at 12.) Rather, Defendants argue that, "[a]t best, each alleges a vague desire to acquire a semiautomatic firearm potentially subject to the Act's licensing regulations at some unspecified time in the future." (*Id*.) But the allegations in the FAC, at least as to Plaintiffs Del Toro, Reeves, and Flicker, are sufficient to establish injury in fact.

Del Toro alleges that "due to the difficulty that he experiences trying to hold a more traditional-style handgun with only one partially intact hand, [he] has come to rely

on the more versatile AR platform semiautomatic pistol with stabilizing brace." (ECF No. 51 at ¶ 2.) "[He] intends to purchase additional specified semiautomatic firearms after August 1, 2026; specifically, semiautomatic rifles with pistol grips, which—as previously explained—are the only firearms he can effectively use given his physical disabilities." (*Id.*) Although he "presently intends to and will need to as his currently possessed firearms age, malfunction, or will otherwise need to be replaced," Mr. Del Toro is prepared to testify that "the training and additional financial burdens of the Act will make it significantly more difficult for him to do so after the Act goes into full effect, and may even dissuade him entirely from purchasing another semiautomatic firearm after August 1, 2026 . . . ." (*Id.* at ¶ 3.)

Mr. Reeves "currently possesses multiple semi-automatic firearms and intends to acquire similar 'specified semiautomatic firearms' after the provisions of the Act are fully implemented." (*Id.* at ¶ 6.) Reeves describes himself as a "frequent firearms purchaser" who "acquires a new firearm—on average—once per quarter." (*Id.*) "With rare exception, every firearm he purchases is a semiautomatic firearm that falls under the Act's provisions." (*Id.*) He is also prepared to testify under oath that "it is a virtual certainty that he will purchase a semiautomatic firearm after August 1, 2026." (*Id.*)

Mr. Flicker alleges an intention to purchase "additional semiautomatic firearms for himself and his partner after the provisions of the Act are fully implemented on August 1, 2026." (*Id.* at ¶ 7.) But like the other individual plaintiffs, Reeves "will be prevented from doing so unless he follows a series of burdensome and costly bureaucratically imposed steps . . . ." (*Id.*)

Each of these individual plaintiffs have established the requisite concrete plan to

engage in the proscribed conduct here: Del Toro, Reeves, and Flicker explicitly allege plans to purchase SSFs after the PTP scheme goes into effect on August 1. Defendants argue that no plaintiff "describes a specific plan for when, how, or where they intend to purchase a covered weapon," or describes a time frame for their future purchase more specific than 'after August 1, 2026.'" (ECF No. 51 at 12.) But, as discussed above, Defendants' purported requirements are well-beyond what the court required in *RMGO*, and Defendants have failed to convincingly demonstrate why the circumstances here—a series of pre-purchase requirements as opposed to a minimum age requirement—command Plaintiffs to allege a more detailed or "granular" account of their plaints to engage in the violative conduct. (ECF No. 65 at 4.)

While the question of Sorensen's standing is a closer call, the Court nevertheless finds that he also has Article III standing. Unlike the plaintiff in *RMGO*, who alleged a "*present intention* and desire to lawfully purchase a firearm for lawful purposes," 121 F.4th at 107, Sorensen does not allege a present intention—nor could he. (ECF No. 33 at ¶ 4.) At the time of the FAC, Mr. Sorensen is a "19-year-old college student with limited financial resources." (*Id*. at ¶ 4.) He alleges that "[b]ecause § 18-12-112 prohibits anyone who is under twenty-one years of age from purchasing a firearm, [he] will not have an opportunity to purchase one of the specified semiautomatic firearms included in the Act until after the semiautomatic firearms provisions go into full effect on August 1, 2026." (*Id*.) But even if Sorensen tried to purchase an SSF after August 1, he would otherwise be barred by Colorado's minimum-age requirement (coincidentally, the very law at issue in *RMGO*). Knowing this, he has pleaded that "[h]e fully intends to purchase a firearm for his own self-defense *once he reaches the age of twenty-one*,

specifically, a .357 semiautomatic handgun." (*Id.*) (emphasis added).

Defendants argue that Sorensen's allegation that he "fully intends to purchase a firearm for his own self-defense once he reaches the age of twenty one, specifically, a .357 semiautomatic handgun," (ECF No. 33 at ¶ 4) is not sufficiently concrete to constitute a valid injury-in-fact for Article III standing purposes. (ECF No. 51 at 12.) Recall Lujan's command that "'some day' intentions—without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require." 504 U.S. at 654. But there is substantial daylight between a "some day intention" to engage in prohibited conduct "*without any description of concrete plans*," and an objectively ascertainable date of doing so accompanied with an explicit intention. *Id*. (emphasis added). The Court also recognizes that, unlike an intention qualified by a vague or uncertain future condition, the intervening event here—Sorensen turning 21—is certain. (ECF No. 33 at ¶ 4.) Indeed, there is no bright-line rule addressing how *soon* a future intention to engage in prohibited conduct must be in a pre-enforcement challenge. *See McConnell v. Fed. Election Comm'n*, 540 U.S. 93, 226 (2003), overruled on other grounds by *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010) (finding that a plaintiff's challenge to restrictions on campaign advertising that would not affect him for five years was an "alleged injury in fact [. . .] too remote temporally to satisfy Article III standing."); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) ("Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly impending*.") (emphasis in original). Although

Sorensen was 19 years old at the time of Plaintiffs' FAC (ECF No. 33 at ¶ 4), Plaintiffs' opposition notes that Sorensen turned twenty by the time the PTP scheme went into effect in August. (ECF No. 58 at 15.) A year (or less), paired with a definite, ascertainable date, is sufficiently imminent. Also, if Sorensen's allegations are that he "fully intends to purchase" a SSF when he turns 21, the alleged injury is "certainly impending." *See Clapper*, 568 U.S. at 409. Accordingly, Sorensen, like Del Toro, Reeves, and Flicker, has established the requisite concrete plan to engage in the proscribed conduct.

The same cannot be said for Skiver. Skiver alleges that his role as a firearms instructor "requires him to frequently acquire semi-automatic firearms," which will continue "even after the provisions of the Act become fully effective in August of 2026." (ECF No. 33 at ¶ 5.) But unlike Del Toro, Reeves, Flicker, and Sorensen—each of whom allege an unconditional intent, or at a minimum, and intent contingent on a definite, ascertainable condition—Skiver *conditions* his intent on a vague, uncertain condition. (*Id.*) Skiver alleges that "*depending on his business income over the coming year*, [he] intends to purchase additional 9mm semiautomatic handguns to have available for his clients' firearms training purposes." (*Id.*) (emphasis added). Because it is not clear what level of income would be necessary for Skiver to proceed with the steps to acquire an SSF, nor how likely he is to obtain that income, this allegation does not suffice to establish his "*concrete* plans" to purchase a covered SSF. *See RMGO*, 121 F.4th at 110 (citing *Colo. Outfitters Ass'n*, 823 F.3d at 551).

In sum, the Court concludes that while Del Toro, Reeves, Flicker, and Sorensen have established the requisite standing to challenge Section Two, Skiver has not.

(i) Section Nine: rapid-fire device prohibition

Defendants next seek to dismiss Individual Plaintiffs Del Toro, Sorensen, Skiver, and Flicker's standing for the purposes of their Section Nine rapid-fire devices challenge; Defendants expressly "do not challenge Reeves' standing for purposes of those provisions." (ECF No. 51 at 15.)

Although Skiver, Sorensen, and Flicker make no allegations concerning their desire or intent to possess a rapid-fire device in violation of § 18-12-102, now or in the future (ECF No. 33 at ¶¶ 4–5, 7), Del Toro does. Del Toro alleges that he "relies on common firearm accessories like force-reset triggers to enable him to operate a firearm." However, under the provisions of the Act, forced reset triggers, and all other "rapid-fire devices," have now been classified as "dangerous weapons," possession of which is a class 5 felony." (*Id*. at ¶ 2.) Defendants argue that his stated reliance on accessories "like" the rapid-fire device is "vague," and thus, does not satisfy Article III standing requirements. (ECF No. 51 at 15 n.10.) But accepting Plaintiffs' allegations that "[r]apid-fire devices include such items as bump stocks, forced reset triggers, super safeties, and binary triggers," (ECF No. 33 at ¶ 28(f)), this allegation is sufficiently concrete as to Del Toro. (*Id*. at ¶ 2.) In other words, he pleads that he relies on a device that is encompassed by the statutory definition of "rapid-fire devices," *such as* force-rest triggers. This passes muster.

In sum, the Court further concludes that Plaintiffs Del Toro and Reeves have established the requisite standing to challenge Section Nine; Plaintiffs Sorensen, Flicker, and Skiver have not.

b. *Redressability*

The Court next considers Defendants' argument that Sorensen's injury is not redressable as to his Section Two challenge. (ECF No. 51 at 14.) Redressability requires that it "be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *RMGO*, 121 F.4th at 111 (quoting *Lujan*, 504 U.S. at 561). "The plaintiff must show that a favorable judgment will relieve a discrete injury, although it need not relieve his or her every injury." *Id*. (quoting *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1158 (10th Cir. 2005)). "A showing that the relief requested might redress the plaintiff's injuries is generally insufficient to satisfy the redressability requirement . . . ." *Id*. (quoting *WildEarth Guardians v. Pub. Serv. Co. of Colo.*, 690 F.3d 1174, 1182 (10th Cir. 2012)).

Here, Defendants argue that Sorensen's injury is not redressable because he is "prevented from purchasing a firearm by a separate legal impediment, the Minimum Age Law . . . ." (ECF No. 51 at 14.) But this facile attack is not right, and the specific intentions in the FAC are important. Sorensen alleges in the FAC that he "fully intends to purchase a firearm for his own self-defense *once he reaches the age of twenty-one*." (ECF No. 33 at ¶ 4 (emphasis added).) Once again, *RMGO* provides some guidance. There, the Tenth Circuit held that the plaintiff's inability to purchase a firearm due to a separate *federal* law, which prohibited firearm purchases by individuals under 21, did not defeat redressability because he could still lawfully purchase a firearm through an alternative avenue if the challenged state minimum age law was enjoined. 121 F.4th at 111. Similarly, here, although Sorensen is currently prohibited from purchasing an SSF because he is under 21, he alleges that he intends to purchase one upon turning 21, at

which point the § 18-12-112 age restriction will no longer apply. (ECF No. 33 at ¶ 4.) Thus, assuming he satisfies the other applicable requirements, § 18-12-112's age restriction will no longer prevent the purchase. Sorensen's injury is redressable.

2. Organizational Standing

Defendants further contend that CSSA lacks organizational standing. Where the plaintiff is an organization, the standing requirements of Article III can be satisfied in two ways: (1) either the organization can claim that it suffered an injury in its own right; or (2) alternatively, it can assert "standing solely as the representative of its members." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) (quoting *Warth v. Seldin*, 422 U.S. 490, 511 (1975)). The latter approach requires an organization to demonstrate: (a) its members would otherwise have standing to sue in their own right; (b) the interests at stake are germane to the organization's purpose; (c) and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) (citing *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977)). An organization's standing tracks individual members' standing claim by claim. *Nat'l Ass'n for Gun Rts. v. Polis*, 173 F.4th 1317, 1330–31 (10th Cir. 2026) (finding that organizational plaintiffs had standing to make claims for which individual plaintiffs had standing; but organizational plaintiffs did not have standing to make claims for which no individual plaintiff had such standing); *Colo. Outfitters Ass'n*, 823 F.3d at 549 (same).

Accordingly, the Court finds that CSSA has standing to challenge Section Two to the degree that Del Toro, Flicker, Reeves and Sorensen do; likewise, CSSA has

standing to challenge section Nine to the degree that Del Toro and Reeves do.

3. Ripeness

Beyond challenging Plaintiffs' FAC on standing grounds, Defendants next contend that Plaintiffs' challenges to Section Two, specifically, are not yet ripe, as at the time of filing, SB25-003's PTP scheme had not yet been implemented. The Court rejects that argument, as the scheme went into effect on August 1, 2026, and is now in full effect.

In conclusion, Plaintiffs Del Toro and Reeves have established standing in their challenges to both Sections Two and Nine, and thus the Motion is denied with respect to these two individual plaintiffs. Flicker and Sorensen have established standing to challenge only Section Two, and not Section Nine, and Defendants' Motion is therefore granted with respect to Flicker and Sorensen concerning Section Nine. Defendants' Motion is further granted as it pertains to challenges by Skiver, as he has not established standing to challenge either section. CSSA has standing to the degree that Individual Plaintiffs have standing, and as to it the Motion under Rule 12(b)1) will be denied.

**B. Defendants' 12(b)(6) Arguments**

Having resolved the standing issues, the Court turns to whether those Plaintiffs' claims as to which they have standing survive Defendants' Motion to dismiss for failure to state a claim upon which relief can be granted, brought pursuant to Rule 12(b)(6). In this action, Plaintiffs bring both a facial and as-applied challenge to Section Two and Section Nine. (ECF No. 33 at ¶¶ 28, 65.) Defendants apparently seek dismissal of only Plaintiffs' facial (and not as-applied) challenges for failure to state a claim. (ECF No. 51

at 19–23.) Specifically, Defendants argue Plaintiffs have failed to state a claim because Section Two is a "presumptively lawful" licensing regime, and Plaintiffs have failed to rebut this presumption by plausibly alleging "abusive ends"; Defendants also argue that Plaintiffs have failed to state a claim because Section Nine does not implicate the Second Amendment. (*Id*. at 21.) Accordingly, the Court will evaluate only Plaintiffs' facial challenges to both Section Two and Section Nine. But before doing so, it sets forth the standard under which Second Amendment challenges are assessed.

1. Second Amendment Framework

"[T]he Second Amendment protects the right to keep and bear arms for the purpose of self-defense . . . ." *McDonald v. City of Chicago*, 561 U.S. 742, 749–50 (2010) (citing *D.C. v. Heller*, 554 U.S. 570, 635 (2008)). This right to "keep" and "bear" arms is made applicable to the states by the Fourteenth Amendment. *Id.* at 791. "Like most rights, though, the right secured by the Second Amendment is not unlimited." *United States v. Rahimi*, 602 U.S. 680, 690 (2024) (internal quotation marks omitted) (quoting *Heller*, 554 U.S. at 626). Courts evaluating Second Amendment challenges apply a two-part burden shifting framework established in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). *RMGO*, 121 F.4th at 113. First, the plaintiff bears the burden of establishing that "the Second Amendment's plain text covers" either the conduct they engaged or intended to engage in. *Id*. (citing *Bruen*, 597 U.S. at 17). If so, the burden shifts to the Government to demonstrate that its regulation is "consistent with the principles that underpin our" Nation's historical tradition of firearm regulation. *Id*. (quoting *Bruen*, 597 U.S. at 17) (emphasis removed).

Relevant here, the *Heller* and *Bruen* Courts specifically recognized a specific carve-out for "presumptively lawful regulatory measures," *Heller*, 554 U.S. at 626–27 n.26, including for certain "shall-issue" licensing regimes that confer limited to no discretion to officials tasked with issuing permits. *Bruen*, 597 U.S. 13 n.1, 38 n.9. In the Tenth Circuit, a shall-issue licensing regime must (1) be "designed to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens"; and (2) "contain only narrow, objective, and definite standards' guiding licensing officials, rather than requiring the appraisal of facts, the exercise of judgment, and the formation of an opinion." *RMGO*, 121 F.4th at 122 (quoting *Bruen*, 597 U.S. at 38 n.9) (internal quotations omitted). A plaintiff may still rebut this presumption of lawfulness by establishing that the regime was "put toward abusive ends," such as through "lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry." *Id*. (quoting *Bruen*, 597 U.S. at 38 n.9). If a plaintiff fails to rebut this presumption of constitutionality, the plaintiff's challenge to the "shall-issue" licensing regime falls "outside the scope of the Amendment's protections. . . ." *RMGO*, 121 F.4th at 127–28. If a plaintiff succeeds in overcoming this presumption, however, the burden shifts to the Government under step two of *Bruen*. *See Ortega v. Grisham*, 148 F.4th 1134, 1148–49 (10th Cir. 2025)

2. <u>Plaintiffs' Facial Challenges to SB25-003</u>

Here, Plaintiffs bring facial and as-applied challenges to two primary components of SB25-003: Section Two's PTP licensing scheme and Section Nine's criminalization of "rapid-fire devices." (ECF No. 33 at ¶¶ 28, 65.) Defendants seek to dismiss both challenges. (ECF No. 51 at 19–23.) An "as-applied challenge concedes that the statute

may be constitutional in many of its applications, but contends that it is not so under the *particular circumstances* of the case." *United States v. Harrison*, 153 F.4th 998, 1007 (10th Cir. 2025) (quoting *United States v. Carel*, 668 F.3d 1211, 1217 (10th Cir. 2011)) (emphasis in original). A "facial challenge," on the other hand is "a head-on attack [of a] legislative judgment, an assertion that the challenged statute violates the Constitution in all, or virtually all, of its applications." *Id*. (internal citations omitted). To succeed on a facial challenge, Plaintiffs would need to "establish that no set of circumstances exists under which the Act would be valid." *Id*. (internal citations omitted). Unsurprisingly, a "facial challenge" is "the most difficult to mount successfully." *City of Los Angeles v. Patel*, 576 U.S. 409, 415 (2015)

As noted above, Defendants only seek dismissal of Plaintiffs' facial challenges to Sections Two and Nine. (ECF No. 51 at 19–23.) In its recent Preliminary Injunction Order, the Court concluded that the PTP scheme is a "shall-issue" licensing regime entitled to the presumption of constitutionality—an inquiry that the Court will not repeat here. (ECF No. 99 at 21–27). Because the PTP scheme is a "shall-issue" regime, each Plaintiff must plausibly plead that the PTP scheme is brought to "abusive ends" to rebut the presumption of constitutionality. *RMGO*, 121 F.4th at 122. Section Nine, on the other hand, is not a licensing regime. Accordingly, the Court will evaluate Plaintiffs' challenge to Section Nine, instead, under *Bruen*'s two step framework.

a. *Plaintiffs' Facial Challenge to Section Two*

Here, as discussed in the earlier Preliminary Injunction Order (ECF No. 99), the Court concludes that, as a matter of law, SB25-003's PTP shall-issue regime is a "presumptively lawful" shall-issue licensing regime. *RMGO*, 121 F4th at 122.

Therefore, Plaintiffs challenge must do more than allege that the regime burdens the Second Amendment; to rebut the presumption of constitutionality afforded to shall-issue licensing regimes like SB25-003's PTP scheme, Plaintiffs must plausibly allege that the scheme is put towards "abusive ends," such that it effectively "den[ies] ordinary citizens their [Second Amendment] right[s]" through "lengthy wait times in processing license applications or exorbitant fees . . . ." *Id*. (quoting *Bruen*, 597 U.S. at 38 n.9). Additionally, because Plaintiffs bring a facial challenge, they must *also* establish that "no set of circumstances exists" under which the PTP scheme would be valid.

Plaintiffs allege that, "for those who wish to purchase a specified semiautomatic firearm, the Act requires them to delay that purchase for weeks or months in order to complete a series of complicated, burdensome, and costly permit-to-purchase requirements." (ECF No. 33 at ¶ 40.) Before a prospective purchaser can enroll in one of the required courses, Plaintiffs allege, "the individual must fill out an application, pay a fee, submit to a separate background check conducted by a third-party vendor, pay another fee, and then throw themselves at the mercy of their local Sheriff—which results in the payment of yet another fee!" (*Id*.) Indeed, the PTP scheme requires different levels of fees. But merely alleging the existence of these fees associated with a shall-issue licensing regime does not plausibly allege that the regime is being put toward abusive ends. *RMGO*, 121 F.4th at 122. Rather, a plaintiff must plausibly allege that the fees are sufficiently "exorbitant" to effectively deny ordinary citizens their Second Amendment rights. *Id*.

As for delays, Plaintiffs further allege that "[n]ot only is the Act's permit-to-purchase scheme costly, but it is also time-consuming with delays likely, if not

inevitable, at every stage." (*Id.* at ¶ 41.) They continue:

> According to Representative Caldwell, there is already such an extensive backlog in Colorado of people attempting to apply for and receive their Hunter's Safety Training card through the Colorado Division of Parks and Wildlife (the same administrative agency that has been tasked with establishing and administering the Firearms Safety Course Eligibility Card application process, the Firearms Training and Safety Course Record System, as well as the course requirements for the various mandatory firearms safety courses) that the minimum wait currently averages 120 days. . . Similar, if not lengthier, delays are inevitable as the Act's new training requirements are likely to add tens of thousands of additional Coloradans to the training lists.

(*Id.*) (citing Testimony of Rep. Caldwell CO House 2025 Legislative Day 076, 10:51:00). Even accepted as true, these allegations concerning the 120-day backlog for the Hunter's Safety Training card are not sufficient to allege *categorical* abusive ends. Recall that, under Section Three, a hunter's education course is a component of one of three discrete training options.[3] Plaintiffs do not plausibly allege that impermissibly lengthy delays exist for the other two training options, beyond speculative and unsupported claims that "[s]imilar, if not lengthier, delays are *inevitable*" for those options. (*Id.*) Even if Plaintiffs did allege concrete delays beyond mere speculation, which the Court does not concede, any such delays are incidental and reflect time necessary to satisfy Section Two's substantive qualifications, rather than a fixed waiting

[3] Under Section Three's PTP Scheme, a prospective purchaser must complete one of the three training options: (A) a hunter education course in combination with a *basic* firearms safety course, completed *within* five years before making the purchase, § 18-12-116(3)(e)(I)(A); (B) an *extended* firearms safety course, completed *within* five years before making the purchase, § 18-12-116(3)(e)(I)(B); or (C) an *extended* firearms safety course completed *more than* five years before in combination with a basic firearms safety course completed *within* five years before making the purchase, § 18-12-116(3)(e)(I)(C).

period that applies irrespective of eligibility requirements. *Cf. Ortega*, 148 F.4th at 1148 ("A blanket waiting period is simply not of a kind with the conditions and qualifications imposed by other presumptively lawful measures.").

In light of the foregoing, Plaintiffs' facial challenge under the Second Amendment fails to overcome the presumption of constitutionality afforded to the PTP shall-issue regime and fails at step one of the *Bruen* analysis. As a consequence, the Court need not proceed to step two. *RMGO*, 121 F.4th at 127–28. Accordingly, the Court will grant the Motion as to Plaintiffs' facial challenge to the PTP scheme. The Court does not address Plaintiffs' as-applied challenges to the PTP scheme, and thus Plaintiffs Del Toro, Reeves, Flicker, and Sorensen's as-applied challenges to Section Two survive at this motion to dismiss stage.

b. *Plaintiffs' Facial Challenge to Section Nine*

Plaintiffs further allege that Section Nine's classification of "rapid-fire devices" as dangerous weapons violates the Second Amendment. (ECF No. 33 at ¶¶ 44–47.) According to Plaintiffs, the term "rapid-fire devices" encompasses "bump stocks, forced reset triggers, binary triggers, and other trigger replacement mechanisms . . . ." (*Id*. at ¶ 46.) Defendants seek to dismiss Plaintiffs' facial challenge to Section Nine, contending that rapid-fire devices are "accessories, not arms," and thus, are not entitled to Second Amendment protection. (ECF No. 51 at 21–23.) Defendants are correct. The factual allegations, even accepted as true, are not sufficient to establish that "rapid-fire devices" fall within the Second Amendment's ambit under *Bruen* step one.

At *Bruen* step one, Plaintiffs must plausibly allege that the "Second Amendment's plain text covers" the regulated conduct at issue. *RMGO*, 121 F.4th at 113 (citing

*Bruen*, 597 U.S. at 17.) Only if the regulated conduct falls within the Second Amendment's ambit does the Court proceed to the second step to determine whether the regulation is "consistent with the Nation's historical tradition of firearm regulation." *Id*. (quoting *Bruen*, 597 U.S. at 17.) The *Bruen* step one inquiry entails three subsidiary questions: (1) whether the challenger is a part of the "the people" whom the Second Amendment protects—which is to say, to "all members of the political community"; (2) whether the challenged law concerns any form of "'Arms,' i.e., any weapon customarily used for offensive or defensive purposes"; and (3) "whether the law places any restrictions on either the 'keep[ing]' (i.e., possession) or the 'bear[ing]' (i.e., carrying) of arms." *Wolford v. Lopez*, 609 U.S. 185, 195 (2026) (certain alterations incorporated). If the plaintiff fails to meet this burden, the analysis ends. *RMGO*, 121 F.4th at 113 (citing *Bruen*, 597 U.S. at 17).

Defendants argue that "rapid-fire devices" are not "arms," and thus, are not entitled to Second Amendment protection (ECF No. 51 at 21–23). To be sure, "[t]he term 'arms' within the Second Amendment encompasses 'all instruments that constitute *bearable arms*,' regardless of their existence at the time of the Founding." *RMGO*, 121 F.4th at 116 (citing *Heller*, 554 U.S. at 581–82) (emphasis added). "Nonetheless, this term 'extends only to certain types of weapons.'" *Id*. (citing *Heller*, 554 U.S. at 623). "Protected 'arms' include only those weapons commonly used and possessed by law-abiding citizens for lawful purposes." *Id*. (citing *Heller*, 554 U.S. at 623). Conversely, the Second Amendment "does not extend to weapons rarely used or possessed by law-abiding citizens, such as short-barreled shotguns, or those *adapted for unlawful uses*, for instance sawed-off shotguns." *Id*. at 116–17 (emphasis added) (internal quotations

omitted). But while the *Heller* Court stated that a covered "arm" must be "in common use at the time for lawful purposes" (*see* 554 U.S. at 624 (internal quotation marks omitted)), the *Bruen* Court refined the inquiry to whether the weapons at issue are "commonly used firearms for self-defense." 597 U.S. at 38; *see id.* (stating, at the threshold inquiry, that no "party dispute[s] that handguns are weapons "in common use" today *for self-defense*.") After all, the *Heller* Court underscored that "self-defense" was "the *central component* of the right [to keep and bear arms] itself." 554 U.S. 599 (emphasis in original).

Circuit courts, including the Tenth, have adopted this reasoning and identified at *Bruen*'s first step, that the relevant threshold inquiry is "whether the item at issue is an arm that is in common use today *for self-defense*. . . ." *RMGO*, 121 F.4th at 114 (internal quotation marks omitted) (emphasis added); *see also Bianchi v. Brown*, 111 F.4th 438, 460 (4th Cir. 2024) ("Appellants contend that mere possession of a firearm by a requisite quantity of Americans is sufficient, but the Court's choice of the phrase common *use* instead of common *possession* suggests that only instances of 'active employment' of the weapon should count, and perhaps only active employment in self-defense.") (emphasis in original). Accordingly, the requirement is not merely that the weapon at issue is in common use today to be considered an "arm" under the Second Amendment; the weapon must be in common use for *self-defense*. *See RMGO*, 121 F.4th at 114; *see also Bianchi*, 111 F.4th at 461 ("*Bruen*'s admonition that the right to keep and bear arms extends only to those weapons ' "in common use" today for self-defense' reflects the fact that the Second Amendment protects only those weapons that are typically possessed by average Americans for the purpose of self-preservation and

are not ill-suited and disproportionate to achieving that end.") (quoting *Bruen*, 597 U.S. at 32).

But merely alleging that an instrument facilitates self-defense is not sufficient to elevate such a device to the protection of the Second Amendment. Plaintiffs point to language in *Bruen* that "even though the Second Amendment's definition of 'arms' is fixed according to its historical understanding, that general definition covers modern instruments that *facilitate* armed self-defense." (ECF No. 58 at 24) (quoting *Bruen*, 597 U.S. at 28) (emphasis added). From this, Plaintiffs opine "what falls under the Second Amendment's protection of *arms*? *Anything* that facilitates armed self-defense." (ECF No. 58 at 25.) (emphasis added). They continue:

> a rapid-fire device is added to optimize a firearm's performance—making it fire faster and more efficiently. And being able to fire more rounds of ammunition in a shorter period of time certainly "facilitates armed self-defense." Therefore, a rapid-fire device, just like the specified semiautomatic firearms that are regulated by Section 2 of the Act, is an "arm" which implicates the plain text of the Second Amendment.

*Id*. at 26. If only it were that simple. Indeed, the *Bruen* Court does recognize that an instrument need not have existed in 1791 to qualify as an "arm." 597 U.S. at 28. But the context is crucial. The qualification that the definition of arms "covers modern instruments that facilitate self-defense" directly follows *Bruen*'s critical instruction that arms covered by the Second Amendment must be "*bearable* arms." *Id*. As such, the language must be read to mean that the Second Amendment's historically fixed definition of arms encompasses modern technology; it does not eliminate the independent requirement that the instrument qualify as an "arm" in the first place. *Id*.

But Plaintiffs nevertheless contend that "*anything* that facilitates armed self-defense" "falls under the Second Amendment's protection of *arms*." (ECF No. 58 at 25.) (emphasis added). Not only is reading *Bruen* this way absurd—a flashlight doubtless facilitates armed self-defense, but it is clearly not an "arm"—but it would also require accepting that *Bruen* effectively replaced *Heller*'s "historically fixed" meaning of what constitutes an arm with a brand new one, without expressly announcing so. The Court rejects Plaintiffs' reading of *Bruen*.

In sum: That a weapon merely facilitates self-defense does not, standing alone, establish that it constitutes an "arm" protected by the Second Amendment; nor does mere "common use," absent a lawful purpose (like self-defense), entitle a weapon to Second Amendment protection.

The Supreme Court recently clarified in *Wolford* that, at step one of the *Bruen* framework, the relevant inquiry is whether the regulated object is any form of arm "customarily used for offensive or defensive purposes." 609 U.S. at 195 (citing *Heller*, 554 U.S. at 580). Although this appears broader than the traditional formulation of weapons in "common use" for self-defense, the context and nuance of the *Wolford* opinion suggest no meaningful departure from the Second Amendment's central concern with armed self-defense.

First, in clarifying that arms entail "any weapon customarily used for offensive or defensive purposes," *Wolford* cites to *Heller*, 554 U.S. 584. Not only did *Heller* identify self-defense as the Second Amendment's "central" concern, 554 U.S. at 628; but the actual language "offensive and defensive purposes," as used in *Heller*, contemplates as much. The language derives from *Heller's* discussion of the right to "bear arms," which,

quoting *Muscarello v. United States*, described the purpose of bearing arms as "being armed and ready for offensive or defensive action in a case of conflict with another person." 554 U.S. at 584 (quoting 524 U.S. 125, 143 (1998) (Ginsburg, J., dissenting)). Read in that context, the distinction between offensive and defensive action concerns one's readiness for armed confrontation—whether one initiates or responds to the use of force—not an expansion beyond the underlying concern of armed self-defense. *Id*. Indeed, it would be implausible to suggest that the right to armed self-defense protects only those who fire second. Thus, *Wolford*'s formulation seems perfectly consistent with the *Heller* and *Bruen* understanding of "arms" as those presently used for self-defense.

Secondly, *Wolford* gives no indication that its formulation displaces *Heller* and *Bruen*'s understanding of "arms" as those in use for self-defense; the question of "arms" was not disputed in *Wolford*. 609 U.S. at 202 ("No party disputes that petitioners . . . seek to 'bear,' i.e., to carry, 'arms.' Therefore, 'the plain text of the Second Amendment protects' what petitioners want to do: carry handguns *for self-defense*.") (emphasis added). The Court's hypothetical of a "young woman" carrying a handgun to defend herself—perhaps from a "violent ex-boyfriend," like the petitioner in *Caetano v. Massachusetts*, 577 U.S. 411, 413–14 (2016) (Alito, J., concurring in judgment)—further underscores that understanding. *Id*. at 202–03; *see also Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*, 183 F.4th 211, 285 n.8 (3d Cir. 2026) (Shwartz, J., dissenting) ("While *Wolford* defines 'Arms' as 'any weapon customarily used for offensive or defensive purposes,' the rest of the opinion makes clear that these 'purposes' do not include uses best suited to military force. Instead, because the opinion later emphasizes that 'self-defense' was 'the right *Bruen* recognized,'

(describing a 'hypothetical woman' who sought to carry a concealed handgun for self-defense against a 'violent ex-boyfriend'), the use of 'offensive' here merely acknowledges the principle that, in some situations, an individual may 'reasonably' fire the first shot 'to protect his own life.' This reading is consistent with the definition of 'offensive' as '[o]f, relating to, or designed for attack.'") (internal citations omitted).

This Court does not read *Wolford* to broaden the definition of "arms" in such a way that it would encompass "rapid-fire devices." Moreover, even if it did, which the Court does not concede, Plaintiffs have made no showing that the use of "rapid-fire devices" is *customary*.

Beyond these requirements from *Heller*, *Bruen*, and *Wolford* as to what is required to be classified as an "arm" under the Second Amendment, the Tenth Circuit has specifically addressed firearm accessories. In *United States v. Cox*, 906 F.3d 1170, 1186 (10th Cir. 2018)[4], the Tenth Circuit held that "[a] silencer is a firearm accessory; it's not a weapon in itself (nor is it 'armour of defence'). Accordingly, it can't be a "bearable arm" protected by the Second Amendment." (quoting *Heller*, 554 U.S. at 581.)

[4] Defendants also point to *Garland v. Cargill*, 602 U.S. 406, 410 (2024), in which the Supreme Court ruled that "bump stocks"—which according to Plaintiffs, are encompassed by the statutory definition of "rapid-fire devices" (ECF No. 33 at ¶ 28(f))—are "accessor[ies] for a semiautomatic rifle," and thus, do not convert it into the statutory definition of a "machinegun." Of note, although this might signal whether "bump stocks" would fall within the Second Amendment's ambit, the Supreme Court decided this case on purely statutory grounds and did not address the question of whether "bump stocks" are "arms" for the purposes of the Second Amendment. Transcript of Oral Argument at 105, Garland v. Cargill, 602 U.S. 406 (2024) (No. 22-976) ("JUSTICE KAVANAUGH: [ . . .] You haven't made a Second Amendment or constitutional avoidance argument. In your view, are bump stocks covered by the Second Amendment, protected by the Second Amendment? MR. MITCHELL: We didn't argue that because courts are generally loath to decide constitutional questions when there's an easy statutory off-ramp.").

Plaintiffs argue that *Cox*'s holding was displaced by *Bruen*, and even if it wasn't, it is distinguishable from the facts here. But those arguments fall flat.

As for the first contention, Plaintiffs argue that "*Bruen* expounded *on Heller*'s definition of 'arms,' by explaining that arms include 'modern instruments that facilitate armed self-defense.'" (ECF No. 58 at 26) (quoting *Bruen,* 597 U.S. at 28.) (emphasis removed). Therefore, say Plaintiffs, *Cox*—a pre-*Bruen* decision—no longer has the force of law. But that is not correct. As explained above, *Bruen*'s language about "facilitating self-defense" did not create a separate avenue by which an instrument or device can gain constitutional protection merely by facilitating self-defense; such an instrument must still be a bearable arm. In this Circuit, a silencer is not a bearable arm. *Cox*, 906 F.3d at 1186. Otherwise, there is no reason to suggest that *Bruen*, which replaced the prior post-*Heller* means-end scrutiny approach to evaluate Second Amendment challenges with the two-part history and tradition framework, abrogated *Cox*.

Nor do Plaintiffs convincingly show that *Cox*, which indeed was about silencers, has no bearing on rapid-fire devices, which include "bump stocks, forced reset triggers, super safeties, and binary triggers." (ECF Nos. 58 at 25; 33 at ¶¶ 6, 28(f).) To Plaintiffs, "[s]ilencers and rapid-fire devices have nothing in common . . . . Comparing silencers to rapid-fire devices on firearms is like comparing a muffler to a supercharger on a car." (*Id.*) While the latter question is one for a different day, the former leaves one wrinkle. Silencers and "rapid-fire devices" have at least one thing in common: they are both firearm accessories—Plaintiffs plead as much. (ECF No. 33 at ¶ 2) ("Due to his physical restrictions, Mr. Del Toro relies on common firearm *accessories* like force-

reset triggers to enable him to operate a firearm.") (emphasis added). Considering *Cox*, the FAC is inconsistent with Plaintiffs' own argument opposing Defendants' Motion. Therefore, Plaintiffs cannot plead that the criminalization of "rapid-fire devices" under SB25-003 violates the Second Amendment.

Even so, the Court turns to the below factual allegations in the FAC. As noted above, the FAC alleges that "[r]apid-fire devices include such items as bump stocks, forced reset triggers, super safeties, and binary triggers." (ECF No. 33 at ¶ 28(f).) Only Del Toro and Reeves make any factual allegations concerning "rapid-fire devices." (*Id*. at ¶¶ 2, 6.) Reeves alleges that he "owns several rapid-fire devices, including a forced reset trigger, 'super-safety' trigger systems, and binary triggers." (*Id*. at ¶ 6.) Del Toro alleges that he "relies on common firearm *accessories* like force-reset triggers to enable him to operate a firearm." (*Id*. at ¶ 6.) (emphasis added). Even when accepting these facts as true and drawing all reasonable inferences in Plaintiffs favor, they have not made the requisite pleading that these devices encompassed by the statutory definition of "rapid-fire devices" are customarily used for offensive or defensive purposes (i.e., self-defense). (*See generally id*.) Nor can they reconcile their own admission in the pleadings that Mr. Del Toro relies on "common firearm accessories like force-reset triggers" with their contention that these instruments are arms, and *not* accessories, in light of *Cox*. *See* 906 F.3d at 1186. For this reason, the Court holds that "rapid-fire devices," as a matter of law, fall outside the Second Amendment's protection. Thus, the Court grants Defendants' Motion to dismiss Plaintiffs' facial challenge to Section Nine.

3. <u>Plaintiff's As-Applied Challenges to SB25-003</u>

Finally, the Court addresses whether Plaintiff's as-applied challenges to Sections

Two and Nine survive Defendants' Motion. As Defendants fail to raise any arguments as to why these claims should be dismissed in the context of their Rule 12(b)(6) motion (ECF No. 51), Plaintiffs' as-applied Second Amendment challenges to Section Two's PTP scheme survive as to plaintiffs Del Toro, Reeves, Flicker, and Sorensen.

Plaintiffs' as-applied challenges to Section Nine, however, are a different matter. Although Defendants have not specifically moved against Plaintiff's as-applied challenges to Section Nine, the Court finds that such challenges no longer have any legal viability. Whether made facially or as applied to Plaintiffs Del Toro and Reeves (who have standing to challenge Section Nine), as the Court has already ruled, *any* claims that assert constitutional protection for Section Nine's "rapid-fire devices" fail as a matter of law, and therefore, are dismissed with prejudice.

## IV. CONCLUSION

For all the foregoing reasons, the Court ORDERS as follows:

1. Defendants' Motion to Dismiss (ECF No. 51) is GRANTED IN PART and DENIED IN PART as follows;

2. Plaintiffs' claims are DISMISSED pursuant to Rule 12(b)(1) for lack of standing as follows:

   a. Plaintiff Skiver's claims challenging Section Two of SB25-003 are DISMISSED WITHOUT PREJUDICE;

   b. Plaintiffs Flicker, Skiver, and Sorensen's claims challenging Section Nine of SB25-003 are DISMISSED WITHOUT PREJUDICE;

3. Plaintiff's remaining claims are DISMISSED pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted as follows:

a. Plaintiffs Del Toro, Reeves, Sorensen, Flicker, and CSSA's facial challenge claims as to Section Two are DISMISSED WITHOUT PREJUDICE;

b. Plaintiffs Del Toro, Reeves, and CSSA's facial and as-applied challenge claims as to Section Nine are DISMISSED WITH PREJUDICE;

4. The Motion is DENIED in all other respects; and

5. This matter remains set for a Final Pretrial Conference before Magistrate Judge Maritza Dominguez Braswell on April 5, 2027.

Dated this 18th day of November, 2026.

BY THE COURT:

William J. Martínez
Senior United States District Judge